**No. 25-4322**

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

MIGUEL ROLON,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
24CR0684-LL*

**ANSWERING BRIEF FOR THE UNITED STATES**

ADAM GORDON
  *United States Attorney*

DANIEL E. ZIPP
  *Assistant U.S. Attorney
  Chief, Appellate Section
  Criminal Division*

  *880 Front St., Rm. 6293
  San Diego, CA 92101
  (619) 546-8463*

**TABLE OF CONTENTS**

Page

Jurisdiction and Bail Status .................................................. 1

Questions Presented ............................................................ 1

Statutory Provisions............................................................2

Statement ...........................................................................2

A.  Rolon is arrested after he attempts to bring two people into the United States using imposter passport cards .....2

B.  Rolon proceeds to trial, and the United States gives notice of its intent to call an expert witness ....................3

C.  Rolon is convicted after jury trial and sentenced to three years in custody ......................................................6

Summary of Argument...........................................................14

Argument ...........................................................................16

A.  The district court did not plainly err in admitting expert testimony as to the meaning of the word "pollos" ..........................................................................16

    1.  Standard of Review................................................16

    2.  It was not plain error for the court to decline to make an explicit reliability finding when Rolon made no challenge to reliability ...............................16

    3.  Any error in failing to make an explicit reliability finding did not affect Rolon's substantial rights.......21

B.  The United States complied with Rule 16 when it provided Rolon with notice of its proposed expert..........28

    1.  Standard of Review ...............................................28

    2.  The United States provided sufficient notice of the proposed expert testimony...........................28

3.   Any deficiencies in the notice would not have
     affected the outcome of trial ........................................ 33

Conclusion ................................................................................ 35

Certificate of Compliance

Addendum…………………………………………………….. A1

**TABLE OF AUTHORITIES**

Cases:

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   43 F.3d 1311 (9th Cir. 1995) ............................................. 18

*Gov't of Virgin Islands v. Harris,*
   938 F.2d 401 (3d Cir. 1991) .............................................. 26

*In re Perez,*
   30 F.3d 1209 (9th Cir. 1994) ............................................. 27

*Johnson v. United States,*
   520 U.S. 461 (1997) .......................................................... 28

*Kumho Tire Co., Ltd. v. Carmichael,*
   526 U.S. 137 (1999) .......................................................... 17

*Puckett v. United States,*
   556 U.S. 129 (2009) .......................................................... 16

*United States v. Alatorre,*
   222 F.3d 1098 (9th Cir. 2000) ........................................... 16

*United States v. Alahmedalabdaloklah,*
   94 F.4th 782 (9th Cir. 2024) ................................. 19, 21, 29

*United States v. Alonso,*
   48 F.3d 1536 (9th Cir. 1995) ............................................. 28

*United States v. Basinger,*
  60 F.3d 1400 (9th Cir. 1995) ...............................................33

*United States v. Boylan,*
  No. 24-3077, 2026 WL 595711 (9th Cir. Mar. 3, 2026)......25

*United States v. Burgos-Lopez,*
  No. CR-25-01394-001-PHX-SHD, 2026 WL 74487
  (D. Ariz. Jan. 9, 2026).......................................................32

*United States v. Castro Alavez,*
  167 F.4th 1056 (9th Cir. 2026) ...........................................17

*United States v. Cuadrado,*
  No. 24-2937, 2026 WL 84566 (9th Cir. Jan. 12, 2026).......19

*United States v. De Gudino,*
  722 F.2d 1351 (7th Cir. 1983).............................................23

*United States v. Eby,* No. 24-3716, 2025 WL 3688925
  (6th Cir. Dec. 19, 2025).....................................................34

*United States v. Espino,*
  892 F.3d 1048 (9th Cir. 2018).............................................16

*United States v. Figueroa-Lopez,*
  125 F.3d 1241 (9th Cir. 1997).............................................33

*United States v. Garcia-Jaramillo,*
  258 F. App'x 978 (9th Cir. 2007) ........................................23

*United States v. Gonzalez-Aguilar,*
  718 F.3d 1185 (9th Cir. 2013).............................................26

*United States v. Gonzalez-Becerra,*
  784 F.3d 514 (9th Cir. 2015) ..............................................22

*United States v. Hankey,*
  203 F.3d 1160 (9th Cir. 2000).............................................22

iii

*United States v. Holguin,*
  51 F.4th 841 (9th Cir. 2022) .................................. 17, 18, 22

*United States v. Jawara,*
  474 F.3d 565 (9th Cir. 2007) ...................................... 19, 22

*United States v. Jimenez-Chaidez,*
  96 F.4th 1257 (9th Cir. 2024) ............................... 19, 22, 23

*United States v. Kwok,*
  No. 23 CR. 118 (AT), 2024 WL 1773143
  (S.D.N.Y. Apr. 24, 2024) ................................................ 31

*United States v. Leon,* No. 23-1025,
  2025 WL 415723 (9th Cir. Feb. 6, 2025) ........................... 16

*United States v. Liera,*
  585 F.3d 1237 (9th Cir. 2009).................................... 23, 33

*United States v. Man Nei Lui,*
  402 F. App'x 235 (9th Cir. 2010) ................................... 21

*United States v. Mendoza-Paz,*
  286 F.3d 1104 (9th Cir. 2002)...................................... 34, 35

*United States v. Menendez,*
  No. (S4) 23-CR-490 (SHS), 2025 WL 547794
  (S.D.N.Y. Feb. 19, 2025) ................................................ 31

*United States v. Mrabet,*
  703 F. Supp. 3d 442 (S.D.N.Y. 2023)............................... 31

*United States v. Ruvalcaba-Garcia,*
  923 F.3d 1183 (9th Cir. 2019)............................... 17, 18, 22

*United States v. Shih,*
  73 F.4th 1077 (9th Cir. 2023)........................................ 34

*United States v. Soto,*
  769 F. App'x 472 (9th Cir. 2019) ................................... 33

iv

*United States v. Valencia-Lopez,*
  971 F.3d 891 (9th Cir. 2020) ........................................ 17, 18

*United States v. Villanueva,*
  408 F.3d 193 (5th Cir. 2005) ............................................. 23

*United States v. Young,*
  470 U.S. 1 (1985) .............................................................. 27

*United States v. Young,*
  623 F. App'x 863 (9th Cir. 2015) ...................................... 21

Statutes:

  18 U.S.C. § 3231 ................................................................ 1

  28 U.S.C. § 1291 ................................................................ 1

Rules:

  Fed. R. App. P. 4(b)(1) ........................................................ 1

  Fed. R. Crim. P. 16 ............................................ 28, 29, 32, 33

  Fed. R. Crim. P. 16 advisory committee's note to 1993
  amendment……………………………………………………… 29

  Fed. R. Evid. 702 ......................................................... 17, 20

Other Authorities:

  Black's Law Dictionary 156 (5th ed. 1983) ........................... 26

**No. 25-4322**

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

MIGUEL ROLON,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court*
*for the Southern District of California*
*24CR0684-LL*

**JURISDICTION AND BAIL STATUS**

The district court had jurisdiction under 18 U.S.C. § 3231, as Miguel Rolon stood charged with an offense against the United States. Excerpts of Record (ER)-57-59. On July 7, 2025, the court entered final judgment. ER-21. Rolon timely noticed his appeal on July 18, 2025. Fed. R. App. P. 4(b)(1); ER-62. This Court has jurisdiction under 28 U.S.C. § 1291. Rolon is scheduled to be released from custody on November 23, 2026.

**QUESTIONS PRESENTED**

1.   Whether the court committed plain, reversible error when it allowed an expert witness to offer his opinion as to the

1

meaning of the word "pollos," without making an explicit reliability finding on the record.

2.     Whether the United States gave sufficient Rule 16 notice of the proposed expert testimony before trial.

STATUTORY PROVISIONS

Relevant provisions are provided in the addendum to this brief.

STATEMENT

A.     Rolon is arrested after he attempts to bring two people into the United States using imposter passport cards

On March 11, 2024, at 5:30 a.m., Rolon drove a Honda Civic into the United States from Mexico through the San Ysidro Port of Entry. Supplemental Excerpts of Record 1-(SER)-26-27. At the primary inspection booth, he handed over a copy of his California identification card, along with U.S. passport cards for two passengers in his car, a 25-year-old woman in the front seat, and a 20-year-old man in the back. 1-SER-29-31, 2-SER-396-98. When the officer asked if the passengers were Rolon's children, he said they were his "friends," and he was picking them up "from the dentist." 1-SER-32. Both passengers were wearing hats that obscured their faces, and the inspecting officer had suspicions that they "might not be the persons on the identification." 1-SER-33. The officer asked the back seat passenger what high school he attended, and when he

2

did not answer, Rolon turned around in his seat and tried to whisper something. *Id*. When the passenger still did not answer, Rolon himself said "Arroyo High School." 1-SER-36. At that point, the officer thought "[s]omething [was] definitely up" and referred the car for further inspection. 1-SER-37.

In the secondary inspection area, another officer compared the male passenger to the image on the passport card and saw that "it didn't look like him at all." 1-SER-56. Both passengers eventually admitted to being from Guatemala, with no permission to enter the United States. Presentence Report (PSR)-5; ER-40. In a post-arrest statement, Rolon initially claimed that he was in Mexico visiting his father, and he left around 3:00 a.m. to get some tacos. ER-40; PSR-4; Ex. 69. He said at the taco stand he was approached by two people who asked if he could drive them to the border, and when he asked if they had papers, they showed him their documents. *Id*. Later, when agents pressed him on the implausibility of that account, he changed his story and said that he agreed to do a favor for his friend named "Mel" by picking up his son and daughter from the dentist in Tijuana. *Id*. ER-40.

B.   Rolon proceeds to trial, and the United States gives notice of its intent to call an expert witness

Rolon was charged with one count of conspiracy to bring in aliens and two counts of bringing in aliens for financial gain. ER-

3

57-59. A few days after his arrest, he made a phone call from jail in which he said "the 'pollos' are talking." ER-44. About a month later, he made another call in which he complained that the "pollos are snitching on me." ER-44. Rolon's case was set for trial on April 8, 2025. ER-38; 78.

A few weeks before trial, the United States filed motions in limine seeking to admit, among other things, expert testimony from Customs and Border Protection (CBP) Officer Alexander Medina about the meaning of the word "pollos." ER-37. The United States outlined the four factors under *Daubert* the court was required to consider to "determine whether expert testimony is sufficiently reliable to assist the jury." ER-41-43. The United States explained that Officer Medina would testify that "in the context of alien smuggling," the "term 'pollos' or 'chickens,' is a slang term commonly used to refer to people who are illegally smuggled into the United States." ER-43. Officer Medina would offer this testimony "based on his training and experience from an eight-year career with CBP, during which he has been nearly exclusively assigned to the San Ysidro Port of Entry, and his knowledge as a native Spanish speaker." ER-43-44. The United States noted that the word "pollos" was a common enough slang term that testimony about its meaning did not "necessarily constitute[] expert

4

testimony," but "in an abundance of caution," it was providing notice of its intent to call Officer Medina. ER-44. The United States also served Rolon with separate written notice of the proposed testimony, along with a copy of Officer Medina's résumé. ER-60. Rolon filed a response in opposition, arguing that the United States failed to comply with the notice requirements of Rule 16, as its proffer did not contain the required disclosures and did not include "a list of other cases in which Officer Medina has testified in the last four years." ER-36.

At a pretrial hearing, the court said it had read the motions papers for both parties and was prepared to rule, but the parties were free to "attempt to persuade me otherwise" or "put anything on the record." ER-4. As to the motion to admit expert testimony, the court said it would admit the testimony, but "limit it to whatever this witness has included in their Rule 16 disclosure." ER-4. The court therefore warned the United States to "make sure that the witness testifies consistent with the Rule 16 disclosure and not out of the four corners" of the notice document. *Id*. Rolon did not object or raise any challenge to the reliability of the proposed testimony.

C.    Rolon is convicted after a jury trial and sentenced to three years in custody

On the first day of trial, the United States called the CBP officer who first encountered Rolon at the primary inspection booth. He testified about his interactions with Rolon and introduced a video from the primary inspection booth. 1-SER-29.[1] The United States then called a second CBP officer, who testified about his interview with the two passengers in secondary inspection and his determination of their identity and alienage. 1-SER-57-62.

On the second day of trial, the United States called one of the passengers from Rolon's vehicle, Yonathan Ixan-Marroquin (Ixan). 1-SER-111. He testified that he was born in Chimaltenango, Guatemala and his family made arraignments to pay approximately $13,000 for him to be smuggled into the United States. 1-SER-132. Ixan explained that he entered Mexico from Guatemala and met a man named Melquides, who provided him with a fake Mexican identification card—with his true name and photograph—so he could board a flight from Tuxtla, Mexico to Tijuana, Mexico. 1-SER-135. He then flew with Melquides to Tijuana, and when they arrived, he was dropped off at a "small

---

[1]    The United States has moved to transmit a copy of the video, along with a video of Rolon's post-arrest interview, both of which were admitted as exhibits at trial.

house with one room" where he spent about two weeks waiting to cross the border. 1-SER-136.

Ixan testified that on the day of the arrest, Melquides arrived at the house "in the early morning hours," with Rolon, who was "the one who was going to cross us." 1-SER-137. He identified Rolon in the courtroom and testified that Rolon rode with Melquides to the border that morning in the front seat, while he and the female passenger were in the back. 1-SER-142. This testimony was corroborated by a photograph of Rolon—taken at the house in Tijuana shortly before they left for the border—as well as photographs and video from inside the vehicle, showing Rolon from behind. 2-SER-388-90. Ixan testified that as they drove to the port, Rolon instructed the passengers that "he was going to have the identifications" and if anyone asked, they "were coming from the dentist." 1-SER-141.

Next, Ixan testified that as they were approaching the port of entry, Melquides got out of the car—with their luggage—and said he would meet them in Los Angeles. 1-SER-148. This was corroborated by photographs from the port of entry showing the person later identified as Melquides walking through the pedestrian line carrying luggage, and a photograph of the same man in Ixan's phone. 1-SER-167, 269. As they continued toward the

primary inspection booth, Rolon told Ixan "to be calm." 1-SER-150. At the port, Rolon told him to say "Arroyo" when the inspecting officer asked for the name of his high school. 1-SER-149. Finally, Ixan introduced several screenshots from his cellphone, including a contact for "Melquides," and discussions about the forged Mexican identification he used to fly to Tijuana. 1-SER-154-68.

After Ixan's direct testimony ended around 11:00 a.m., his attorney had to leave for a personal matter, so the court allowed his cross-examination to be postponed until after the lunch break. 1-SER-179. So as not to "waste [the jury's] time," the court allowed the United States to quickly call its expert witness before the break. 1-SER-178. The United States then called Officer Medina to testify "as an expert in the meaning of the word 'pollos' in an alien smuggling context." 1-SER-184. He told the jury that he had been a CBP officer since 2017 and had worked at various ports of entry throughout that time. 1-SER-181. He testified about his training, and he explained that he had been working in the "Criminal Enforcement Unit" for the past year. 1-SER-181. Officer Medina explained that he had participated in "over 60" alien smuggling investigations and, as a fluent Spanish speaker, "had occasion to interview" members of alien smuggling organizations, including suspects and the persons who had been smuggled. 1-SER-182, 185.

8

Based on these interviews, as well as his review of phone data and recorded jail calls, Officer Medina had "learned [some] common slang terms used by those involved in alien smuggling along the southwest border," including the term "pollo." 1-SER-182-185. The United States then moved "to qualify Officer Medina as an expert in the meaning of the word 'pollos' in an alien smuggling context." 1-SER-184. The following exchange occurred:

> THE COURT: From the Defense?
>
> [DEFENSE]: Your Honor, we'd stand on our former objections as to this matter.
>
> THE COURT: Do you wish to explain?
>
> [DEFENSE]: Not at this time, Your Honor.
>
> THE COURT: All right. Thank you. So he will be admitted -- tendered as an expert.

1-SER-184. Officer Medina testified that the word "pollos," literally translated from Spanish means "chickens," and in his experience it "means undocumented people attempting to cross the international border." 1-SER-185. The United States then played the recorded call from jail, in which Rolon complained that "[t]he pollos are snitching on me." 1-SER-188. Officer Medina confirmed that this was "the same term [he] just testified about meaning 'smuggled aliens.'" *Id.*

9

On cross-examination, defense counsel established that "pollos" is a "common slang term," not "used exclusively by … people accused of alien smuggling." 1-SER-189. In fact, Officer Medina admitted that even Border Patrol agents and CBP officers sometimes use the term. *Id.* On redirect, Officer Medina explained that agents would only use the term "when they're either doing investigations" or "seeing where other individuals are using that terminology," but they would not "reference people as [pollos themselves]." 1-SER-191. He explained that agents needed to "be aware of how the slang is used," but it would be offensive for an officer to "use that term just in their normal … speech." 1-SER-191.

After the lunch break, Ixan retook the stand for cross examination. 1-SER-214. When that was finished, the United States called a CBP officer who introduced border records showing Melquides crossing through the pedestrian lanes, and a photograph showing the same Honda Civic that Rolon was driving entering Mexico from the United States at 12:27 a.m., five hours before Rolon was stopped coming back into the country. 1-SER-260-268. The same officer then played clips from Rolon's post-arrest interview in which he initially claimed he met his passengers at a taco shop, and then said he was picking them up from the dentist as a favor to his

10

friend. 1-SER-276-77. The United States then rested its case. 2-SER-310-11. Rolon did not put on a defense. *Id.*

In closing, the United States argued that Rolon was on a "five-hour business trip to Tijuana," as he entered the United States after midnight, and was captured in a photograph at 2:30 a.m. at the stash house where Ixan was waiting to cross. 2-SER-331. He was then captured in another photograph—taken from the backseat of the vehicle—as he rode toward the border with Melquides driving at 2:45 a.m. 2-SER-331. And then at 5:26 a.m., he was captured on video at the port of entry as he handed over imposter identification documents to the CBP officer. 2-SER-331-32. As the United States argued, this was "alien smuggling caught on camera." 2-SER-331.

Next, the United States summarized Ixan's testimony, noting that he traveled to Tijuana with Melquides, met Rolon in the early morning hours, and then rode to the port of entry where Melquides got out to carry their luggage through the pedestrian lanes. 2-SER-335-36. The United States also highlighted text messages from Ixan's phone, which showed him texting directly with Melquides, making arrangements through his sister, and texting the female passenger in the car. 2-SER-338-39. Finally, the United States summarized all the evidence showing that Rolon must have known that his passengers were not here legally, including his instructions

11

that they should say they were coming from the dentist; his directions to raise their hands if they heard the names printed on the fraudulent identifications; and his efforts to answer "Arroyo high school," when Ixan failed to answer at primary. 2-SER-339-48. The United States also pointed to Rolon's shifting stories after his arrest, where he first claimed to have met his passengers at a taco stand, and then said he picked them up from the dentist, neither of which could have been possible given the photographic and video evidence. 2-SER-349. Finally, the United States played the recording from jail in which Rolon said "[t]he pollos are snitching on me," and noted that Rolon "did not say 'Mel's kids.' He did not say 'Yonathan and Zuleny.' He did not say 'strangers.' He was using that word for a reason." 2-SER-349.

In the defense closing, Rolon argued that Melquides asked him to "pick up his kids from the dentist." 2-SER-351. He argued that when he answered "Arroyo" at primary inspection he was "trying to be helpful," since it was hard for the CBP officer to hear in the back. 2-SER-355. Next, he argued that Ixan had lied in the past, and while "he seems like a good kid," he has "a lot on the line" in this case. 2-SER-356. He also noted that the United States failed to call the second passenger in the car as a witness, and there were "many other people involved" whom the government failed to follow

up on. 2-SER-358. Finally, as to the jail call in which Rolon referenced "pollos," the defense argued that he could have learned that "commonly used slang term" from other inmates while he was already in custody in San Diego. 2-SER-360. The fact that he used that term in a phone call "has no bearing on his guilt," and the fact that the government was "pointing to this phone call as the smoking gun in their case" was "ridiculous." 2-SER-360-61.

In rebuttal, the United States pointed out flaws in Rolon's various arguments and noted that his story about driving to Mexico, in the middle of the night, to pick up his friend's children at the dentist "makes no sense" and was directly inconsistent with the photos, videos, and crossing records. 2-SER-367-68. As to the jail call, the United States explained this was not a "smoking gun," as the defense claimed, but it was just "one piece of the puzzle" that the jury should consider with all the other evidence of Rolon's knowing involvement in the smuggling conspiracy. 2-SER-368. The jury retired to deliberate at 11:17 a.m., and, after lunch, returned a verdict of guilty at 1:54 p.m. 2-SER-312, 370-73.

In advance of sentencing, the probation department filed a presentence report outlining Rolon's extensive criminal history. It showed that he had six felony convictions and numerous misdemeanor convictions, extending over the course of more than

13

two decades. PSR-7-11. As a result, probation placed Rolon in the highest criminal history category. PSR-25. At sentencing, while the court initially expressed an intent to impose a sentence of six years in custody, based on concerns over Rolon's extensive criminal history, the court ultimately imposed a mandatory minimum sentence of three years. 2-SER-384-89. This appeal followed.

## SUMMARY OF ARGUMENT

This Court should affirm Rolon's conviction. The district court did not plainly err in allowing Officer Medina to testify as to the meaning of the word "pollos." District courts have broad latitude to determine the reliability of expert testimony, and Officer Medina was well qualified—based on his years of experience working at the border—to give the limited testimony he did. While the court did not make an explicit reliability finding on the record before admitting the testimony, Rolon never actually challenged the reliability of the testimony, and it was not "plain" error for the court to decline to say more in this context. Furthermore, Rolon has not shown that any deficiency in the court's reliability finding would have affected the outcome of trial, as there is no real dispute that the word "pollos" means what Officer Medina said it means. There is not a realistic possibility the court would have excluded his testimony as unreliable. Finally, even if the court had excluded

14

Officer Medina's testimony altogether, the outcome of trial would have been the same as the evidence of Rolon's guilt was otherwise overwhelming.

The United States also provided sufficient notice of Officer Medina's proposed testimony in advance of trial. In a written notice to defense counsel, it provided a complete summary of the narrow opinion Officer Medina would offer and outlined his experience working at the border where he gained the knowledge to support that opinion. Under the circumstances, this was sufficient to satisfy the requirements of Rule 16. Furthermore, to the extent there were details missing from the notice, the law is clear that even if Rule 16 notice is deficient, the test for harmless error is only whether the outcome of the case would have been different had a more fulsome disclosure been provided. Rolon has not shown, or even argued, how his defense would have been any different had he received a more detailed notice of Officer Medina's qualifications. Finally, as outlined above, even if Officer Medina's testimony had been excluded altogether, the other evidence of Rolon's guilt was overwhelming.

15

**ARGUMENT**

A.  The district court did not plainly err in admitting expert testimony as to the meaning of the word "pollos"

    1.  *Standard of review*

Rolon did not object to the court's failure to make an explicit reliability finding, so this Court reviews only for plain error. *See United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000); *United States v. Leon*, No. 23-1025, 2025 WL 415723, at \*1 (9th Cir. Feb. 6, 2025) ("Leon contends that the district court erred by admitting the expert testimony … without making a specific reliability finding," because he "did not object below, we review his claim for plain error…"). Under this standard, Rolon has the burden of demonstrating (1) error that (2) was plain, (3) affected substantial rights, and (4) seriously affected the fairness, integrity, or reputation of the proceedings. *United States v. Espino*, 892 F.3d 1048, 1051 (9th Cir. 2018). Proving all that "is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 134 (2009) (citation omitted).

    2.  *It was not plain error for the court to decline to make an explicit reliability finding when Rolon made no challenge to reliability*

District courts have discretion to allow testimony from qualified experts when it is helpful, based on "sufficient facts or data" and produced by "reliable principles and methods" reliably

16

applied to the facts of the case. Fed. R. Evid. 702. When law enforcement officers are offered as experts, "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind the testimony." *United States v. Castro Alavez*, 167 F.4th 1056, 1067 (9th Cir. 2026) (citation and alterations omitted). The "test of reliability is 'flexible,'" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

Nevertheless, while courts have broad latitude to decide how to test reliability, they "do not have discretion to abandon the gatekeeping function altogether." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019). This Court has held that a "district court "abdicates its gatekeeping role, and necessarily abuses its discretion, when it makes no reliability findings." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022)) (citing *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020)). Such reliability findings "must be made 'explicit' on the record," and "an 'implicit' finding does not suffice." *Id.*

In this case, the district court did not make an "explicit" reliability finding before allowing Officer Medina to testify about

17

the meaning of the word "pollos" in the context of alien smuggling. 1-SER-185. But Rolon never challenged the reliability of Officer Medina's testimony. In *Daubert*, the Court made clear that the need for "findings about the soundness and reliability of the methodology employed by the scientific experts" is triggered only "[w]here the opposing party ... raises a material dispute as to the admissibility of expert scientific evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 n.10 (9th Cir. 1995). In the cases cited by Rolon, Appellant's Opening Brief (AOB)-15, where this Court recognized the need for an "explicit" reliability finding, the defendants raised at least *some* challenge to the reliability of the proposed testimony. *See Holguin,* 51 F.4th at 855 ("Because appellants challenged the reliability of the government's expert testimony, and the district court did not make explicit reliability findings, the district court abused its discretion"); *United States v. Valencia-Lopez,* 971 F.3d 891, 895 (9th Cir. 2020) (court erred by failing to make an explicit reliability finding after the defendant argued "there was no methodology whatsoever" and the witness "lacked relevant experience."); *United States v. Ruvalcaba-Garcia,* 923 F.3d 1183, 1187 (9th Cir. 2019) (court erred by not making a reliability finding after defendant conducted cross-examination and "questioned [the expert] about his qualifications

18

and methodology" and then objected to his admission); *United States v. Jawara*, 474 F.3d 565, 571, 583 (9th Cir. 2007) (court erred by not making a reliability finding after defendant "requested a separate hearing to assess the reliability of [the] expert testimony" and the parties engaged in "lengthy oral arguments" about the witness's qualifications.).

Of course, a defendant need not say "the magic word 'reliability' in objecting" to the proposed testimony to require an explicit finding. *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1269 (9th Cir. 2024). But there must be some sort of challenge to "trigger the district court's obligation to analyze the reliability of [the] evidence and state its finding on the record." *Id.* For instance, in *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 840 (9th Cir. 2024), the court simply overruled the defendant's objection to an expert, after considering the witnesses' "training, knowledge, and experience, as well as his planned testimony." This Court declined to remand for further reliability findings, finding "[o]n this record, [defendant] has not shown that the district court failed to fulfill its gatekeeping role, which included determining that Graham's testimony was reliable." *Id.* Likewise, earlier this year, this Court held that the "district court did not abuse its discretion in failing to make explicit findings regarding the reliability of [the

19

expert's] opinions," when the defendant did not directly challenge the expert's reliability but instead only raised concerns that he might testify as to hearsay or "vouch for the Government's other witnesses." *United States v. Cuadrado,* No. 24-2937, 2026 WL 84566, at \*2 (9th Cir. Jan. 12, 2026).

In this case, Rolon never made any challenge to the reliability of Officer Medina's testimony. In his written opposition filed before trial, Rolon argued that the government's proffer was "insufficient under Rule 702," but he made no specific argument as to reliability. Instead, his objection focused solely on the form of the disclosure. ER-35 ("Because Mr. Rolon did not receive proper notice, he opposes the admission of this testimony."). At the pretrial hearing on the issue, after the court advised the parties they were "free to put anything on the record," Rolon again raised no objection to the reliability of Officer Medina's testimony. ER-4. And, at trial, after Officer Medina testified about his experience at the border and gave his understanding of the word "pollos," Rolon again raised no objection to the reliability of his opinion. Instead, Rolon just said he would "stand on our former objections," and when the court prompted "[d]o you wish to explain?" counsel responded "[n]ot at this time, your Honor." 1-SER-184. In this context, it is not surprising the district court did not say more about reliability.

20

Here, as in *Alahmedalabdaloklah*, the court "fulfilled its gatekeeping obligation" by admitting the testimony after Rolon failed to make any reliability challenge. 94 F.4th at 840. At the very least, on these facts, any error on the part of the district court in failing to say more about reliability would not have been "plain." *United States v. Gonzalez-Becerra*, 784 F.3d 514, 518 (9th Cir. 2015); *see United States v. Man Nei Lui*, 402 F. App'x 235, 237 (9th Cir. 2010) (when the defendant "did not object at trial to the district court's qualification of Robinson as an expert," it "was not plain error for the court to fail to make an explicit reliability determination."); *United States v. Young*, 623 F. App'x 863, 865 (9th Cir. 2015) ("The district court did not make explicit relevance and reliability findings, but if the failure to do so was error, it was not plain…").

3. *Any error in failing to make an explicit reliability finding did not affect Rolon's substantial rights*

In any event, even if the district court did err by not making a sufficiently explicit reliability findings, and even if that error was "plain," Rolon would still need to show that it affected his substantial rights to warrant remand on plain error review. He has not made that showing. First, this Court has held that the failure to make a reliability finding is harmless when the record on appeal "is sufficient for us to determine that [the] testimony had a reliable

21

basis in the knowledge and experience of the relevant discipline." *United States v. Ruvalcaba- Garcia*, 923 F.3d 1183, 1191 (9th Cir. 2019) (citation omitted). For law enforcement witnesses, experts may reliably testify based on "years of experience and special knowledge" rather than a systematic methodology. *Holguin*, 51 F.4th at 855 (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000). Here, Officer Medina had years of experience working at the border. He spoke fluent Spanish, and he had conducted interviews and reviewed evidence relating to dozens of criminal alien smuggling investigations. 1-SER-181-85. This was more than enough experience for him to testify about the meaning of a commonly used term he learned on the job. His testimony was clearly reliable "based on the record established by the district court," even if the district court did not say as much explicitly. *Jimenez-Chaidez*, 96 F.4th 1257, 1269; *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007) (finding "lack of an explicit finding of reliability was harmless," based on the "extensive academic qualifications and experience" of the witness.").

Furthermore, the scope of what Officer Medina was testifying about was extremely limited. His entire testimony was limited to the interpretation of a single word commonly used in the context of alien smuggling. There is no real question that his interpretation

was correct and reliable. Indeed, this Court and others have repeatedly recognized the same meaning of the word "pollo," in this context, for decades. See, e.g., *United States v. Liera*, 585 F.3d 1237, 1240 (9th Cir. 2009) ("In Spanish slang, 'Pollos' (or 'chickens') refers to people who are illegally smuggled into the United States."); *United States v. Garcia-Jaramillo*, 258 F. App'x 978, 980 (9th Cir. 2007) (stating the defendant "referred to his passengers as 'pollos,' a slang term for illegal aliens"); *United States v. Villanueva*, 408 F.3d 193, 197 (5th Cir. 2005) ("'Pollo' is a Spanish word for a chicken and is commonly used by alien smugglers to describe their human cargo"); *United States v. De Gudino*, 722 F.2d 1351, 1354 (7th Cir. 1983) ("The word 'pollo' is the Spanish word for 'chicken,' and it commonly is used to refer to aliens smuggled into the United States."). There is no reason to think the district court would have found Officer Medina's identical interpretation of the term to be so unreliable that it should be excluded.

Furthermore, even if the court had found the "pollos" testimony to be unreliable and struck it altogether, the jury would have still "reached the same verdict." *Jimenez-Chaidez*, 96 F.4th at 1269. The weight of the evidence—with or without the expert testimony—was overwhelming. When Rolon arrived at the port of entry, he told the inspecting officer that his passengers were

23

"friends" whom he was picking up from the dentist. 1-SER-33. He later changed that story and said he picked them up at a "taco stand" that morning, before changing back and saying that his friend "Mel" asked him to pick up his children from the dentist. 1-SER-33, ER-40, PSR-4. But even accepting that last story provided the basis for Rolon's defense, it was completely inconsistent with the rest of the evidence at trial. Rolon's car crossed into Mexico at 12:27 a.m., he met his passengers at a house in Tijuana at 2:30 a.m., and he rode to the border in the front seat before Melquides got out and crossed on foot. 2-SER-331-32. None of that is consistent with Rolon's story of picking up the passengers at the dentist—in the middle of the night—as a favor for his friend. Even if there *was* a dentist open at that hour, why couldn't Melquides have just picked up his children himself? As the United States argued in rebuttal, Rolon's defense "makes no sense." 2-SER-367.

Moreover, one of the passengers, Ixan, who defense counsel conceded "seems like a good kid," 2-SER-356, testified credibly that he was paying $13,000 to be smuggled into the United States; that Rolon met him at a stash house in the early morning hours; that Rolon told the passengers to raise their hands if the name listed on their U.S. passport cards were called; that he told them to falsely say "we were coming from the dentist" if questioned; and that he

24

instructed them "to be calm" as he drove to the port. 1-SER-150. The jury could credit this testimony, which was also corroborated by photographs and video, and showed clearly that Rolon was a knowing participant in the smuggling event. The additional expert testimony defining the word "pollos" would not have made a difference in the outcome of trial. *See United States v. Boylan*, No. 24-3077, 2026 WL 595711, at *1 (9th Cir. Mar. 3, 2026) (expert "testimony likely did not materially impact the jury's verdict, given that [the] testimony was mostly contextual and common sense and that the evidence against [the defendant] was overwhelming.") (alterations omitted).[2]

Rolon argues that the expert testimony of Officer Medina affected his substantial rights because it "went to the heart of the case," was "the equivalent of a confession," and was relied on by the prosecutor "heavily" in closing argument. AOB-31-32. True, the issue of Rolon's knowledge was "the only contested issue at trial," AOB-11, but it was not much of a contest. Even if the "pollos" call

---

[2] Moreover, even if the court had excluded the expert witness, the United States could have still played the recorded jail call itself for the jury to consider. Even if the jury did not know what the word "pollos" meant, in that context, the fact that Rolon was complaining from jail—one month after his arrest—that *someone* was "snitching" on him, still undercuts any claim that he was just an unknowing driver who was doing a favor for his friend.

went to a key disputed element, the other evidence proving that same element was overwhelming and essentially uncontested. Moreover, one recorded jail call saying that the "pollos are snitching on me" was far from a "confession," defined as a "statement admitting or acknowledging all facts necessary for conviction of the crime." *Gov't of Virgin Islands v. Harris*, 938 F.2d 401, 409 (3d Cir. 1991) (citing Black's Law Dictionary 156 (5th ed. 1983). Although the evidence was certainly damaging to Rolon's defense, he was still able to argue in closing that he learned the meaning of the word "pollos" after he was in custody charged with alien smuggling and his use of the term had "no bearing on his guilt." 2-SER-360. Finally, while the United States played the recorded jail in closing argument, it was not the most damning piece of evidence. As the United States noted in rebuttal argument, the recorded jail call was not a "smoking gun," as the defense claimed, but it was just "one piece of the puzzle," which the jury should consider with all the other evidence. 2-SER-368. As outlined above, that other evidence definitively proved Rolon's knowledge, with or without any testimony about the meaning of the word "pollos."

Finally, for similar reasons, any error in failing to make an explicit reliability finding is not the type that "seriously affect[s] the fairness, integrity, or public reputation of [the] judicial

26

proceedings." *United States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1187 (9th Cir. 2013). If Rolon had concerns about the reliability of Officer Medina's translation of the word "pollos," he could have raised those concerns in response to the motions in limine, or at trial when the record could have easily been supplemented. *See In re Perez*, 30 F.3d 1209, 1213 (9th Cir. 1994) ("The principal reason [this Court] require[s] parties to raise an issue in the trial court is to give that court an opportunity to resolve the matter and, hopefully, avoid error."). Indeed, the court twice prompted Rolon to make whatever objections or statements he wanted, and he declined to challenge the reliability of the testimony. Instead, he embraced the definition of "pollos" in cross-examination, sought to have Officer Medina admit that even Border Patrol agents used the word, and then argued in closing that it was a term Rolon could have learned in custody. 1-SER-189-90. Having made those strategic choices below, he cannot show that the court's failure to make an explicit reliability finding rose to the level of a "miscarriage of justice" warranting the "extravagant protection" of discretionary correction on plain error. *United States v. Young*, 470 U.S. 1, 16 (1985) (citations omitted). Indeed, reversing a jury's verdict over the failure to make an on-the-record reliability finding—for testimony that no one challenged as unreliable—would

27

itself undercut the "integrity, or public reputation of the judicial proceedings." *See Johnson v. United States*, 520 U.S. 461, 470 (1997) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.").

B.   The United States complied with Rule 16 when it provided Rolon with notice of its proposed expert

1.   *Standard of Review*

"This Court reviews the decision to admit expert testimony for an abuse of discretion." *United States v. Alonso*, 48 F.3d 1536, 1539 (9th Cir. 1995).

2.   *The United States provided sufficient notice of the proposed expert testimony*

When the United States calls an expert witness, Rule 16(a)(1)(G) requires it to provide the defendant with (1) "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief," (2) "the bases and reasons for them," (3) the "witness's qualifications, including a list of all publications authored in the previous 10 years," and (4) "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Fed. R. Crim. P. 16(a)(1)(G)(iii). The original purpose of the rule was "to permit more complete pretrial preparation by the requesting party" and to "provide a fair

28

opportunity to test the merit of the expert's testimony through focused cross-examination." *Alahmedalabdaloklah*, 94 F.4th at 837 (citing Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment). The provision was "not intended to create unreasonable procedural hurdles." *Id.*

In this case, the United States provided sufficient notice to comply with Rule 16. As noted above, the expert testimony of Officer Medina was limited to one narrow opinion about the meaning of a single word. The United States provided a "complete statement" of that opinion before trial. ER-60. The notice explained that he would testify "the term 'pollo' is a term commonly used by alien smugglers to refer to smuggled aliens." ER-60. This notice was sufficient to provide Rolon a fair opportunity to test the opinion.

Rolon argues that the notice was insufficient because it did not specify the "bases and reasons" for the opinion. But the notice explained that Officer Medina's opinion was based on his "training and experience," and his résumé outlined his years of experience including working in "Frontline Passenger Operations" at the port of entry, serving in the "Admissibility Enforcement Unit," where he conducted inspections and interviews at the port, and working in the "Criminal Enforcement Unit" where he provided "prosecution support" across seven ports of entry. ER-60. As the United States

29

explained in written its motion to admit the testimony, Medina would testify based on "his training and experience from an eight-year career within CBP, during which he has been nearly exclusively assigned to the San Ysidro Port of Entry, and his knowledge as a native Spanish speaker." ER-44. None of this left any mystery about where Rolon learned the meaning of the word "pollos" or the "bases" for his opinion.

Rolon argues that merely citing "training and experience" is not enough to satisfy the "bases and reasons" requirement of Rule 16. While that may be true in some cases, where the proposed expert is offering a broader range of opinions or testimony, here the nature of the expert testimony was extremely limited and it was directly tied to Officer Medina's own personal experience working at the port of entry. Indeed, the United States questioned whether expert testimony was even required and only designated Medina as an expert out of an "abundance of caution." ER-44. On these facts, a simple description of his training and experience was sufficient. He worked at the port of entry as a CBP officer for more than seven years, and during that time he learned the meaning of a common slang term. It is not clear what more there would be to say.

Rolon cites a series of district court cases where courts have found the "bare-bones" notice provided by the government to be

30

insufficient. But in those cases, the scope of the expert opinions being offered were much broader, and there was not the same direct relationship between the expert's experience and the opinion being offered. For instance, in *United States v. Mrabet*, 703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023), the government provided a "broad statement" that the expert would testify regarding "seven broadly and briefly described categories" about how drug traffickers operate. *Id.* Even assuming these "broad and generalized 'explanations' can somehow be understood as expert opinions," simply stating that his testimony would be based on the witnesses' "training, education, and experience" was insufficient. The other cases cited by Rolon involved similarly broad opinions, without a direct correlation between training and experience and the stated opinion. *See United States v. Menendez*, No. (S4) 23-CR-490 (SHS), 2025 WL 547794, at *5 (S.D.N.Y. Feb. 19, 2025) (proposed defense expert was not qualified to given an "opinion on how Middle Eastern cultures 'treat and regard gifts of things of value between friends and business associates'"); *United States v. Kwok*, No. 23 CR. 118 (AT), 2024 WL 1773143, at *2 (S.D.N.Y. Apr. 24, 2024) (proposed defense expert notice deficient when it identified "the general topics about which the expert will testify," and failed to provide sufficient bases and reasons for any opinions) (citation

31

omitted); *United States v. Burgos-Lopez,* No. CR-25-01394-001-PHX-SHD, 2026 WL 74487, at \*3 (D. Ariz. Jan. 9, 2026) (notice for fingerprint expert initially failed to identify any "conclusions or opinions" and supplemental notice failed to provide the "expert's explanation of the 'points of comparison' she used to analyze the specific fingerprints at issue."). Here, in contrast, the United States provided a full description of the narrow opinion Officer Medina would offer and then supported that with a summary of his training and experience at the border that allowed to him hold that opinion. This was sufficient to comply with Rule 16.

Rolon also argues that the notice was deficient because it failed to provide a list of the cases that Officer Medina had testified as an expert in the past four years. AOB-28. But, as he acknowledges, this is likely because Medina had in fact never testified as an expert before. In any event, even if the notice could have spelled that point out more explicitly, it was still sufficient to provide notice of what Officer Medina would testify to and allow Rolon to prepare for cross-examination. As discussed above, neither the reliability of Officer Medina's testimony, nor the meaning of the term "pollos" was in any dispute.

32

3. *Any deficiencies in the notice would not have affected the outcome of trial*

Finally, even if the United States could have provided more detail in its Rule 16 notice, this Court has repeatedly held that "a violation of Rule 16 does not itself require reversal, or even exclusion of the affected testimony." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997) (citing *United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir. 1995). The prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules, not had the evidence suppressed." *Id.*; *United States v. Soto*, 769 F. App'x 472, 473 (9th Cir. 2019) ("Even assuming an abuse of discretion, the verdict would not have been different had the government more precisely followed Rule 16(a)(1)(G)").

Here, the outcome of the case would not have been different if the United States provided a more detailed Rule 16 disclosure. Rolon does not argue that he was surprised by the testimony of Officer Medina about the meaning of the term. Nor could he. As outlined above, that has been a common understanding of the word for decades. *See Liera*, 585 F.3d at 1240. Rolon has not explained how his defense would have been any different if the United States had provided more information about when officer Medina first

33

"heard the word" pollos, or "how many times he heard it." AOB-26; *United States v. Eby*, No. 24-3716, 2025 WL 3688925, at \*4 (6th Cir. Dec. 19, 2025) ("Eby does not explain how he was surprised at trial or how the outcome of his case would have been different" based on the allegedly deficient Rule 16 notice); *United States v. Shih,* 73 F.4th 1077, 1098 (9th Cir. 2023) (Shih "does not explain how he would have cross-examined the [expert] differently….").

Indeed, Rolon himself embraced the term "pollos" at trial, and on cross-examination, tried to have Officer Medina admit that even Border Patrol agents used the term when referring to undocumented aliens. 1-SER-190. He then argued, in closing, that the word was a "commonly used" term; that Rolon could have overheard it in custody after he was accused of alien smuggling; and the government's reliance on the jail call as a "smoking gun" was "ridiculous." 2-SER-360-61. Rolon offers no explanation for how this defense would have been any different had he received a more detailed Rule 16 notice in advance of trial. *See United States v. Mendoza-Paz*, 286 F.3d 1104, 1111 (9th Cir. 2002) ("Although [the defendant] asserts that she was prejudiced by defense counsel's inability to adequately cross-examine the expert, she does not explain how she was prejudiced. Nor does she argue that the

34

expert's testimony was in any way erroneous or based on unreliable sources.").

Finally, while the law is clear that the test for harmlessness is whether "the verdict would have been different had the government complied with the discovery rules, not had the evidence been suppressed,'" *Mendoza-Paz*, 286 F.3d at 1111, even if the testimony *had* been suppressed, the outcome of trial would have been the same. For all the reasons outlined above, the evidence of Rolon's knowledge—including his own shifting stories, his behavior at the port of entry, the credible testimony of his passenger Ixan, and the numerous corroborating photographs and videos all showed that he clearly knew he was bringing undocumented individuals into the United States. The outcome of the case would have been the same with or without any additional expert testimony on the meaning of the word "pollos."

## CONCLUSION

Rolon's conviction and sentence should be affirmed.

Respectfully submitted,

> ADAM GORDON
>   *United States Attorney*
>
> S/DANIEL E. ZIPP
>   *Assistant U.S. Attorney*
>   *Chief, Appellate Section*
>   *Criminal Division*
>
> MAY 4, 2026.

35

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-4322

I am the attorney or self-represented party.

**This brief contains** 7,649 **words,** including [blank] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [blank].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Daniel E. Zipp **Date** May 4, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## Addendum

Federal Rules of Evidence Rule 702

Rule 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

A1