**No. 25-4322**

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

MIGUEL ROLON,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
24CR0684-LL*

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 2**

ADAM GORDON
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-8463*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LINDA LOPEZ

UNITED STATES DISTRICT JUDGE

_____
                               )
UNITED STATES OF AMERICA,       )
                               ) Case No. 24-CR-00684-LL
                Plaintiff, )
                               ) Tuesday, April 8, 2025
        v.                     )
                               )
MIGUEL ROLON,                   )
                               )
                Defendant. )
_____) San Diego, California


REPORTER'S TRANSCRIPT OF JURY TRIAL DAY 1

PAGES 5 THROUGH 206

APPEARANCES:

For Plaintiff:  UNITED STATES ATTORNEY'S OFFICE
                880 Front Street, Suite 6293
                San Diego, California  92101-8807
                BY:  HENRY F. B. BESHAR, AUSA
                and  DAVID EUGENE FAWCETT, AUSA.

For Defendant:  FEDERAL DEFENDERS OF SAN DIEGO
                225 Broadway, Suite 900
                San Diego, California  92101-5030
                BY:  JULIAN ANDREE BUGARIN, ESQ.
                and  TIMOTHY ROBERT GARRISON, ESQ.


   (Appearances of Counsel continued on following page.)

Reported By:  Jessica Borynack, RPR, CSR No. 14779
District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California  92101-3806
(Reported stenographically; transcribed via computer)

SER-002

(Appearances of Counsel continued.)


For Material Witnesses:      LAW OFFICE OF RUTH PHILIPS
                             P.O. Box 16353
                             San Diego, CA 92176
                             BY: RUTH B. PHILIPS, ESQ.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 4 of 298
Case 3:24-cr-00684-LL   Document 157   Filed 08/25/25   PageID.776   Page 3 of 207

3

**I  N  D  E  X**

| Witnesses | | Page |
|---|---|---|
| **JESSIE GONZALEZ PRESAS (SWORN)** | | |
| Direct | By Mr. Beshar | 114 |
| Cross | By Mr. Bugarin | 139 |
| Redirect | By Mr. Beshar | 146 |
| Recross | By Mr. Bugarin | 147 |
| | | |
| **LUIS MIGUEL PEREZ (SWORN)** | | |
| Direct | By Mr. Beshar | 149 |
| Cross | By Mr. Garrison | 162 |
| | | |
| **ANDREA  BOSCOR (SWORN)** | | |
| Direct | By Mr. Beshar | 173 |
| **RUTH SMITH (SWORN)** | | |
| Direct | By Mr. Beshar | 179 |
| **CARLOS CASANOLA (SWORN)** | | |
| Direct | By Mr. Beshar | 186 |
| Cross | By Mr. Garrison | 198 |
| | | |
| Jury Voir Dire | | 13 |
| Jury Instructions | | 93 |
| Government Opening Statement | | 105 |
| Defense Opening Statement | | 109 |
| Sidebar | | 195 |

**SER-004**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 5 of 298
Case 3:24-cr-00684-LL   Document 157   Filed 08/25/25   PageID.777   Page 4 of 207

4

E X H I B I T S

| Government Recieved | Page |
|---|---|
| 35 | 118 |
| 36 | 118 |
| 37 | 125 |
| 38 | 127 |
| 39 | 128 |
| 40 | 128 |
| 41 | 128 |
| 42 | 157 |
| 43 | 160 |

| Government  Identified | Page |
|---|---|
| 54 through 64 | 178 |
| 65 through 66 | 185 |
| 70 | 194 |

SER-005

4:30 today?

THE COURT:  We will go until 4:30 today.

MR. GARRISON:  Okay.

THE COURT:  Thank you.

THE CLERK:  The Court is in recess.

(A recess was taken from 12:43 p.m. to 2:00 p.m.)

(Jury enters the courtroom at 2:00 p.m.)

THE COURT:  All right.  Welcome back, everyone.

Counsel, you may be seated.

Welcome back, everyone.  Thank you for being prompt.  By a show of hands, did anyone communicate with anyone else about this case?  Did anyone do any research or hear or learn anything about this case?  All right.  Seeing no hands.

The Government may proceed with their opening statement.

MR. BESHAR:  Thank you, Your Honor.

THE COURT:  Of course.

**GOVERNMENT OPENING STATEMENT**

MR. BESHAR:  Testing?  Perfect.

"If you hear the name 'Joel' or 'Elizabeth,' raise your hand," that's what the Defendant Miguel Rolon said to two undocumented persons before he tried to smuggle them into the United States.  But their names weren't "Joel" or "Elizabeth," and the U.S. passports bearing those names -- the same passports that the Defendant tried to use to smuggle them into

**SER-006**

the U.S. -- they didn't belong to them either.  Their true names were "Yonathan Marroquin" and "Zulemy Mucia," both Guatemalan citizens without authorization to be in the United States.

Ultimately, the Defendant's scheme to smuggle two aliens into the U.S. failed and he is now charged with first: conspiring with others to bring undocumented aliens to the United States; and second, bringing those aliens to the U.S. for financial gain.

During this trial, you will hear testimony from Yonathan and Zulemy.  Yonathan will tell you how he agreed to pay over $19,000 to be smuggled from his home in Guatemala to California.  And how at three o'clock in the morning, the Defendant and his co-conspirator -- a man authorities have identified as "Melquides" -- picked him and Zulemy up from a house in Tijuana, Mexico.  The group -- you will learn -- studied the U.S. passports at the house; and Yonathan became "Joel," and Zulemy became "Elizabeth."

From there, the four traveled to the international border.  During the drive, Yonathan will tell you that the Defendant instructed him to tell officers that he had just picked them up from the dentist in Mexico, and that he is a student at the "Arroyo," which is a high school in the Defendant's home town of San Bernardino, California.

Yonathan will also tell you that while the trio waited

**SER-007**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 8 of 298
Case 3:24-cr-00684-LL   Document 157   Filed 08/25/25   PageID.880   Page 107 of 207

OPENING STATEMENT | GOVERNMENT

107

to be inspected by customs officials, the Defendant said, "If you hear the name 'Joel' or 'Elizabeth,' raise your hand."

Additionally, Zulemy will tell you that she agreed to pay nearly $20,000 to be smuggled from Guatemala to Philadelphia. Like Yonathan, Zulemy will tell you that the Defendant instructed her to lie to officers by saying that she too was a student at the Arroyo.

At approximately 5:30 in the morning, the Defendant and his passengers enter the United States at the San Ysidro Port of Entry. You'll hear from the Customs and Border Protection officer who greeted the Defendant, Yonathan, and Zulemy. And you'll watch their interaction beginning with the Defendant handing his California driver's license to the officer, as well as two United States passport cards for Joel and Elizabeth.

The officer will tell you that he noticed brief eye contact from Yonathan and Zulemy. Both were wearing hats with their faces partially obscured. The Defendant described his passengers as his friends, and that he had picked them up from the dentist in Mexico.

When asked what high school he went to, Yonathan did not answer. Instead, you'll watch the Defendant whisper answers to Yonathan before eventually saying himself, "Arroyo." Hearing enough, the officer sent all three to Secondary Inspection where the scheme fell apart. Yonathan and Zulemy

**SER-008**

were, in fact, not Joel and Elizabeth.  But more importantly, they were not U.S. citizens, but Guatemalans without permission to be in the United States.

Following his arrest, you'll watch the Defendant tell not one, but two stories of what happened.  First, the Defendant told agents that Yonathan and Zulemy -- then supposedly complete strangers -- came up to him at a Tijuana taco stand at 3:00 a.m. and asked for a ride.  Minutes later though, the Defendant changed his story.  Instead of the taco stand version, the Defendant shared that, in fact, his coworker, Mel, had asked the Defendant if he would pick up his two children from the dentist in Tijuana at 5:00 a.m.

Members of the jury, your job is straightforward, but important.  Apply the law, follow the evidence.  At the end of this trial, considering Yonathan and Zulemy's insider testimony, the Defendant's explicit coaching of both aliens, and the Defendant's changing stories, we will ask that you find the Defendant Miguel Rolon "guilty."  Thank you.

THE COURT:  Thank you, Counsel.

THE CLERK:  Your Honor, I believe one of the jurors has a question.

ALTERNATE JUROR:  I'm sorry, Your Honor.  I forgot my iPad in the bathroom.  Can I grab it?

THE COURT:  One moment.  I'm going to have you --

Rhea, if you can go speak with her?

SER-009

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 10 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.882    Page 109 of 207

OPENING STATEMENT    |    DEFENSE

109

THE CLERK:  She left her iPad in the bathroom.

THE COURT:  Oh you can go get it.  We'll wait for you.  Don't rush.  I'm glad you realized it now.

**(Alternate Juror exits courtroom from 2:08 p.m. to 2:09 p.m.)**

**(Proceedings heard in the presence of the jury.)**

THE COURT:  You may proceed, Counsel.  Thank you.

**DEFENSE OPENING STATEMENT**

MR. BUGARIN:  Thank you, Your Honor.

"Left holding the bag."  That's what happened to Mr. Miguel Rolon on the early morning of March 11th, 2024.  He was left holding the bag.  All while the smuggler in this case strolled past pedestrian with the undocumented peoples' bags in hand, and walked freely into the United States unimpeded.  The smuggler, Mr. Melquides Palafox Posadas -- we'll call him "Mr. Posadas" for short -- he walked into the United States and left Mr. Rolon holding the bag.

Now, the Government told you about the events that occurred that early morning.  And it's true, Mr. Rolon was in a car with two undocumented individuals.  But that's not the whole story.  Mr. Rolon was under the belief that he was simply along for a ride with Mr. Posadas to pick up Mr. Posadas's kids from the dentist.

He had no idea that he was just a piece of the puzzle for Mr. Posadas to accomplish his goal.  Mr. Rolon was kept in the dark, used, and discarded -- all to save Mr. Posadas from

exposure.

And during this trial, you'll hear about the conspiracy at play. This wasn't Mr. Posadas's first time. In fact, he was detained for doing this exact thing in 2006, and this is more than just Mr. Posadas masterminding a plot. This is very much a family enterprise.

Mr. Posadas and his wife went down to Guatemala and traveled with two undocumented people to the southern U.S. border. Mr. Posadas falsified IDs for them, arranged travel within Mexico, stashed them in Tijuana for two weeks, gave them his own family's passports -- his own children's passports -- and this was all well before bringing in an outsider, someone from outside his family to take the heat if things went wrong. That outsider; that's Mr. Rolon.

What the Government won't show you is any agreement between Mr. Rolon and the smuggler, Mr. Posadas. They won't show you any agreed upon amount to bring people across the border. That's because there is none. Mr. Rolon was kept in the dark, used, and discarded. And I want to hone in quickly on the name "Posadas." I want you to remember that name. It's going to come up a lot.

Now, for the undocumented people in this case -- the ones that were in the car -- you're going to hear us from time to time refer to them as the "material witnesses." So the undocumented people from Primary Inspection to Secondary to

their post-arrest interview, it's clear that they were untruthful.

They lied about who they were and where they were from on multiple occasions.  And look, they were in a desperate situation.  They had traveled a long way, and they were willing to lie over and over again to save themselves.

During this trial, you will see how Mr. Posadas, the smuggler, drove the car that morning to the border line, walked out with the undocumented peoples' bags -- his supposed children's bags -- and went on to the pedestrian lane leaving Mr. Rolon in the car holding the bag; leaving Mr. Rolon as the fall guy.

The Government is going to point to Mr. Rolon's presence in the car that early morning as proof of his guilt. They're going to show you a phone call and point to that as definitive proof that Mr. Rolon is the smuggler.  But the truth is there is no agreement here.  There is no evidence that Mr. Rolon knew about an agreement between the smuggler, Mr. Posadas, and the undocumented people in the car that morning.

Mr. Rolon -- as the Government mentioned -- he's being charged with conspiracy, and the Court has already begun to instruct you on the law.  But to put it simply, a conspiracy is an agreement to do something illegal, knowledge of that agreement, and an overt act to accomplish it.  By the end of

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 13 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.885    Page 112 of 112

OPENING STATEMENT  |  DEFENSE
207

this trial, you will see -- and it'll be clear -- that there is no agreement here.

Mr. Rolon is also being charged with bringing in people for financial gain.  Mr. Rolon had nothing to gain from this.  He was kept in the dark, he was used, and discarded.  By the end of this trial, it'll be evident that Mr. Posadas's fingerprints are all over this.

The Government needs to prove their case beyond a reasonable doubt.  That's the highest level of burden that our justice system affords.  That means if there's any reasonable doubt, then you cannot find someone guilty.

After hearing all the evidence in this case -- and not just the evidence the Government wants you to hear -- you're going to go back into that deliberation room, and you're going to see that the Government has not met its burden.  After seeing and hearing all the evidence in this case, you will see why Mr. Rolon is "not guilty."

**THE COURT:**  Thank you, Counsel.

The Government can call their first witness.

**MR. BESHAR:**  Thank you, Your Honor.  The United States calls Customs and Border Protection Officer Jessie Gonzalez Presas.

**THE COURT:**  Thank you.

**THE CLERK:**  You can come up here.

(Witness duly sworn.)

**SER-013**

THE CLERK:  Please take the stand.  Please state your first and last name for the record.

THE WITNESS:  Jessie Gonzalez Presas.

MR. BESHAR:  Thank you, Your Honor

SER-014

<u>**JESSIE GONZALEZ PRESAS**</u>,

**Called as a witness for the Government, having been duly sworn, testified as follows:**

**DIRECT EXAMINATION**

Q   Good afternoon, Officer Gonzalez.  Where are you employed?

A   **I'm employed at the San Ysidro Port of Entry.**

Q   And for what agency?

A   **For Customs and Border Protection.**

Q   What is your title at CBP?

A   **Title is CBPO; Customs and Border Protection officer.**

Q   What are your duties and responsibilities as a Customs and Border Protection officer?

A   **So my main duty as a Customs and Border Protection officer is to -- pretty much, I'm inspecting all travelers and conveyances coming into the United States from Mexico.**

Q   How long have you been employed with CBP?

A   **As of now, just over three years.**

Q   Would you describe your training to become a CBP officer?

A   **So training started at the -- it's called the Federal Law Enforcement Training Center -- FLET-C for short.  That is in Glynco, Georgia.  So we go there for, approximately, four months -- I believe, now it's a little bit longer -- but we go there, we do scenario-based training, immigrations courses training, talking with lawyers regarding immigration law.  We do tactical training.  And the training after that, once we**

graduate, is at the port itself.  So, it's basically on-the-spot training.

Q    That training being at the San Ysidro Port of Entry?

A    Correct.

Q    Have you recieved any other training at the another port of entry?

A    No.  Not at any other port of entry.

Q    Have you trained other officers?

A    Yes.  I've been tasked many times.  Since I've been around for over two years, they sometimes task me with training newer officers, TDY officers, officers that are assigned to different ports.  So they come to San Ysidro, and I'll pretty much show them the ropes, show them how things work at San Ysidro.

Q    What are the types of things that you're training them on?

A    So every port is different, of course.  They have all their own standard operation procedure.  San Ysidro, we have our own methods.  We have different tactics that we use, different -- let's see -- we have many different things at San Ysidro compared to other ports.  So we teach them pretty much how we do it at our port, and we try to make sure that they understand and keep it just and how it is.

Q    Officer Gonzalez, how proficient is your Spanish?

A    I am pretty proficient in Spanish.  I am not fluent, but I'm proficient enough to hold a conversation and to understand when I'm being spoken to.

**SER-016**

Q    And you mentioned that you work at the San Ysidro Port of Entry.

How long have you been at that port of entry?

A    **At that port of entry, approximately, since September of 2022.**

Q    So approximately, two and a half years?

A    **Two and a half years.  Yes, sir.**

Q    Could you explain to the members of the jury what is the San Ysidro Port of Entry?

A    **Yes.  So the San Ysidro Port of Entry is the largest land port entry in the western hemisphere.  So we have 34 vehicle lanes to handle --**

**(Court Reporter interruption.)**

*THE WITNESS:*  Sorry.

So we have 34 vehicle lanes from Mexico to San Diego. And then we have pedestrian east and west, so those handle the foot traffic.  We have a bus lane for commercial buses, shuttles.  So anybody coming in from Mexico that wants to come into the United States, we will process them, process their passports, visas, whatever documentation that they have to prove their citizenship.  And we try to do thing as quickly and efficiently as possible.

*BY MR. BESHAR:*

Q    Officer Gonzalez, do you have a binder in front of you?

*THE COURT:*  He has two.

**SER-017**

*BY MR. BESHAR:*

Q   Could you grab the exhibit binder, please, and turn to what is marked as "Government Exhibits 35 and 36"?

A   **Okay.**

Q   Do you have those in front of you?

A   **Yes, sir.**

Q   Do recognize Government Exhibits 35 and 36?

A   **Yes, sir.**

Q   What are they?

A   **So Government Exhibit 35 depicts the top half being the Southern District of California, which is the bottom half of San Diego County.  And then the bottom half of that is the part of Mexico -- the northern part of Mexico -- Tijuana.**

Q   And Government Exhibit 36?

A   **Exhibit 36 is the -- is an aerial image of the San Ysidro Port of Entry.**

Q   Are the map and the photograph in Government Exhibits 35 and 36 a fair and accurate representations of the port of entry as it existed on March 11, 2024?

A   **Yes, correct.**

   *MR. BESHAR:*  Your Honor, we'd move to admit Government Exhibits 35 and 36.

   *MR. BUGARIN:*  No objection, Your Honor.

   *THE COURT:*  All right.  They'll be admitted.  You may publish.

(Government Exhibits 35 through 36 received into evidence.)

        MR. BESHAR:  Thank you.  We ask to publish 35 here.

BY MR. BESHAR:

Q   Okay.  Officer Gonzalez, can you orient us here?  What are we looking at?

A   So this is -- like I said earlier -- the top half is the Southern District of California.  So it's the low part of California.  This is, pretty much, San Ysidro -- the city of San Ysidro.  The bottom half is Tijuana, Mexico.

Q   Can you indicate on this map, please, where the San Ysidro Port of Entry is?

A   Okay.  It is right -- is it, like, a touch screen?  There we go.

Q   Is that point within the Southern District of California?

A   Yes, it is.

Q   Is there a U.S. highway access from this port of entry?

A   Yes.  There are two highway accesses.  It is the 805 North and the 5 North.

Q   If we could turn to Government Exhibit 36, please?

        MR. BESHAR:  Thank you, Rhea.

BY MR. BESHAR:

Q   Okay.  Officer Gonzalez, what are we looking at here?

A   So this is an aerial image of the San Ysidro Port of Entry.  Right here, you're pretty much looking at the in-bound traffic coming into the United States.

**SER-019**

**Q** Is there an international border in this photo?

**A** **Yes, there is.**

**Q** By drawing on the screen again, could you please indicate where that is?

**A** **Of course. (Indicating)**

**Q** Excellent. So what is everything below this line?

**A** **Everything below the red line is Tijuana, Mexico.**

**Q** What is everything above the red line?

**A** **Everything above is the United States of America.**

**Q** Now, how many vehicle lanes are at the San Ysidro Port of Entry?

**A** **34 vehicle lanes, sir.**

**Q** Proceeding northbound, is there only one-way traffic at the San Ysidro Port of Entry?

**A** **Proceed northbound, yes. There is only one-way traffic.**

**Q** So the cars that you see on this photo heading northbound, where are they coming from?

**A** **The cars heading northbound are coming from Tijuana, Mexico.**

**Q** What are the white canopy figures across the middle of this photo?

**A** **This white canopy area is -- that's above our -- excuse me -- our vehicle lane booths. So that's where the vehicles are being processed into the United States.**

**Q** Excellent. So how many vehicle lane booths would be there

**SER-020**

in this photo?

A    There would be 34.

Q    34.    What is a Primary booth?

A    The Primary booth -- in terms of the vehicle -- is where the officer is stationed at.  That's where I am typically stationed.  So there we have our computer; we have our chair; we have an open door so the car comes up to us.  They pull up to hand us their documents, and then we proceed with the inspection.

Q    Broadly, what is Primary Inspection?

A    The Primary Inspection can entail several things. Basically, our main goal is to ask for a customs declaration. Which means "What are you bringing from another country into the United States?"  That's our main goal to figure out what they're bringing into the United States.

We're conducting an interview, "Hey, what were you doing in so-and-so country?  How long were you there?"  Like I said earlier, "What are you bringing into the United States? What was your purpose -- what's your purpose into the United States" -- if they're non-U.S. citizens.  Pretty much, we're just getting the gist of what their travel purposes are.  And then from there, we either admit or refer.

Q    And as a Primary officer, what are you typically looking for?

A    You know what?  It could honestly vary so much depending on

the situation.  You're looking for so many things nowadays. CBP's main goal is terrorist and terrorist weapons.  But there are so many other things.  You know, it could be anything from just regular customs violations, "Hey, you have too many of so-and-so items, too many candies."  Or it could be something to -- you know, higher stakes.

Q   You mentioned questions that you ask travelers coming into the United States.

How long do these questions typically take?

A   Not long.  The typical inspection in vehicle Primary is one to two minutes.

Q   Why would it take longer than two minutes?

A   Every encounter is different, honestly.  It's the officer and his experience that will pretty much, you know -- regarding his questioning, if the officer is a very experienced officer, he will ask more questions and try to get more of a story from the traveler.  And then with those answers that he gets from the traveler, then he makes his justified decision whether to admit the traveler into the United States and no more questions or refer to Secondary, and they will ask more questions there.

Q   Were all Primary Inspections recorded?

A   Yes, to my knowledge.

Q   How many people would you estimate that you encounter in a typical shift at Primary Inspection?

A   Oh, man.  That varies throughout the week.  But I would say

throughout my shift, approximately, like two -- three thousand people.

Q   So in your, approximately, three years at CBP, how many prior inspections would you estimate that you've done?

A   I can't give a confirmed number, but it's in the tens of thousands.

Q   We briefly touched on this earlier.

What happens if a Primary officer is suspicious of a vehicle's driver or passengers?

A   So if the Primary officer is suspicious of anything, he can either handle the situation there and ask more questions, or he can call for another officer to come and basically escort that vehicle -- we call it a "package."  The vehicle, all the people inside of it, that's what we call a "package."

We can escort them to Secondary, or if it's something that's not too serious but we still need to look further into, we can watch that vehicle go into Secondary.  We'll allow them to drive themselves into Secondary.

Q   And what is Secondary Inspection?

A   So Secondary Inspection is the -- let me see...  So in terms of Vehicle Secondary, the vehicle -- we'll instruct the driver to go to what is called "Vehicle Secondary."  They'll drive to another area.  I don't know if I can highlight it in the -- in the picture, but it is --

MR. BUGARIN:  Objection, Your Honor.  Narrative.

**SER-023**

**THE COURT:**  I'll sustain that.

*BY MR. BESHAR:*

Q    That's fine.  We'll get to that, Officer Gonzalez.

Broadly speaking right now, what is Secondary Inspection?

A    **Secondary is -- it's a first inspection.  If I have suspicion of something in the vehicle or the person, I will send them to other officers and then the other officers will make a decision -- a second decision.**

Q    What tools does CBP have in Secondary Inspection?

A    **So we have many tools.  We have state and local federal databases that we can utilize; fingerprint, biometrics.  And we can call upon other agencies or other officers for assistance.**

Q    And I just wanted to confirm for the record the indication that you've made on Government Exhibit 36 where Secondary location is.

Could you circle it one more time for us, please?

A    **Of course. (indicating)**

Q    So that is Secondary Inspection?

A    **Correct.**

Q    Officers Gonzalez, turning your attention to March 11, 2024.

Where were you working that night?

A    **On that date, I was working the vehicle Primary lane.**

Q    At the San Ysidro Port of Entry?

**SER-024**

A    At the San Ysidro Port of Entry, sir.

Q    What was your, typically, hour shift at that point?

A    So at -- that day, I was on the hour which means that every hour, I rotate from vehicle Primary lane to Vehicle Secondary lane.  I would go from -- from the lane to the lot -- the secondary lot.  At five o'clock, that's when I was assigned to the lane.

Q    So at Primary Inspection, did you do a Primary Inspection of a 2004 blue Honda Civic?

A    Yes, I did.

Q    What time did this car approach your booth?

A    Almost towards the end of my shift at approximately 5:26 or 5:30.

Q    In the morning?

A    In the morning, sir.

Q    What was the name of the driver of the vehicle?

A    It was Miguel Rolon.

Q    Were there any passengers in this vehicle?

A    Yes.  There were two passengers.

Q    Where were they located in the vehicle?

A    There was a female passenger, she was seated in front driver's seat -- excuse me -- the front passenger seat; and then the younger male sitting in the rear passenger seat.

Q    A moment ago you said that you asked questions of travelers.

**SER-025**

Did you ask those questions to this trio?

A    Yes, of course.

Q    How long was your interaction with the driver and two passengers?

A    The whole interaction took approximately six to seven minutes.

Q    Officer Gonzalez, in your binder please turn to what is marked "Government Exhibit 37."

Do you recognize Government's Exhibit 37?

A    Yes.

Q    What is it?

A    So this is a image of the vehicle that came through my lane, and that is Miguel Rolon.

Q    Is this photo a fair and accurate representation of Mr. Rolon and his vehicle on March 11, 2024?

A    Yes, that is correct.

MR. BESHAR:  Your Honor, the Government moves to admit Government Exhibit 37.

MR. BUGARIN:  No objections.

THE COURT:  All right.  It's admitted and you may publish.

(Government Exhibit 37 received into evidence.)

MR. BESHAR:  Thank you.

BY MR. BESHAR:

Q    Officer Gonzalez, what are we looking at here?

A    So this is an image from one of the cameras before the Primary booth.  So we see Miguel Rolon in his sedan and he's presenting his identification to the cameras.

Q    So just orient the jurors for a second.

Where in relation to your booth is this photo taken?

A    So this photo is taken, approximately, I would say 20 to 30 feet before my booth.  So these cars come up, they show their identification to the camera, and the camera -- and it has a scanner.  It's supposed to pick up the RFID chip, that way their information is on my computer by the time they pull up to my booth.

Q    Officer Gonzalez, if I asked you to look around this courtroom to determine the person that you encountered on March 11, 2024, could you identify them?

A    Yes, sir.

Q    Could you please identify that person based on where they are sitting and what they are wearing?

A    Yes, sir.  They are sitting on the left side with a gray polo shirt.

MR. BESHAR:  Your Honor, may the record reflect that Officer Gonzalez has identified Defendant Miguel Rolon?

THE COURT:  It will.  Thank you.

BY MR. BESHAR:

Q    Officer Gonzalez, please turn in your binder to what is marked as Government Exhibit 38.

**SER-027**

Do you recognize Government's Exhibit 38?

A    Yes, I do.

Q    What is it?

A    **That is the disk copy of my interaction on that day.**

Q    How do you know?

A    **Because I reviewed it, and I signed for it.**

Q    Does the video you reviewed accurately depict your encounter with Mr. Rolon?

A    **Yes, it does.**

Q    And following your review, did you sign that disk?

A    **Yes, I signed it.**

Q    Your Honor, the Government moves to admit Government Exhibit 38.

         *MR. BUGARIN:*  No objections.

         *THE COURT:*  All right.  It'll be admitted and you may publish.

    **(Government Exhibit 38 received into evidence.)**

         *MR. BESHAR:*  Great.  So let's play until five seconds in.

    **(Video played in open court.)**

*BY MR. BESHAR:*

Q    Officer Gonzalez, is this the vehicle that you conducted an inspection on that morning?

A    **That is correct.**

Q    What did the Defendant just hand you?

**SER-028**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 29 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.901    Page 128 of

PRESAS  |  DIRECT  |  BESHAR

207

128

A    He handed me the identifications of himself and, I believe, the rest of the passengers.

Q    And what were those identifications?

A    He handed me one California ID -- I believe it was a driver's license for himself -- and then he handed me two birth -- excuse me -- U.S. passports.

Q    Officer Gonzalez, please turn in your binder to what is marked as Government Exhibits 39, 40, and 41.

Do you recognize these exhibits?

A    Yes.

Q    What are they?

A    Exhibit 39 is the California identification card for Miguel Rolon.  Exhibit 40 is a United States passport card.  Exhibit 41 is another United States passport card handed to me by Rolon.

Q    Are these identification documents fair and accurate representations of what Mr. Rolon handed you on March 11?

A    That is correct.

MR. BESHAR:  Your Honor, the Government moves to admit and publish Government Exhibits 39, 40, and 41.

MR. BUGARIN:  No objections.

THE COURT:  All right.  They can be admitted, and you can publish.

(Government Exhibits 39 through 41 received into evidence.)

///

SER-029

*BY MR. BESHAR:*

**Q**   So we're looking at Government Exhibit 39.

What is this once more?

**A   It's a California identification card handed to me by Miguel Rolon.**

**Q**   Let's turn to Government Exhibit 40.

What is this?

**A   A United States passport card handed to me by Miguel Rolon.**

**Q**   And who did this card belong to in the vehicle?

**A   So this card was to represent the male passenger in the rear.**

**Q**   Could you please read the first name on Government Exhibit 40?

**A   First name is "Joel Isaias."**

**Q**   Could we turn now to Government Exhibit 41?

What is this once more?

**A   It's a passport card given to me by Miguel Rolon.**

**Q**   And could you please read the first name on this card as well?

**A   It is "Gabriela Elizabeth."**

**Q**   Okay.  Sorry to jump around on you, but let's go back to Government Exhibit 38, please.

**MR. BESHAR:**  So we'll play until 15 seconds, please.

**(Video played in open court.)**

*///*

BY MR. BESHAR:

Q   Officer Gonzalez, after receiving the identification cards from Mr. Rolon, what did you do next?

A   **So typically what I do after I get the identification from the driver:  I pretty much look at them.  I call them out.  I say, "We have Miguel."  I get a response.  I ask for the next one, and I wait for a response.**

Q   According to the responses in this vehicle, where was Gabriela sitting?

A   **She was sitting in the front passenger's seat.**

Q   And where was Joel sitting?

A   **The rear passenger seat.**

   MR. BESHAR:  Let's play until 21 seconds in.

   **(Video played in open court.)**

   MR. BESHAR:  Go back to 21, if that's okay.

BY MR. BESHAR:

Q   Where did the Defendant say that he was going?

A   **He said he was going to San Bernardino.**

   MR. BESHAR:  Okay.  Let's see if we can play from 21 to 34, please.

   **(Video played in open court.)**

BY MR. BESHAR:

Q   In that clip, what was the purpose of your questions to the Defendant?

A   **So since I was handed two passport cards that obviously**

SER-031

states that they are citizens of that country -- the passport card -- obviously, it was U.S. passports. But I was handed a California driver's license or identification. So that doesn't state whether they're a citizen of the United States or not. So that's why I asked Miguel Rolon, "Are you a citizen of the United States? Naturalized?" And that's when I got the answer saying that he was born in LA County.

MR. BESHAR: Let's play until 42 seconds in.

(Video played in open court)

BY MR. BESHAR:

Q   When you asked the Defendant why he was going down to Mexico, what did he say?

A   He said that he was picking up the two people in the vehicle from the dentist.

MR. BESHAR: Let's see if we could play from 42 seconds to 47, would that be okay?

(Video played in open court)

BY MR. BESHAR:

Q   What did the Defendant just say there?

A   So I had asked, "Are they your kids? He said, "No. They're friends. They asked me for a favor."

MR. BESHAR: Let's play into 1:46, please.

(Video played in open court.)

BY MR. BESHAR:

Q   Officer Gonzalez, when you called Gabriela and Joel's

names, what were you doing?

A   So at that point, I believe I had some suspicion that they might not be the persons on the identification.  So I called again for their names -- as you could see in the video.  And I tried to look at their photos -- excuse me -- the faces and compare them to the identifications that were handed to me.

Q   Could you briefly describe the female passenger's appearance?

A   So the female, she was wearing a hat.  The hat was -- imagine my hand as the bill of the hat (indicating).  It was, kind of, facing down obscuring her face.  And then I remember the initial encounter, she had her hair -- imagine my hand as her hair, kind of, covering her face like this.

Q   Did the female passenger make eye contact with you?

A   Yes, she did.

Q   What about the male passenger's appearance?

A   The male also -- he had a hat.  Like I said with the female, she -- image my hand being the bill of the hat (indicating) she had -- excuse me -- he had the hat facing down kind of obscuring his face.  And yeah, that's how I remember him.

Q   Did the male passenger make eye contact with you?

A   He did, but briefly.  He, kind of, looked at me and then, kind of, looked back pretty quick.

Q   Did you note anything in particular about the two

**SER-033**

passengers?

A    Just the, kind of, strange behavior.  Usually when I have people looking at me a second time, they want to show me their face.  At that time, they, kind of, looked at me briefly and then turned away.  That's what -- I got suspicious.

Q    Before we move on from this clip, what is the Defendant wearing in this photo?

A    The Defendant is wearing a green hat and a white jacket.

        MR. BESHAR:  Let's play until 2:22, please.

    (Video played in open court.)

BY MR. BESHAR:

Q    Officer Gonzalez, what were you doing just in that clip?

A    So in that clip, I'm basically exploring the unknown.  Obviously, I could see the passengers.  The windows are -- I would say for the most part -- they were all open.  I could see inside the vehicle, so I know that there is nothing that I should be worried about in the vehicle.

        So I go to the trunk.  I asked to please open it.  He complies.  He opens it.  I just inspect the trunk for anything -- if anything derogatory in there.

        MR. BESHAR:  Let's play until 2:30, please.

    (Video played in open court.)

BY MR. BESHAR:

Q    What did you just ask the back seat male passenger there?

A    So I go to the back seat passenger -- he's the first one I

go up to after I inspected the trunk -- and I asked him what high school he went to.

Q    Did the male passenger respond?

A    So he did not.  He pretty much looked at me and gave me a blank face, and then looked away.  And that's why I believe I asked him two or three times.

Q    So you repeated the question?

A    Correct.

Q    Why did you ask him that question?

A    Because I believe that's a question that most people could answer.

MR. BESHAR:  Let's play until 2:33, please.

(Video played in open court.)

BY MR. BESHAR:

Q    So during your interaction with the back seat male passenger, what did the Defendant who is driving do?

A    So if you could see in the video, when I was asking the back seat passenger what high school he went to, you could see the Defendant looking back.  And then later after I asked again, he shouted out -- what I believed he said was "Arroyo." I believe he was trying to reference "Arroyo High School."

MR. BESHAR:  Okay.  Let's play until 2:45, please.

(Video played in open court.)

BY MR. BESHAR:

Q    What did you just ask the backseat male passenger there?

A    So again, I go to what the Defendant said, "Arroyo."  I asked, "Did you go to Arroyo High School?"  And then in Spanish I said --(Speaking Spanish) -- "Did you go to high school?"  And then I could see the Defendant turn around again and try to say something to him -- the male back seat passenger -- and that's when I told him, "Hold on.  Hold on."  Referencing -- or excuse me -- for me showing him that I need him to, kind of, stand down, that I'm only talking to the back seat passenger.

Q    Just to clarify, who were you telling to stand down there?

A    Miguel Rolon, because he was turning around trying to interact with the passenger.

        MR. BESHAR:  Let's play until 3:05, please.

    (Video played in open court.)

BY MR. BESHAR:

Q    What did you just ask the back seat male passenger there?

A    Again, I believe I asked him regarding if he went to school.  I don't remember exactly what I said because the audio isn't too clear, and honestly, the incident happened some time ago.  I don't remember exactly what I spoke to him.  But after I received pretty much no acknowledgment or communication from him, that's when I terminated the conversation with him.

Q    Was the male passenger able to answer your questions, Officer Gonzalez?

A    I remember he said something.  I don't know if it was in Spanish -- in the Spanish language -- or what he said to me,

because I remember I -- in an earlier clip, I kind of poked my head in a little bit more to hear him better, but I didn't hear anything pretty much from him.

Q   Given the passenger's inability to answer your questions, what was your thought process at that moment?

A   So my thought process at that moment was "Something is definitely up.  Why isn't this kid answering me?"  Most kids that age, you know, if I can ask them a simple question as, "Hey, what high school do you go to?"  That's a pretty easy -- in my opinion, that's a pretty easy question to answer.  So that's when I had heightened suspicion of the situation.

Q   You just walked off camera.  Where did you go?

A   So off camera, I walked into my Primary booth.

Q   And what was your goal in going to the Primary booth?

A   So on the Primary booth, we have a computer -- kind of, like, how you guys have a computer right there.  So in that computer, I'm looking at their travel history.  I'm scanning their identification looking to see if they may be crossed with Miguel Rolon before.

We can see things like that.  Trying to see when their last crossing was, if they crossed recently, if they're daily crossers; information like that.

MR. BESHAR:  Let's play until 6:15, please.

(Video played in open court.)

///

*BY MR. BESHAR:*

Q   Officer Gonzalez, when you searched each passenger's traveling history, what did you learn?

A   **So once I query their documents, I noticed that they have almost zero crossing history together.  I don't think I even saw that they crossed ever together.  Whether it'd be like one -- you know, one person be with the other or all three at the same time.  That also raised my suspicion.**

Q   Just on to clarify, what do you mean by "crossing history"?

A   **Crossing history as to "Have they ever crossed the international border from Mexico into the United States," whether that be in a vehicle or in a pedestrian environment.**

Q   Based on your entire interaction with this vehicle, what did you decide?

A   **So based on the interaction -- the conversations I held with the travelers, I decide to refer the vehicle and the passengers to Secondary -- Secondary Inspection.**

Q   And why was that?

A   **Because I had suspicions of both the -- the passengers.  I had suspicions whether they were not the persons on the identification cards that were presented to me.  That was my main suspicion.**

          *MR. BESHAR:*  Let's play until 6:36, please.

     **(Video played in open court.)**

*///*

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 39 of 298
Case 3:24-cr-00684-LL   Document 157   Filed 08/25/25   PageID.911   Page 138 of

PRESAS   |   DIRECT   |   BESHAR          138
207

BY MR. BESHAR:

Q    What did you just do?

A    So in that instance, I had written up a referral slip.  So it's an orange piece of paper that's basically, like, your ticket to go to Secondary.  I had put it on their windshield and then I instructed the driver and the passengers, "You're going to be going to Secondary."  Mr. Rolon said, "Okay."  And then you could see me put my hand up -- that was to the next vehicle to stop -- and then I escorted the vehicle to pretty much the edge of my vehicle lane -- which is the end of Primary -- and I watched them go into Secondary.

Q    Did you contact Secondary Inspection?

A    Yes.  So I don't believe it's going to show on the video.  But after I released the vehicle into Secondary and I watched it go into Secondary, we have a phone in our booth and I contacted the lead officer in the secondary lot and I told him of my suspicions.

Q    Following your direction to Secondary Inspection, did you have any further contact with the Defendant or the passengers in his vehicle?

A    I did not.

        MR. BESHAR:  No further questions, Your Honor.

        THE COURT:  Thank you.

        Cross-examination?

///

**SER-039**

CROSS-EXAMINATION

*BY MR. BUGARIN:*

**Q**    Good afternoon, Officer Gonzalez.

**A**    **Good afternoon.**

**Q**    Do you go by "Gonzalez" or "Gonzalez Presas"?

**A**    **I typically go by "Gonzalez" for shorter.**

**Q**    Thank you for letting me know.

Officer Gonzalez, did you -- you reviewed a report in preparation for today's hearing?

**A**    **Correct, sir.**

**Q**    You were stationed in Primary Inspection on March 11th, 2024?

**A**    **Correct.**

**Q**    And on that morning, Mr. Rolon approached your lane for inspection?

**A**    **Correct.**

**Q**    They were two other passengers in the car?

**A**    **Correct.**

**Q**    And those passengers were on the opposite side of the driver?

**A**    **Yes.  Correct.**

**Q**    And they presented documents for entry into the United States?

**A**    **Correct.**

**Q**    And you asked them where they were going?

**SER-040**

A   Correct.

Q   Mr. Rolon told you that they were going home?

A   Yes.

Q   To San Bernardino?

A   Yes.

Q   And you asked them what they brought down from Mexico?

A   Uh-huh.  I did.

Q   Oh, I'm sorry.  You asked them what brought them down to Mexico?

A   Yes.

Q   And Mr. Rolon said that they went to the dentist?

A   Correct.

Q   That the passengers went to the dentist?

A   Yes.  That the passengers went to the dentist.

Q   And that he came to pick them up?

A   Yes.

Q   And you asked Mr. Rolon if they were his kids?

A   I did ask that.

Q   And he told you, "No"?

A   Yes.  He said, "No."

Q   Now on direct, you said that Mr. Rolon told you that they were his friends?

A   Yes, he did.

Q   But in fact, he told you that they were his friend's kids?

A   I believe so.  But yes, that's what I remember.

SER-041

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 42 of 298
Case 3:24-cr-00684-L1 — Document 157 — Filed 08/25/25 — PageID.914 — Page 141 of 207

PRESAS | CROSS-EXAMINATION | BUGARIN 141

**Q**   Okay.  And he told that his friend had asked him for a favor?

**A**   **Yes, that is correct.**

**Q**   Okay.  And Officer Gonzalez, you said you worked at U.S. Customs and Border Protection for over three years?

**A**   **Yes, sir.**

**Q**   And as part of your duties, you're assigned to Primary Inspection?

**A**   **Yes, sir.  Daily.**

**Q**   And most of that time -- in those three years, most of that time in Primary Inspection has been at the San Ysidro Port of Entry?

**A**   **Yes.  The entirety of the three years.**

**Q**   And in Primary Inspection, you asked documents of people seeking entry?

**A**   **Correct.**

**Q**   Passports?

**A**   **Passports, visas; whatever documentation they have.**

**Q**   Passport cards, right?

**A**   **Yes.**

**Q**   Okay.  And while stationed at Primary, people hand you over their documents for entry?

**A**   **Correct.  Yes.**

**Q**   And you take them and you inspect them?

**A**   **Uh-huh.  Yes.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 43 of 298
Case 3:24-cr-00684-L1 Document 157 Filed 08/25/25 PageID.915 Page 142 of 207

PRESAS | CROSS-EXAMINATION | BUGARIN          142

**Q**   And it's not uncommon for you to take them from the driver's side of the car?

**A**   **No.  It's not uncommon.**

**Q**   In your experience, it's not uncommon for the driver of the car to present the documents for all people in the car?

**A**   **Correct.  Yes.**

**Q**   So Mr. Gonzalez, on direct the Government played the video of Primary Inspection?

**A**   **Correct.**

**Q**   And we all saw the video?

**A**   **Yes, we did.**

**Q**   And you saw that Mr. Rolon said that he was heading home to San Bernardino?

**A**   **Yes.**

**Q**   However, that's not what you wrote in your report, is it?

**A**   **That is not what I wrote in my report.**

**Q**   You wrote that he was going to Los Angeles?

**A**   **That is correct, I did.**

**Q**   Los Angeles is not San Bernardino?

**A**   **The report was written approximately --**

**Q**   Can you please answer my question?

**A**   **Yes.**

**Q**   Los Angeles is not San Bernardino?

**A**   **That is correct.**

**Q**   Okay.  So that was incorrect?

**SER-043**

A    Uh-huh.

Q    And as part of your inspection, you determined that Mr. Rolon was a United States citizen?

A    **That is correct.**

Q    And you asked him if he had any items to declare?

A    **Correct.**

Q    He told you he had a statue?

A    **That is correct.**

Q    You asked Mr. Rolon to pop the trunk?

A    **Correct.**

Q    Which he did?

A    **He did.**

Q    And Mr. Rolon had the car windows rolled down as you approached Primary Inspection?

A    **Correct.**

Q    So you could see inside the vehicle?

A    **Yes.**

Q    You then asked the passenger of the back seat of the vehicle -- of the car -- you asked him some questions?

A    **I did.**

Q    And you asked him where he went to high school?

A    **Yes, I did.**

Q    And in your report, you said that you couldn't understand him?

A    **That is correct.  I could not understand him.**

SER-044

**Q**   However, on direct, you said that he gave you a blank stare and he didn't acknowledge your question?

**A**   Yes.

**Q**   So you couldn't understand him; is that right?

**A**   Correct.  Yes.

**Q**   And you heard Mr. Rolon say "Arroyo"?

**A**   Yes, I did.

**Q**   Which you repeated to the backseat passenger?

**A**   I did.

        *MR. BUGARIN:*  One moment.

        *THE COURT:*  Of course.

   **(Defense Counsel reviewing documents.)**

*BY MR. BUGARIN:*

**Q**   On direct, as you were -- as you were talking about questioning the backseat passenger, you said you poked your head in to try to hear him better?

**A**   That is correct.

**Q**   And after questioning the people of that car, you then referred them to Secondary Inspection?

**A**   That is correct.

**Q**   You told Mr. Rolon that they needed to go to Secondary?

**A**   Yes.

**Q**   And you heard him say "Okay"?

**A**   That is correct.  Yes.

**Q**   You asked Mr. Rolon if he had been to Secondary before?

**SER-045**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 46 of 298
Case 3:24-cr-00684-L-1   Document 157   Filed 08/25/25   PageID.918   Page 145 of 207

PRESAS   |   CROSS-EXAMINATION   |   BUGARIN          145

A    Yes, I did.

Q    And to which you heard him say that he had been there before?

A    I believe that is what he said.  Yes.

Q    And then Mr. Rolon drove to Secondary?

A    Yes.

Q    And you believed that the two passengers in the car that were not Mr. Rolon, you believe that they were not the people in those passports?

A    I was not 100 percent sure, but I had suspected.

Q    And you wrote in your report that you believed that they were Mexican nationals?

A    That's what I presumed.

Q    You wrote in your report that you believed that they were attempting to deceive you?

A    Yes, possibly.

Q    And you saw the passport cards that were presented on that date?

A    Correct.  Yes.

Q    And you remember the names of those passport cards?

A    The first names I could remember.

Q    Okay.  Do you remember the last names?

A    Not that I remember, honestly.

Q    I just want to pull up Government's Exhibit --

        MR. BESHAR:  40.

MR. BUGARIN:  40 and 41.

BY MR. BUGARIN:

Q   So can you tell me what the surname is on this passport card?

A   It is "Posadas."

Q   Okay.

MR. BUGARIN:  Can we go over to the next exhibit, 41, please?

BY MR. BUGARIN:

Q   Can you tell me what the surname is on this passport card?

A   I'm going to try to say this, "Posadas Uitz."

Q   Thank you.

MR. BUGARIN:  Thank you.  No further questions.

THE COURT:  Thank you, Counsel.

Any redirect?

MR. BESHAR:  Yes, Your Honor, briefly.

REDIRECT EXAMINATION

BY MR. BESHAR:

Q   Officer Gonzalez, did you write a report detailing your encounter with the Defendant and his two passengers?

A   Yes, I did.

Q   Why do you prepare reports?

A   We prepare reports for cases that we suspect that are going to be going to a court in a future date.  So that report is basically our -- it's what we believed happened at the

**SER-047**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 48 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.920    Page 147 of 207

PRESAS | RECROSS | BUGARIN

147

situation at the time.  We're trying to remember as best as we can trying to make sure that everything is fair and what we recall from the incident, of course.  We can't always remember everything as humans, so I try to write everything that I believed happened at that incident.

Q   You touched on it briefly, do you include every single detail that goes through your head into that report?

A   Unfortunately, we can't include every single detail.  I try to put in everything that I can remember.  But like I said, we're all human.  We all make mistakes.  I believe I said "Los Angeles, San Bernardino," they're pretty much close to each other. I believe that's why I got mixed up with the two.

Q   And at the time that you drafted the report in this case, were you aware that all your encounters were being recorded at Primary Inspection?

A   I was aware, yes, that the encounters were being recorded.

         MR. BESHAR:  No further questions, Your Honor.

         THE COURT:  Thank you.

         Any recross?

         MR. BUGARIN:  Just briefly, Your Honor.

         THE COURT:  Of course.

                    RECROSS-EXAMINATION

BY MR. BUGARIN:

Q   Officer Gonzalez, you mentioned on direct about the extent 1of your training?

A    Yes, sir.

Q    And in your training, you're trained to write reports?

A    Correct.

Q    And you're trained to write those reports accurately?

A    As best as we can.

Q    Accurately?

A    Yes.

Q    And that's because law enforcement relies on those reports?

A    That is correct.

Q    The prosecution relies on those reports?

A    Correct.

Q    The Court relies on those reports?

A    Of course.

Q    As well as a jury in a trial?

A    Yes, of course.

        MR. BUGARIN:  Okay.  Thank you.  No further questions.

        THE COURT:  All right.  Thank you.

        Is this witness excused?

        MR. BESHAR:  Yes, Your Honor.  Thank you.

        THE COURT:  From the Defense?

        MR. BUGARIN:  Yes, Your Honor.

        THE COURT:  All right.  Thank you, sir.  You are excused.

        The Government can call their next witness.

        Members of the jury, as we're swapping out witnesses

feel free to stand and stretch.  I may do it.  It's good for you to stay awake and alert.  So feel free to do so.

MR. BESHAR:  Thank you, Your Honor.  The United States calls Customs and Border Protection Officer Luis Miguel Perez.

THE COURT:  Perfect.

(Witness duly sworn.)

THE CLERK:  You may take the stand here.  Please state your first and last name for the record?

THE WITNESS:  My name is Luis, and my last name is Perez.

THE CLERK:  Thank you.

MR. BESHAR:  Thank you, Your Honor.

**LUIS MIGUEL PEREZ**,

**called as a witness for the Government, having been duly sworn, testified as follows:**

**DIRECT EXAMINATION**

BY MR. BESHAR:

Q   Good afternoon, Officer Perez.  Where are you employed?

A   **I'm employed at the San Ysidro Port of Entry and --**

(Court reporter interruption.)

THE WITNESS:  I'm employed at the San Ysidro Port of Entry.  I'm a U.S. Customs and Border Protection Officer.

BY MR. BESHAR:

Q   What is your title at CBP?

A   **I'm a Custom and Border Protection officer.**

**Q**   What are your duties and responsibilities as a CBP officer?

**A   My duties as a CBP officer is to facilitate trade and travel into the United States; meaning that I have to verify everything that is coming in and or anyone that is coming into the United States.  I have to verify that they're either Americans, residents, they have visas.**

**Secondly, inspect anything they're coming with; meaning that I inspect their vehicles or belongings for either prohibited or illegal items -- for example, weapons or drugs.**

*THE COURT:*  Before you ask your next question, it sounds very strange, but we speak fast as humans.  She's trying to type everything you're speaking.  That's why she asked you to slow down.  It's hard for me as well.  But if you can please slow down so she can capture it all.  I know it feels awkward to pause yourself, but please do so.

Thank you, you may proceed.

*MR. BESHAR:*  Thank you, Your Honor.

*BY MR. BESHAR:*

**Q**   Officer Perez, how long have you been employed with Customs and Border Protection?

**A   I've been employed for three years and ten months.**

**Q**   Are you fluent in Spanish?

**A   Yes, I am.**

**Q**   Would you briefly describe your training to become a Customs and Border Protection officer?

A    In order to become a CBP officer -- Customs and Border Protection officer -- I went to Federal Law Enforcement Training Center in Georgia.  I was there for five months.

Q    Please --

A    I was just slowing down.  For five months, there I got to -- I was able to learn about the policies of becoming a Customs and Border Protection officer.  So about the rules to verify certain documents, birth certificates, passports, the use of force during those five months.  And moreover, when I came back to San Ysidro Port of Entry, I got another 22 weeks training on-hand in the field doing this stuff.

Q    Officer Perez, have you trained other officers at CBP?

A    Yes.

Q    What have you trained them on?

A    After I got experience any new officer, like, either when they come and they needed extra help in order for them to show them the way, they shadow me.  They -- I show them what to do, what not to do; how to start an interview with the travelers, how to inspect the vehicle.  And they just shadow me for a couple of days.

Q    Officer Perez, you mentioned that you work at the San Ysidro Port of Entry.

How long have you worked there?

A    I have worked though -- other than my training, I've been there for almost the three years, plus my training.

**SER-052**

**Q** So apart from your training at the Federal Law Enforcement Training Center, have you spent your entire CBP career at the San Ysidro Port of Entry?

**A** Correct.

**Q** Have you worked both Primary and Secondary Inspection?

**A** Yes.

**Q** Briefly, what is Secondary Inspection?

**A** Secondary Inspection is when they send a traveler for a Secondary Inspection. Meaning that either the Primary officer saw something that they didn't like, or they have questions that they could not do in Primary. They send to Secondary -- they come to an officer in Secondary position -- and they will verify whatever -- they will do another interview. And they will read the comments of the Primary officer, and whatever he says, they want to analyze, do some queries -- do anything -- and verify that question the officer had at the beginning.

**Q** And Officer Perez -- I know it's hard -- to the extent you're able to slow down for Jessica, that would be great. I appreciate it.

    ***THE COURT:*** Thank you, Counsel.

    ***MR. BESHAR:*** Of course.

***BY MR. BESHAR:***

**Q** During Secondary Inspection, Officer Perez, what are you looking for?

**A** In Secondary Inspection, I'm looking for -- obviously, I

**SER-053**

read the referral from the Primary officer.  After that, I verify these questions.  I check what I have to check for him, those inquiries depending on what the case is.  After that, I go ahead and follow up with the -- with the inspection in hand.

Q   Turning your attention to March 11, 2024.

Where were you working that night?

A   I was working in the vehicle B-slot -- meaning, in Secondary Inspection -- doing Secondary Inspection.

Q   At the San Ysidro Port of Entry?

A   Yes.

Q   What was your typical hourly shift at that time?

A   I work from 2200 to 600, meaning 10:00 p.m. to 6:00 a.m.

Q   And what were your assigned duties that morning?

A   I'm both Primary officer and Secondary officer.  Every other hour we switch.

Q   Did you conduct a Secondary Inspection on a 2004 Honda Civic?

A   Yes.

Q   What time did that inspection occur?

A   About 5:48 a.m.

Q   Before approaching that vehicle, what was your understanding as to why that vehicle was sent to Secondary Inspection?

A   When I got the referral given me, I checked it was to verify three individuals in the vehicle.  Therefore, I went to

**SER-054**

to a computer, checked -- checked the two individuals who were in question.  I query their names.  I check and search who they were.

MR. GARRISON:  Objection.  Nonresponsive.

THE COURT:  I think it's narrative more than nonresponsive.

I'll sustain it and ask you to ask tighter questions.

MR. BESHAR:  Of course, Your Honor.

BY MR. BESHAR:

Q   So prior to your engaging with the travelers in the vehicle, what was your objective in your encounter?

A   To verify the referral, to check the --

(Court Reporter interruption.)

THE WITNESS:  So my primary function there was to verify the comments of the Primary officer.  After that, I checked what I had -- what he had the question for.  So I -- to verify two individuals in the vehicle.  Secondly, after that --

MR. GARRISON:  Objection.  Narrative.

THE COURT:  Sustained.

BY MR. BESHAR:

Q   No worries, Officer Perez.  So after completing your research, what did you do next?

A   I went ahead and approached the vehicle.  And when I approached the vehicle, I asked the driver -- I asked the driver -- I did -- I have the documents in my hand.  So I had

to ask her to step down --

   *MR. GARRISON:* Objection. Narrative.

   *THE COURT:* Sustained.

*BY MR. BESHAR:*

Q   No worries, Officer Perez.

  After you asked the subjects to exit the vehicle, what did you do next?

A   **When they were exiting the vehicle, I told him to state their names to verify with the passport I had in hand.**

Q   And while you're interacting with the passengers in the vehicle, where are their identification cards?

A   **In my hand.**

Q   Did you separate the passengers?

A   **Yes.**

Q   Who did the male passenger identify as at that point?

A   **Joel Posadas.**

Q   Did the male passenger state that name to you?

A   **Yes.**

Q   Did you notice anything in particular about the male passenger?

A   **Yeah.  When I checked the passport picture with his face, it didn't look like him at all.**

Q   Did you ask the male passenger to provide his correct name?

A   **Yes.**

Q   And what did he say?

**SER-056**

A    The same name I've stated in the passport, which was "Joel Isaias Posadas."

Q    Did you ask the female passenger to provide her correct name?

A    Yes.

Q    And what did she say?

A    She said, "Gabriela Elizabeth Posadas Uitz."

Q    Did the male passenger provide any other items to you?

A    Yes.  I requested his phone and his wallet from him.  Which he got it from his pocket and gave it to me.

Q    So the male passenger provided his cell phone and his wallet from his person?

A    Yes.

        MR. GARRISON:  Objection.  Leading.

        THE COURT:  Sustained.

        You can rephrase, Counsel.

BY MR. BESHAR:

Q    Just so we're clear, Officer Perez, what exactly did the male passenger provide to you?

A    He provided his phone and his wallet.

Q    Did you find anything of note in the male passenger's wallet?

A    Yes.

Q    What was that?

A    I found a Mexican ID -- ID card.

Q    Officer Gonzalez, in your exhibit binder, could you please turn to what is marked as "Government Exhibit 42."

Do you recognize Government Exhibit 42?

A    Yes.

Q    What is it?

A    **This is a Mexican ID card, like, a driver's license in California but from Mexico.**

Q    And was this the driver's license that the male passenger provided to you?

A    Yes.

Q    Is the photo a fair and accurate representation of what you found in the male passenger's wallet on March 11, 2024?

A    Yes.

*MR. BESHAR:*  Your Honor, the Government moves to admit Government Exhibit 42.

*MR. GARRISON:*  No objection.

*THE COURT:*  All right.  It'll be admitted.  You may publish.

**(Government Exhibit 42 received into evidence.)**

*BY MR. BESHAR:*

Q    Officer Perez, once more, what is this?

A    **This is a Mexican ID card.  It's, like, a driver's license in Mexico.**

Q    Could you please read the name on this Mexican driver's license?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 59 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.931    Page 158 of 207

PEREZ | DIRECT | BESHAR

158

A    Yonathan Moises Ixan-Marroquin.

Q    Turning back to your encounter with the male passenger, what did you do next?

A    I'm questioning about her -- his sister.

Q    Did you ask him about Government Exhibit 42?

A    Yes.

Q    And what did he say?

A    I told him what was his -- to give me his real name, that I found an ID in his wallet.  And after that, he stated his real name was Yonathan Moises Ixan-Marroquin.

Q    Did you ask the male passenger who the female passenger was?

A    Yes.

Q    And what did she say -- or excuse me -- what did he say?

A    He said he [sic] was his sister.

Q    Did he provide her name?

A    Yes.

Q    What did he say?

A    Zulemy.

Q    Did the male passenger then say anything else?

A    Yes.  I questioned him, and he said -- he said that he got the passport and the transportation to the United States, and he paid --

        MR. GARRISON:  Objection.  Hearsay.

        THE COURT:  Counsel?

**SER-059**

MR. BESHAR: It's a co-conspirator statement, Your Honor, from the material witness.

THE COURT: Mr. Garrison?

MR. GARRISON: Not in furtherance.

THE COURT: All right. I'll allow it. Overruled.

BY MR. BESHAR:

Q   Let's ask that one more time, Officer Perez.

What did the male passenger say.

A   **So the male said he paid about 200,000 pesos for his service station [sic] the United States and for the passport.**

MR. GARRISON: Objection --

(Court Reporter clarification.)

MR. GARRISON: Objection. Move to strike. Not in furtherance.

THE COURT: I'll overrule that.

BY MR. BESHAR:

Q   Turning back to the female passenger.

What, if anything, did you ask her?

A   **I told her to restate her name. She restated her name as "Gabriela Elizabeth Posadas."**

Q   Did the female passenger provide any items to you?

A   **A phone.**

Q   A cell phone from her person?

A   **Yes.**

Q   Did you find anything of note attached to that cell phone?

**SER-060**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 61 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.933    Page 160 of
207

PEREZ  |  DIRECT  |  BESHAR

160

A    Yeah.   Between the phone and the case, there was -- also a Mexican ID card.

Q    Sorry, I missed that.   Where was that card?

A    Between the middle of the phone and the case.   So inside the case.

Q    Officer Gonzalez, please turn to what is marked as "Government Exhibit 43" in your binder.

       Do you recognize this?

A    Yes.

Q    What is it?

A    It's the Mexican ID that I found in the phone.

Q    Is the photo a fair and accurate representation of what you found attached to the female passenger's cell phone on March 11, 2024?

A    Yes.

       MR. BESHAR:   Your Honor, the Government moves to admit Government Exhibit 43 and to publish.

       MR. GARRISON:   No objection.

       THE COURT:   It'll be admitted.   You may publish.

    (Government Exhibit 43 received into evidence.)

BY MR. BESHAR:

Q    Officer Perez, once more, what is this for the members of the jury?

A    This is a Mexican ID, like, a driver's license -- like a driver's license but in Mexico.

Q   And where did you find this, once more?

A   I found this between the case and the phone of the subject.

Q   Could you please read the name on this Mexican driver's license?

A   Zulemy Yohana Raquec-Mucia.

Q   Officer Perez, following your interactions with both the male and the female passenger, what was your conclusion?

A   My conclusion was they were not who they said they were based on the Mexican IDs and the passport they gave me. Therefore, I concluded they were imposters of the document -- which means that they're not who they say they are when they gave me those passports.

Q   What did you do next?

A   I called the Blue Wave, which means --

        (Court Reporter clarification.)

        THE WITNESS:  "The Blue Wave."  Okay.

        That means officers will come and help me secure the -- the subjects and send them to security office.

BY MR. BESHAR:

Q   During this encounter -- your encounter with the male and female passenger -- did you interact with the driver at all?

A   No.  The only thing -- it was to take him out of the vehicle and to send him to Secondary -- to send him to security office.

Q   Did you have any further contact with the driver or the

SER-062

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 63 of 298
Case 3:24-cr-00684-L1 Document 157 Filed 08/25/25 PageID 935 Page 162 of

PEREZ | CROSS-EXAMINATION | GARRISON

207

162

passengers in the vehicle?

**A    Not after security office.**

MR. BESHAR:  No further questions, Your Honor.

THE COURT:  Thank you.

Cross-examination?

**CROSS-EXAMINATION**

*BY MR. GARRISON:*

**Q**   So you testified on direct that you were trained to work in Secondary, right?

**A    Yes.**

**Q**   And in Secondary you need to be very vigilant, correct?

**A    Correct.**

**Q**   You're trained to be on the lookout for contraband, right?

**A    Correct.**

**Q**   You're trained to be on the lookout for impostors, right?

**A    Correct.**

**Q**   You're trained to be on the lookout for folks that might not have permission to enter?

**A    Correct.**

**Q**   You're trained to be on the lookout for contraband?

**A    Yes.**

**Q**   Okay.  And so if you clear a car from Secondary, it's going into the United States, right?

**A    From Secondary, if I clear it?**

**SER-063**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 64 of 298
Case 3:24-cr-00684-L1 — Document 157 — Filed 08/25/25 — PageID 936 — Page 163 of

PEREZ | CROSS-EXAMINATION | GARRISON

207

163

Q    If you clear it?

A    Yes.

Q    So if you clear a car from Secondary, it's going into the United States, right?

A    If I clear it before it comes out, yes.

Q    All right.  So would it be fair for me to say that in Secondary is really the last line of defense at the port before the person is free into the United States?

A    Yes.

Q    Okay.  And if the Secondary officer doesn't catch a law violation, then the person who is violating the law might get away with it, right?

A    Correct.

Q    Okay.  So that's why you need to be vigilant, right?

A    Correct.

Q    That's why you need -- that's why you don't cut corners?

A    Correct.

Q    And that's why all Secondary officers need to do their job like you, right?

A    Correct.

Q    So in Secondary, there is more scrutiny on a person or a vehicle than in Primary; is that right?

A    Yes.

Q    In Secondary you can perform more intense inspections; is that right?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 65 of 298
Case 3:24-cr-00684-L1 — Document 157 — Filed 08/25/25 — PageID 937 — Page 164 of 207

PEREZ | CROSS-EXAMINATION | GARRISON      164

A    Yes.

Q    Than you can at Primary?  So like, you could do a seven-point inspection, right?

A    Correct.

Q    And that's an inspection that has seven different points that you check to help you determine if there's any -- there might be any contraband in the vehicle, right?

A    The seven-point inspection, it's for the vehicle.

Q    Right.  So you check seven points on the vehicle, right? Yeah?

A    Not myself.

Q    So you've never done a seven-point --

A    I'm talking about this vehicle.

Q    No, I'm just saying in general.

A    Yes.

Q    In Secondary, you've done a seven-point inspection, right?

A    Yes.

Q    Because you worked there for three years?

A    Yes.

Q    And you work Primary and Secondary?

A    Yes.

Q    And you were trained how to do a seven-point inspection?

A    Yes.

Q    Okay.  Thanks.  So in Secondary, you also have access to an X-ray machine, right?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 66 of 298
Case 3:24-cr-00684-L1 — Document 157 — Filed 08/25/25 — PageID 938 — Page 165 of

PEREZ | CROSS-EXAMINATION | GARRISON 165
207

A    Correct.

Q    You can X-ray a whole car, right?

A    Yes.

Q    You can send a person driving the car through the X-ray machine, right?

A    Correct.

Q    You have access to more specialized tools at Secondary, right?

A    Correct.

Q    For example, you have things like density meters, correct?

A    Density meters?

Q    A buster?

A    Not all officers have the buster.

Q    But there's a buster at Secondary, isn't there?

A    Not all the time.

Q    Okay.  Sometimes there's a buster at Secondary?

A    Officers carry those.

Q    And a buster is a density reader, right?

A    Yes.

Q    In Secondary you have more time to ask people questions?

A    Correct.

Q    You have more time to search databases?

A    Correct.

Q    You can run fingerprint checks?

A    Correct.

SER-066

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 67 of 298
Case 3:24-cr-00684-L — Document 157 — Filed 08/25/25 — PageID.939 — Page 166 of 207

PEREZ | CROSS-EXAMINATION | GARRISON    Page 166 of

166

**Q**  Now, Secondary is not always a quick process, is it?

**A**  **No.**

**Q**  Sometimes Secondary can take a long time; is that true?

**A**  **Correct.**

**Q**  Like, if -- it really depends on how busy the port is, right?

**A**  **Yes.**

**Q**  And then how many officers you have working that day, right?

**A**  **Yes.**

**Q**  I mean, it wouldn't be uncommon on a busy day for somebody sent to Secondary to be there for two or three hours, right?

**A**  **It rarely happens, but yes.  If it's pretty busy, yes.**

**Q**  Okay.  In this case, you wrote one report?

**A**  **Correct.**

**Q**  Did you ever take any notes?

**A**  **After this, no.  I didn't know I was going to be here today.**

**Q**  Did you take any notes pertaining to this case?

**A**  **Just the report that I made.**

**Q**  Okay.  Have you testified in this case prior to today?

**A**  **No.**

**Q**  Have you discussed your testimony today prior with anybody?

**A**  **Yes.**

**Q**  With who?

A    With the attorneys, you mean today?

Q    Before you testified, did you talk about --

A    Oh, no.

Q    If you hold on one second.  Let me just finish.

     Before you testified, did you talk to anybody about what you were going to testify about?

A    Today?  No.

Q    At any time?

A    No.

Q    So you did not talk to the U.S. attorneys?

A    Yes.  But about the case today?  I did.  I've talked to him, but not today.  I did talk to him, like, right quick that I was going to testify and with the order.  That's about it.

Q    Okay.  So before you testified today, you talked to the prosecutors, right?

A    Yes.

Q    Thanks.  Did you -- at any time, did you send any emails regarding this case?

A    No.

Q    Did you send any text messages?

A    No.

Q    Let's turn back to the date of March 11, 2024.

     You recall that there was a -- or I'm sorry -- let me back up and restart.

     So you testified on direct about an interaction you

had with these two individuals, right?

A   Correct.

Q   And they were riding in a car that was sent to Secondary, right?

A   Yes.

Q   And the license plate for that car was "8TNE791," right?

A   I don't recall.

Q   Okay.  Well, you wrote a report in this case, right?

A   Uh-huh.  Yes.

Q   And you took a whole class on how to write reports?

A   Yes.

Q   And you've written many reports in your three years as an officer?

A   Yes.

Q   And you're truthful in your reports?

A   Yes.

Q   You're accurate in your reports?

A   The best I can.

Q   You're complete in your reports?

A   Yes.

Q   Do you try to be inaccurate?

A   No.

Q   In your report in this case, you wrote, "I approached vehicle bearing plates CA 8TNE791," correct?

A   If I can -- show me the doc.  Yes, I believe so.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 70 of 298
Case 3:24-cr-00684-L1 Document 157 Filed 08/25/25 PageID.942 Page 169 of 207

PEREZ | CROSS-EXAMINATION | GARRISON Page 169 of 169

**Q** Okay. Sure. If you can look at the Defense exhibit binder, "Exhibit F."

**THE COURT:** This one, sir.

Where is it, Mr. Garrison?

**MR. GARRISON:** Exhibit F-1.

**THE COURT:** Thank you.

**BY MR. GARRISON:**

**Q** Go ahead and take a look at that and look up when you're ready to go. Okay. So that's your report that you wrote about the incident here, right?

**A** Correct.

**Q** And you wrote on there that the license plate was "8TNE791," correct?

**A** Correct.

**Q** So when you're working at Secondary and somebody is sent to you for further inspection, you make it clear that you want truthful answers, right?

**A** Correct.

**Q** Now, the male presented himself to you as "Joel Isaias Posadas," right?

**A** Correct.

**Q** That was pursuant to what he claimed was his U.S. passport?

**A** Correct.

**Q** You immediately recognized that he did not match the picture on the passport?

**SER-070**

A    Correct.

Q    And so you even said to him, "Give me your correct name"?

A    Correct.

Q    And once again, he said, "No.  My name is Joel Posadas."

A    Joel Isaias Posadas.

Q    Okay.  So he lied to you?

A    Yes.

Q    Twice?

A    Uh-huh.

Q    So then you took his wallet, right?

A    Yes.

Q    And you took his phone?

A    Yes.

Q    And in the wallet, you found a Mexican identification, right?

A    Correct.

Q    That had his picture on it, right?

A    Correct.

Q    But it didn't have the name "Posadas" on it, did it?

A    No, it did not.

Q    And so it was only at that point that he did tell you what his real name was, right?

A    Yes.

Q    And then -- I think you testified on direct -- he told you that the female was his sister?

SER-071

A    Correct.

Q    But then he -- upon further questioning -- he admitted that she wasn't his sister, right?

A    Not about -- I told her, "Who was the other traveler that was with him?"  Which was the female passenger.

Q    First he told you that it was his sister, right?

A    Yes.

Q    And then you questioned him more, right?

A    Uh-huh.

Q    And then he told you it wasn't his sister, right?

A    Correct.

Q    Okay.  So even after you caught him in a lie, he lied to you again, right?

A    Correct.

Q    Now with regards to the female, she told you her name was "Gabriela Posadas," right?

A    Gabriela Elizabeth Posadas.

Q    And that was pursuant to what she claimed was her United States passport?

A    Correct.

Q    And at some point, you asked for her name again, right?

A    Correct.

Q    And she once again told you "Posadas"?

A    Yes.

Q    So I think you testified on direct that then you found her

Mexican ID as well, right?

**A     Correct.**

**Q     And you found out that her name was not Posadas either?**

**A     Yes.**

            *MR. GARRISON:*  No further questions, Your Honor.

            *THE COURT:*  Thank you.

            Any redirect?

            *MR. BESHAR:*  No, Your Honor.  Thank you.

            *THE COURT:*  All right.  Is this witness excused?

            *MR. BESHAR:*  Yes, Your Honor.

            *THE COURT:*  All right.  You are excused, sir.  Thank you very much.

            At this time, members of the jury, we're going to take a ten-minute recess.  We will be back at 3:50.  And as I indicated, we'll go until 4:30.  Please make sure you don't go far.  Ten minutes is not very long, but I want to make sure I get you as much of this testimony and evidence as possible.

      **(A recess was taken from 3:40 p.m. to 3:51 p.m.)**

      **(Proceedings heard in the presence of the jury.)**

            *THE COURT:*  All right.  Members of the jury, thank you for being prompt.  Once again, by a show of hands, did you hear anything?  Discuss anything about this case with anyone?

            Thank you.  Seeing no hands.

            The Government may call their next witness.

            *MR. BESHAR:*  Thank you, Your Honor.  The United States

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 74 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.946    Page 173 of 207

173

calls interpreter Andreea Boscor.

THE COURT:  While we're waiting for this witness to come in, in light of the concerns of Juror No. 2, I have indicated to the lawyers that we will start at 9:00 a.m. instead of 9:30 tomorrow.  Does anyone have a problem with that?  Perfect.  That way even if it's just half an hour, it's half an hour that we can be working.  So...

(Witness duly sworn.)

THE CLERK:  Please take the stand.  Please state your first and last name for the record.

THE WITNESS:  Andreea Boscor; B-O-S-C-O-R.

THE COURT:  And remember use that microphone please. Thank you.

<u>ANDREEA BOSCOR</u>, called as a witness for the Government, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BESHAR:

Q   Good afternoon, Ms. Boscor.  How are you employed?

A   Good afternoon.  I am a language specialist at the U.S. Attorney's Office here in San Diego.

Q   How long have you worked the U.S. Attorney's Office?

A   Two years and two months.

Q   What are your duties as a language specialist at the U.S. Attorney's Office?

A    I both perform translation and interpretation duties. Translation involves written work.  Interpretation involves oral work as well as transcription and translation of audio/video recordings.

Q    Do you also testify in court as needed?

A    Yes, I do.

Q    What did you do before working at the U.S. Attorney's Office?

A    I was a staff interpreter at the Superior Court of New Jersey Essex County.

Q    Do you have staff interpreter work prior to that experience?

A    Yes, I do.

Q    What was that?

A    I was a staff interpreter at a hospital -- university hospital in north New Jersey.

Q    Ms. Boscor, what languages are you proficient in?

A    Spanish, English, and Armenian.

Q    Where did you first learn to speak Spanish?

A    Here in the U.S. alongside English.

Q    What formal courses in English have you taken?

A    I completed my education beginning from middle school through graduate school in mostly English.

Q    Where did you attend graduate school?

A    Seton Hall University in New Jersey, as well as La Salle

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 76 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.948    Page 175 of 207

175

University Philadelphia, but remotely.

Q   What formal courses in Spanish have you taken?

A   I have completed my undergraduate degree in Spanish with concentration in translation, as well as continuing education courses to maintain my certification.

Q   How often do you speak Spanish, Ms. Boscor?

A   At least every business day.

Q   And where did you attend college?

A   Montclair State University in New Jersey.

Q   Are you a federally certified Spanish interpreter?

A   Yes, I am.

Q   Could you please explain to the jury briefly what that means?

A   Certainly.  It involves a two-part competitive testing process.  The first part is a written assessment with sections in both languages.  One section is multiple choice, and there are also paragraph completion and other grammar types of test and comprehension.  And the second portion is an oral assessment of interpreting skill.

Q   When did you become a certified court interpreter for the federal Government?

A   I became certified in late 2022.

Q   Do you also hold state certifications?

A   Yes.  I do for New Jersey.

Q   And when did you achieve the New Jersey certification?

**SER-076**

A    In spring of 2019.

Q    Apart from your federal certification and your New Jersey state certification, do you hold any other certifications?

A    Yes.  I'm also certified by the ATA, American Translators Association, as a translator which involves the written work from Spanish into English.

Q    And how long have you held that certification?

A    Since, approximately, late 2018.

Q    You have previously performed as an interpreter in a judicial proceeding?

A    Yes.

Q    How many times would you say you've done so?

A    Hundreds of times.

Q    And have you previously testified in court about your translations?

A    Yes. I have.

Q    How many times has your interpretation of Spanish into English or vice versa been found inaccurate?

A    None.

        MR. BESHAR:  Your Honor, at this point, the United States move to tender Ms. Boscor as an expert witness in the translation of Spanish and English.

        MR. BUGARIN:  No objection.

        THE COURT:  All right.  She'll be tendered as an expert.  Thank you.

**SER-077**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 78 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.950    Page 177 of 207

177

**MR. BESHAR:** Thank you, Your Honor.

*BY MR. BESHAR:*

Q  Ms. Boscor, let's talk about what you were asked to do in connection with this case.  Were you asked to translate certain text messages from Spanish into English?

A  Yes.

Q  Could you please take a look at Government Exhibits 54 through 64 in your binder?

I know I gave you a lot of exhibits.  If you can take a look at each and look up when you're done.

A  Yes.

Q  Thank you.

**(Witness reviewing exhibits.)**

A  **That was 54 through 64?**

Q  Yes, Ms. Boscor.

A  **Okay.**

Q  Thank you.  On each of those exhibits -- Government Exhibits 54 through 64 -- is the Spanish language text messages that you were asked to translate on the left-hand side?

A  **Right hand from my view.**

Q  Where do you see it on your version?

A  **On the right side.**

Q  On the right side.  And so on the left-hand side are your English translations?

A  **Yeah -- oh, I apologize.  My translations are on the right**

**SER-078**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 79 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.951    Page 178 of 207

178

side.  The original messages are on the left side.

Q   Excellent.  No worries.

Now based on your training and, approximately, seven years of experience as a Spanish language interpreter -- including your experience as a federally certified court interpreter -- are your translation of each of these text messages as outlined in Government Exhibits 54 through 64 accurate?

A   Yes, they are.

MR. BESHAR:  Your Honor,  at this point the United States moves to conditionally -- excuse me -- to mark for identification Government Exhibits 54 through 64 pending admission of the original Spanish language evidence.

(Government Exhibits 54 through 64 marked for identification.)

MR. BUGARIN:  No objection, Your Honor.

THE COURT:  All right.  I'll grant that.

MR. BESHAR:  And no further questions for Ms. Boscor, Your Honor.

THE COURT:  Thank you.

Any cross-examination?

MR. BUGARIN:  Not at this time, Your Honor.

THE COURT:  All right.  Thank you.

Is this witness excused?

MR. BUGARIN:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  You are excused.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 80 of 298
Case 3:24-cr-00684-LL   Document 157   Filed 08/25/25   PageID.952   Page 179 of 207

179

You may call your next witness.

**MR. BESHAR:**  Thank you, Your Honor.  The United States calls interpreter Aida Smith [sic].

**THE COURT:**  Thank you.

**(Witness duly sworn.)**

**THE CLERK:**  Please take the stand.  Please state your first and last name for the record.

**THE WITNESS:**  Ruth Smith -- R-U-T-H, S-M-I-T-H.

**THE CLERK:**  Thank you.

<u>**RUTH SMITH**</u>,

**called as a witness for the Government, having been duly sworn,**

**testified as follows:**

**DIRECT EXAMINATION**

*BY MR. BESHAR:*

**Q**   Good afternoon, Ms. Smith.  How are you employed?

**A**   **Good afternoon.  I work for the U.S. Attorney's Office.**

**Q**   Here in San Diego?

**A**   **Yes.**

**Q**   What is your title at the U.S. Attorney's Office?

**A**   **I'm a language specialist.**

**Q**   How long have you worked at the U.S. Attorney's Office?

**A**   **For about --**

**(Court Reporter clarification.)**

**THE WITNESS:**  Eight years.

*///*

*BY MR. BESHAR:*

Q   What are your duties as a language specialist at the U.S. Attorney's Office?

A   Well, at the U.S. Attorney's Office, we interpret and translate.  Interpret is all the oral interpretations.  We interpret for debriefs, grand jury sessions.  We interpret for witnesses, like, in court.  And that's all verbal interpretation.

     And we also do translation which is all the written translation of documents.  We translate -- and we also transcribe and translate, that's transcribing videos, audios, wiretaps.  It's first transcribed into Spanish, and then we translate everything that we transcribed into Spanish into English.  And so that's what we do.

Q   What did you do before working at the U.S. Attorney's Office?

A   Throughout my career, I've been an independent contractor.  Same thing, as a translator of documents and interpreting for attorneys, state court, federal court, conferences.

Q   Ms. Smith, what languages are you proficient in?

A   I'm proficient -- at the level of interpretation, I'm proficient in English and Spanish.  But I speak French and Italian and a little bit of Portuguese.

Q   Incredible.  Where did you first learn to speak Spanish?

A   I was born and raised in Mexico City.  So my whole life.

SER-081

I'm Mexican.

Q    And where did you learn to speak English?

A    I started learning English in Mexico City.  I went to school and learned it at school, and then I moved to the U.S. and --

Q    What formal courses in English have you taken?

A    Since I was not a native speaker of English, I took classes -- as anybody else who wants to learn a language -- from beginner classes, intermediate, advanced.  I then took the teacher's course.  I became an English teacher.  And then I wanted to be an interpreter and translator, so I continued taking proficiency English classes throughout my life.

Q    Do you have a college degree?

A    I do.

Q    From where?

A    It's called the Higher Institute of Interpretation and Translation in Mexico City.

Q    And what was your degree in from that university?

A    Conference interpretation and translation.

Q    What formal courses in Spanish have you taken?

A    Throughout my life -- like I said, I was born and raised in Mexico City -- so school; elementary, middle school, high school.  And then of course when I went to college to get my degree, we have to master both languages -- your working languages -- in my case, Spanish and English.  So I've always

taken grammar classes, advanced grammar, linguistics.

Q    How often do you speak Spanish?

A    **Every day.**

Q    Are you a federally certified Spanish interpreter?

A    **I am.**

Q    And we've briefly heard what that really means.  Could you explain it, briefly?

A    **To become a federally certified interpreter, you have to pass very difficult tests -- written tests and oral tests -- in order to be -- to get the certification to work at the federal level.**

Q    And since when have you held that the federal certification?

A    **For federal court, since 2008.**

Q    Do you also hold a state certification?

A    **I do.**

Q    From where?

A    **It's from the State of California.**

Q    And when you did you achieve that California certification?

A    **In 1995.**

Q    Apart from your federal certification and your State of California certification, do you hold any others?

A    **Yes.  I have -- it's called an "administrative certification" to interpret for medical hearings or administrative hearings like workers' compensation hearings.**

**SER-083**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 84 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.956    Page 183 of

SMITH  |  DIRECT  |  BESHAR
207

183

Things like that.

Q    And for how long have you held that certification?

A    Also since 1995.

Q    Have you previously performed as an interpreter in a judicial proceeding?

A    Yes, I have.

Q    And have you testified before?

A    Yes, I have.

Q    How many times would you say?

A    Testified?  Probably about 25 times.

Q    How many times have your translations been used in federal or state court?

A    I would say hundreds.  I've been an interpreter for several years now, so... And I work for the U.S. Attorney's Office, so hundred of times.

Q    And over your 30-year career as an interpreter, how many times have your translations from Spanish into English or vice versa been found to be inaccurate?

A    Probably, I can recall one time.  One time there were some mistakes in a transcription, and -- but I corrected them when there were some -- a couple of mistakes and I corrected them.

MR. BESHAR:  Your Honor, at this point the United States moves to tender Ms. Smith as an expert in the translation of Spanish into English.

MR. BUGARIN:  No objection.

THE COURT: All right. You'll be tendered as an expert. Thank you.

BY MR. BESHAR:

Q   Ms. Smith, let's talk about what you were to do in connection with this case.

Were you asked to translate a video recording from Spanish into English?

A   Yes.

Q   In your exhibit binder in front of you, please turn to what is marked as "Government Exhibit 65"?

A   Okay.

Q   Do you recognize Government Exhibit 65?

A   I do.

Q   What is it?

A   It's a disk of the video that I first transcribed into Spanish and then translated English.

Q   How do you know?

A   It has my initials.

Q   Could you please turn to what is marked as Government Exhibit 66 in your binder?

A   Yes.

Q   Does this exhibit contain your certified translation of the Spanish language audio from the recording on Government's Exhibit 65?

A   Yes, it does.

**Q** Now based on your training and, approximately, 30 years as a court interpreter -- as a Spanish language interpreter -- are your translations of the video recording outlined in Government Exhibit 65 accurate?

**A** They are.

*MR. BESHAR:* Your Honor, at this point, the United States moves to mark for identification Government Exhibit 65 and 66 pending admission of the original Spanish evidence.

*THE COURT:* Any objection?

*MR. GARRISON:* Just a clarification, but we can do it -- we can do it later. No objection right now, Your Honor.

*THE COURT:* All right. Thank you. It'll be admitted for identification.

**(Government Exhibits 65 through 66 marked for identification.)**

*MR. BESHAR:* No further questions, Your Honor.

*THE COURT:* Thank you.

Any questions from the Defense?

*MR. GARRISON:* No. Thank you, Your Honor.

*THE COURT:* All right. Thank you.

Is this witness excused?

*MR. GARRISON:* Yes, Your Honor.

*MR. BESHAR:* Yes, Your Honor.

*THE COURT:* You are excused. Thank you very much.

The Government can call their next witness.

*MR. BESHAR:* The United States calls Bureau of Prisons

Officer Carlos Casanola.

THE COURT:  All right.  Thank you.

(Witness duly sworn.)

THE CLERK:  Please take the stand.  Please state your first and last name for the record.

THE WITNESS:  Carlos Casanola.

THE CLERK:  Thank you.

                    CARLOS CASANOLA,

called as a witness for the Government's, having been duly sworn, testified as follows:

                 DIRECT EXAMINATION

BY MR. BESHAR:

Q    Good afternoon, Officer Casanola.

A    Good afternoon.

Q    You were testified to -- excuse me -- you were subpoenaed today to testify about certain jail call records; is that correct?

MR. GARRISON:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BESHAR:

Q    Offer Casanola, where do you work?

A    I work at the Metropolitan Correctional Center here in downtown San Diego.

Q    What is the Metropolitan Correctional Center?

A    It's a federal correctional center that houses inmates who

SER-087

have criminal offenses pending.

Q    What is your position at the MCC?

A    My position at MCC is special investigator for the prison.

Q    What does a special investigator do?

A    We uncover illicit activity among the inmate population, crimes, nuisance, contraband, fights, assaults; thing of that nature.

Q    Do you also monitor inmate telephone calls?

(Court Reporter interruption.)

*THE WITNESS:*  Yeah.  That's part of the job.  We monitor inmate telephone calls.

*BY MR. BESHAR:*

Q    How long have you been a special investigator at MCC?

A    It'll be, approximately, two years as a special investigator.

Q    What training have you received to be a special investigator?

A    To be a special investigator, we went through a course in Denver, Colorado -- 80-hour course -- special investigative techniques and trainings.  Before then, we also did training in the aspect of introductory to correctional techniques.  That was 120 hours as a correctional officer.  And then also to follow up, phase two of that would be correctional techniques phase two, we did another 120 hours.  And that was done in the Federal Law Enforcement Training Center in -- located in -- it

slipped my mind now.

       **THE COURT:**  Before you ask any further questions, I am going to ask you to pull that microphone close to you.  You think we can all hear you, but actually we're struggling a little bit.  Thank you very much.  I appreciate it.

       **THE WITNESS:**  Yeah.  In Glynco, Georgia.  I'm sorry. Located in Glynco, Georgia.

**BY MR. BESHAR:**

**Q**  Understood.

       Officer Casanola, have you worked at MCC in another capacity?

**A  Have I've worked at -- say it again?**

**Q**  At MCC, have you worked in another capacity apart from your special investigation work?

**A  I was.  I was a correctional officer there.**

**Q**  As a special investigator, are you familiar with whether MCC has a policy for recording phone calls made by inmates?

**A  We do.  We record all inmate activity within the prison.**

**Q**  How does that process work?

**A  Well, there's a two-way verification process with that. They're assigned their own personal identification number. They're not allowed to give that out to anybody.  If so -- if they do, they're in violation.  They put in their PAC number -- their personal identification number -- and they then have to -- it's a voice recognition system that is authorized.  And**

**SER-089**

if it doesn't recognize their voice, it rejects it.

Q   You mentioned the recording policy.  Do inmates receive notice of the recording policy?

A   They do.  And that's done right in the beginning of the telephone call.  They're aware that they're being monitored.

Q   Are they noticed of that fact elsewhere at MCC?

A   I'm sorry?

Q   Are they noticed of the fact that they're being recorded elsewhere at MCC?

A   Yeah.  Any calls that they make there, they know that -- they're aware that they're being recorded.

Q   Are you familiar with how MCC records and stores telephone calls made by inmates?

A   I am.  I'm aware.

Q   How are they captured?

A   It goes through a process of -- it's called a Truphone system that we use.  And it captures all their -- the date, time, duration of the call, who they're calling.

Q   How long are those digital recordings maintained for?

A   A period of -- it's a period of six months.  If they're locked, then it's indefinite.  But if they're not locked, then they're purged after six months.

Q   Are calls from inmates to their attorneys recorded?

A   No.  They have their own line that they use for attorney phone calls.

**SER-090**

Q    In addition to digitally recording the audio feed of the telephone call, does the Truphone system record other data about the telephone call?

A    It, basically, just records the data as far as time, duration, when the call is placed, who it's to.

Q    Have you personally verified whether the Truphone system is accurately capturing those audio calls?

A    Yeah, I have.

Q    How often do you verify that capture?

A    On a daily basis.  We use it on a daily basis.  Especially if we're getting subpoenas.  We get 10 to 15 a week, and then we're also listening and monitoring phone calls as well.

Q    I may have missed it.  How does an inmate start a telephone call at MCC?

A    Yeah.  They input their personal identification number -- that's how you first start it -- and then it prompts you to say "United States of America."  That's the voice recognition that it wants you to say.  And so the inmate repeats it, and then the call will go through.  If not -- it doesn't recognize it -- it will reject it.

Q    Can another inmate use a certain inmate's PAC number?

A    They can, but not without the voice recognition and the personal identification number.

Q    In this case, Officer Casanola, did you receive a subpoena for all MCC calls placed by the Defendant Miguel Rolon from

**SER-091**

March 11, 2024, through August 24, 2024?

A    That's correct, I did.

Q    In response to that subpoena, what did you do?

A    In response to the subpoena -- we don't get the subpoenas directly.  Our legal department gets them first and they verify the authenticity of the subpoena.  And then once that's complete by our legal department, then it gets forwarded to us for completion.

Q    So once it's forwarded to you, what are you personally doing next?

A    I read through the terminology to see what are the date ranges that they want; the call, the time frame, the dates.  And then also -- so once that's done, we use our Truphone system.  I lock the calls.  Start downloading the calls onto my desktop.  And then from there, complete the data and -- by using it's called "JEFS," it's a Justice Enterprise File Sharing system that is used -- that is secure.  And we send it through there to the agent.

Q    So just so we understand, what's your output from that process?

A    I'm sorry, what's the output?

Q    What are you creating once you've downloaded the files?

A    Yeah.  Just the generic on my desktop folder with the inmate's name, rig number, what the transactional data that's attached to the phone calls and the phone calls that are

included.

Q    Do you remember how many phone calls you downloaded for this time period?

A    I believe it was 299, I believe.

Q    Were the date and time reflected on each call made on that list?

A    Yes.  Date and time, it was reflected.

Q    Officer Casanola, in your binder Government's Exhibit binder in front of you, please turn to what is marked for identification as "Government's Exhibit 70."

     Do you recognize this?

A    Does it say "Mel" on the top of it with a phone number?

Q    Say it one more time, Officer Casanola?

A    Does it say "Mel" on it, is it a photo of --

     THE COURT:  So one second, sir.  I can tell you my binder doesn't have anything on that tab.  So I'm not sure --

     MR. BESHAR:  One second, Your Honor.

     MR. BUGARIN:  We don't have it either, Your Honor.

     THE COURT:  Yup.

     (Government Counsel confers.)

     MR. BESHAR:  Your Honor, do you mind if I approach just to take a look at what Officer Casanola is looking at?

     THE COURT:  You may approach.

     MR. BESHAR:  Thank you.

     Oh, 70.

SER-093

THE WITNESS:  That's my fault.

THE COURT:  Before you leave, though -- because whatever he has the Defense is missing and I am missing.  So we all need to see it.

MR. BESHAR:  Of course, Your Honor.

Our apologies for the delay, Your Honor.

BY MR. BESHAR:

Q   Okay.  Officer Casanola, do you recognize this disk?

A   I do.

Q   What is it?

A   It's a disk of jail calls.

Q   How do you know?

A   It's got the signature right here on the bottom of it.

Q   Officer Casanola, does this disk reflect a particular selection of your list?

A   I'm sorry, does it reflect a specific selection?

Q   What jail calls are on this disk?

A   It's inmate Miguel Rolon's.

Q   But not -- or how many jail calls are on this disk, Officer Casanola?

A   From the date ranges that was supplied to me, it should be, approximately 299.

     (Government Counsel confers.)

BY MR. BESHAR:

Q   My fault for the delay, Officer Casanola.

When we showed this disk, is this the disk that only had two calls selected out of your 299 calls?

A    That's correct.

Q    And we reviewed those two calls prior to your testimony today, right?

A    Yes, sir.

MR. GARRISON:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BESHAR:

Q    Did we review those two calls prior to your testimony today?

A    Yes, sir.

MR. BESHAR:  Your Honor, the Government marks Government's Exhibit 70 for identification only.

THE COURT:  Mr. Garrison?

MR. GARRISON:  No objection.

THE COURT:  All right.  It'll be marked for identification.

(Government Exhibit 70 marked for identification.)

MR. BESHAR:  Our fault, Your Honor, for the back and forth on this.  We're going to move to admit Government's Exhibit 70 at this time.

MR. GARRISON:  Can we have a sidebar, Your Honor?

THE COURT:  Yes.

If you want to stand and stretch, you may.

**SER-095**

**(The following proceedings were heard at the sidebar.)**

*MR. BESHAR:* Your Honor, our apologies for the back and forth. If I may just start at the outset, we're a little bit reshuffled the way we're doing the witnesses. And so we're just moving a bit out of pocket. And so we appreciate the Court's patience as well as Counsel's patience on this.

*THE COURT:* That's good. I'm moving quickly. I run good trials.

Mr. Garrison?

*MR. GARRISON:* I'm wondering what two jail calls are on the disk, because the Government represented multiple times they only used one, so...

*THE COURT:* And I am concerned because it's on the exhibit list. One of them is marked as a call with his wife. And I'm certain the Defense is going to raise, I believe, a marital privilege with that call.

*MR. FAWCETT:* We did have that call on there, and we wanted to have him confirm that -- it was for the purpose of cross-examination, obviously -- the judge may have to overrule me on that -- the only call that we were planning to publish -- and this is what I had mentioned to Mr. Garrison -- was the other call. I think it's marked as with "unknown male." It's just that they -- they probably should be on different disks.

*THE COURT:* So the exhibit list has them as if they're

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 97 of 298
Case 3:24-cr-00684-LL   Document 157   Filed 08/25/25   PageID.969   Page 196 of 207

**SIDEBAR**

196

on separate disks.  They have 70 jail calls.

> **MR. GARRISON:**  Yeah.  So the exhibit list that I have is different.  It has the jail calls as "65" and "66" or something.

> **MR. BESHAR:**  It could be a prior iteration, maybe not the latest that was sent to the courtroom deputy this morning.

> **MR. GARRISON:**  Yeah.  This was sent to us, I believe, last night.  So we're going to need a copy of the -- of the newest one.

> **MR. BESHAR:**  Of course.

> **THE COURT:**  And then, so -- absolutely, you'll get that.  What is your position, Mr. Garrison, that although two calls are the list, only on that exhibit, only one of them will be published?

> **MR. GARRISON:**  Well, if they're just going to publish the one call, then that's one thing.  But if they're going to move the disk into evidence --

> **THE COURT:**  Correct.

> **MR. GARRISON:**  -- then I would ask that they be on separate disks.

> **THE COURT:**  Correct.  What are you intending to do?

> **MR. FAWCETT:**  We could remove the other call from that disk and provide a separate disk in the event that we do try to get that other call.  Again, we weren't planning to try to introduce it or publish it in our case-in-chief.  So we don't

have an issue with that.  We would just need to remove that other call from the disk.

THE COURT:  All right.  So in order to maximize our time today, if your request is to publish just the one call.

Do you have any objection just to publishing the one call, Mr. Garrison?

MR. GARRISON:  This is the "pollo" call?

MR. BESHAR:  Yeah.  The one that's in English.

MR. GARRISON:  Okay.  No.

THE COURT:  So no objection to that.  However, I would like new disks brought tomorrow in the event we need it.  And we can decide if they're going to be 70-A -- or whatever we decide with purposes of numbering it.  But at this juncture, Exhibit 70 is not to be admitted as evidence and provided to the jury in its current condition.  But I will allow the publication of the one call.

MR. FAWCETT:  And if it would be better for everyone, we do have someone who is going to be discussing some -- there is one word of this call that would be our next witness which may end up being tomorrow depending on how the Court wants to proceed.  We could wait and hold off and do that tomorrow morning if that would be more comfortable for everybody, so we just have the disk with one call?

MR. GARRISON:  That would be cleaner.

MR. FAWCETT:  Then if that's the case, then this would

be our last witness for the day.

THE COURT:  Perfect.  All right.

MR. GARRISON:  Thank you, Your Honor.

THE COURT:  Of course.

**(End of sidebar; proceedings heard in presence of the jury.)**

THE COURT:  All right.  Well, thank you very much.  We will address the disk tomorrow.  It's too late in the day for any disk to be -- for you all to deal with anything with respect to a disk.

Other than what we just discussed, do you have any further questions of this witness?

MR. BESHAR:  Not at this time, Your Honor.  Thank you.

THE COURT:  All right.

Any cross-examination?

MR. GARRISON:  Just briefly, Your Honor.

THE COURT:  Okay.  Come forward.

**CROSS-EXAMINATION**

BY MR. GARRISON:

Q   Officer Casanola, you mentioned that you were a corrections officer before you were a special investigator, right?

A   That's correct, sir.

Q   How long were you a corrections officer?

A   Let's see...  approximately, let's say five years.

Q   Was all that time at MCC?

A   It was not, sir.

**Q**    How long of that was at MCC?

**A**    **Five years total at MCC; two years at FCC Hazelton.  So seven years total.**

**Q**    How long have you -- how long did you serve as a correctional officer just at MCC San Diego?

**A**    **I came in 2020; two years.**

**Q**    And then you were promoted to a special investigator?

**A**    **That's correct.**

**Q**    So I believe you -- on direct you had testified that MCC houses people who have pending criminal cases, right?

**A**    **That's correct.**

**Q**    So these are pretrial detainees, right?

**A**    **That's correct, sir.**

**Q**    Okay.  And in your time as a correctional officer, you worked on the floors with -- with the general population of MCC San Diego, correct?

**A**    **Correct.**

**Q**    And, MCC is the main place that houses pretrial detainees for people arrested in the San Diego area for federal crimes, right?

**A**    **Correct.**

**Q**    Okay.  So crimes that happened at San Ysidro Port of Entry, many people housed at MCC, they're accused of crimes that happened there; is that correct?

**A**    **That could be accurate, yes.**

**Q**   Okay.  And so you might have people that are charged with a myriad of different offenses that are housed in the same cell block, right?

**A**   **Correct.**

**Q**   Likewise, you might have people that are charged with similar offenses, right?

**A**   **Correct.**

**Q**   Like, for example, you might have -- well, let me back this up.

MCC has 12 floors?

**A**   **That's accurate, yes.**

**Q**   And most of those floors house inmates?

**A**   **Correct.**

**Q**   Okay.  And on those floors, there are about how many people -- or how many detainees on each floor?

**A**   **Just depending on the needs of the population.  But depending -- 80 -- roughly 80 or so.**

**Q**   Okay.  So about 80 per so people on each floor.  And all of those 80 people are charged with different offenses, federal offenses, right?

**A**   **Yes, sir.**

**Q**   Okay.  It's very possible that a person could be charged with a same offense that another person on their floor is charged with; is that fair?

**A**   **That's accurate, yes.**

**Q** Okay. Now, on direct, you also said that people that are housed at MCC San Diego, sometimes they use each other's pins, correct?

**A** Correct.

**Q** So to break that down a little bit more.

Sometimes one might use another detainee's phone identification number, right?

**A** That has happened, yes.

**Q** Okay. Well, it's a fairly frequent occurrence, right?

**A** If they are, they're in violation of the Bureau of Prison rules and regulations.

**Q** Understood. But I mean, it's not like this only happens once a year, right?

**A** Correct.

**Q** It happens very frequently?

**A** Correct.

**Q** Okay. Now, you testified that there was a voice recognition system?

**A** Yes, sir.

**Q** But you don't know how that voice recognition system works, right?

**A** I don't know how it's operated -- I know how it's operated as far as they say a sentence and a piece of that is "United States of America," and that's what they're supposed to say. And that's how the voice recognition picks it up. As far as

operationally, no.

Q    Right.  Like you don't have a -- you didn't go to school for, like, voice recognition computer training, did you?

A    No.

Q    And so you don't know -- you don't know how accurate, you know, this voice recognition system is, do you?

A    **It's accurate enough to where it can pick up their voice. That's all I know.**

Q    Okay.  Well, what's the error rate?

A    **I couldn't tell you, sir.**

Q    Okay.  So you can't tell me the error rate, but you can testify under oath that it's accurate?

A    **I can testify that alls I know is the system picks up the voice, and it's -- to my knowledge, it's fairly accurate.**

Q    Okay.  Well, what's the error rate?

A    **I couldn't tell you, sir.**

Q    Okay.  So you under oath, you could tell us it's fairly accurate, but you don't know the error rate?

A    **I do not.**

        *MR. GARRISON:*  Okay.  No further questions.

        *THE COURT:*  Thank you.

        Any redirect?

        *MR. BESHAR:*  No.  No thank you, Your Honor.

        *THE COURT:*  Is this witness subject to recall tomorrow?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 104 of 298
Case 3:24-cr-00684-LL    Document 157    Filed 08/25/25    PageID.976    Page 203 of 207

203

MR. BESHAR: No. Thank you, Your Honor.

THE COURT: From the Defense?

MR. GARRISON: He could be excused, Your Honor. Thank you.

THE COURT: All right. Thank you. You are excused. Thank you very much.

THE WITNESS: Thank you.

THE COURT: Members of the jury, as the witness exits, I will once again remind you -- as I told you I would be reminding you -- please do not discuss this case with anyone. When you speak to your friends, to your family members, or to your employers it's okay to tell them that you're serving on a jury and how long you expect to be here. But you are not to discuss any of the testimony that you heard today. Do not begin deliberations. Do not do any research on your own. Good news is there will be coffee and pastries outside in the hallway for you tomorrow.

What time will we have those?

THE CLERK: 8:20.

THE COURT: They'll be here around 8:20. So make sure you get here. In terms of pastries, don't bring them in the courtroom. But you are free to bring your coffee in the courtroom. Try your hardest not to spill it. But yes, you are permitted to bring that.

And we will see you all back here at 9:00 a.m. As

you've seen, I like to start right on time. So make sure you're all here so that we can begin right on time. Thank you very much. We'll see you tomorrow.

**(Jury exits the courtroom at 4:34 p.m.)**

**(Proceedings heard outside the presence of the jury.)**

*THE COURT:* All right. Mr. Garrison, I believe you wanted to be heard regarding Exhibit 66 that at this juncture has only been -- it has only been admitted for purposes of identification. It hasn't actually been admitted. It's been identified. What is your concern with this?

*MR. GARRISON:* Well, it goes to what we discussed at sidebar a little bit later. I wasn't understanding what was on that disk because my exhibit list from the Government had it list as something different.

*THE COURT:* Understood.

*MR. GARRISON:* So I think that once we get the updated exhibit list, then my confusion will be cleared up.

*THE COURT:* Very well. All right. I don't think we should have anything to discuss. I think everyone needs to get your work done. Make sure the Government stays in touch with the Defense regarding the material witnesses. And we will be back here -- I'll be here a couple minutes before 9:00. I'm making them come early. So I'd like to try to make sure we can start right on time. I'm hoping that we don't have any issues to discuss. But if we do, we'll make it happen.

**SER-105**

MR. FAWCETT: One issue that we would likely bring up in the morning, Your Honor, for the one material witness who we had not yet located, we would -- if we have not found or produced her yet, we would likely try to make a showing of unavailablity in that case.

THE COURT: My question with respect to that witness is if you have the other witness -- and we can begin with the other witness then perhaps in the jury's -- out of the jury's presence, we can discuss whether you're able to establish unavailablity. I'll hear any objections from the Defense. And then we can proceed.

Any opposition to that?

MR. GARRISON: No, Your Honor.

THE COURT: Okay.

MR. FAWCETT: Understood --

(Court Reporter interruption.)

MR. FAWCETT: I'm so sorry.

We do want to just inform everyone that we had heard from material witness Counsel, Ruth Philips, who told us that she -- this was from an email earlier this afternoon -- that she will -- I think a family member has a medical procedure that can't be postponed. And so she said that she wouldn't be able to here tomorrow morning when we had planned to call Mr. -- our witness. So we plan on going forward with that --

THE COURT: He's a witness. If she can't be here, she

can't be here.  He needs to be there.

MR. FAWCETT:  Yeah.  That was our plan.  We just wanted to make sure everyone was on the same page.  Thank you.

THE COURT:  Very well.  All right.  Thank you.

MR. GARRISON:  Thank you, Your Honor.

THE CLERK:  The Court is now in recess.

(Recess taken at 4:37 p.m.)

* * * *

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LINDA LOPEZ

UNITED STATES DISTRICT JUDGE

```
_____
                              )
UNITED STATES OF AMERICA,      )
                               ) Case No. 24-CR-00684-LL
                  Plaintiff,   )
                               ) Wednesday, April 9, 2025
        v.                     )
                               )
MIGUEL ROLON,                  )
                               )
                  Defendant.   )
_____ ) San Diego, California
```

REPORTER'S TRANSCRIPT OF JURY TRIAL DAY 2

PAGES 6 THROUGH 206

APPEARANCES:

For Plaintiff:   UNITED STATES ATTORNEY'S OFFICE
                 880 Front Street, Suite 6293
                 San Diego, California  92101-8807
                 BY:  HENRY F. B. BESHAR, AUSA
                 and  DAVID EUGENE FAWCETT, AUSA.

For Defendant:   FEDERAL DEFENDERS OF SAN DIEGO
                 225 Broadway, Suite 900
                 San Diego, California  92101-5030
                 BY:  JULIAN ANDREE BUGARIN, ESQ.
                 and  TIMOTHY ROBERT GARRISON, ESQ.

   (Appearances of Counsel continued on following page.)

Reported By:  Jessica Borynack, RPR, CSR No. 14779
District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California  92101-3806
(Reported stenographically; transcribed via computer)

SER-108

2

(Appearances of Counsel continued.)


For Material Witnesses:          LAW OFFICE OF RUTH PHILIPS
                                 P.O. Box 16353
                                 San Diego, CA 92176
                                 BY:  RUTH B. PHILIPS, ESQ.



                                 Interpreter:  Lorena Fiallo

SER-109

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 110 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.983   Page 3 of 207

3

**I N D E X**

| Witnesses | | Page |
|---|---|---|

**YONATHAN IXAN-MARROQUIN (SWORN)**

| Direct | By Mr. Fawcett | 21 |
|---|---|---|
| Cross | By Mr. Bugarin | 108 |
| Redirect | By Mr. Fawcett | 121 |
| Recross | By Mr. Bugarin | 126 |

**ALEXANDER MEDINA (SWORN)**

| Direct | By Mr. Fawcett | 72 |
|---|---|---|
| Cross | By Mr. Bugarin | 81 |
| Redirect | By Mr. Fawcett | 83 |

**JULIO CORRALES (SWORN)**

| Direct | By Mr. Fawcett | 127 |
|---|---|---|
| Cross | By Mr. Bugarin | 169 |
| Redirect | By Mr. Fawcett | 198 |

**SER-110**

**E X H I B I T S**

| Government's Received | Page |
|---|---|
| 5 | 45 |
| 6 | 45 |
| 7 | 46 |
| 8 | 48 |
| 9 | 49 |
| 10 | 49 |
| 11 | 49 |
| 12 | 124 |
| 14 | 202 |
| 15 | 202 |
| 16 | 61 |
| 17 | 61 |
| 18 | 61 |
| 44 | 133 |
| 45 | 134 |
| 46 | 135 |
| 47 | 136 |
| 48 | 142 |
| 49 | 148 |
| 50 | 153 |
| 51 | 158 |
| 52 | 163 |

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 112 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.985   Page 5 of 207

5

**E  X  H  I  B  I  T  S  (Cont)**

| Government's Received | Page |
|---|---|
| 55 | 48 |
| 56 | 49 |
| 57 | 49 |
| 58 | 49 |
| 59 | 61 |
| 65 | 63 |
| 66 | 64 |
| 69 | 166 |
| 70 | 80 |

| Defense's Received | |
|---|---|
| E4 | 174 |
| E5 | 177 |
| E7 | 187 |

**SER-112**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 113 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.986   Page 6 of 207

6

SAN DIEGO, CALIFORNIA: WEDNESDAY, APRIL 9, 2025; 9:03 A.M.

* * * *

(Proceedings heard outside the presence of the jury.)

(Call to order.)

THE CLERK:  Calling Matter No. 1 from the calendar, 24-CR-684, United States of America v. Miguel Rolon, on calendar for a Jury Trial, Day Two.

MR. BESHAR:  Good morning, Your Honor.  Henry Beshar and David Fawcett for the United States.

THE COURT:  Thank you.

MR. GARRISON:  Good morning, Your Honor.  Timothy Garrison, Federal Defenders, and Julian Bugarin of Federal Defenders on behalf of Mr. Rolon, who is present before the Court in custody.

THE COURT:  Thank you.

Ms. Philips, I know you're present, but I think we have a matter we need to take.  So if you can take a seat, I'll be happy to hear from you.

MS. PHILIPS:  When it's appropriate, can you give my client an interpreter?

THE COURT:  One moment Ms. Philips.  I'm sorry.

Okay.  Counsel?

MR. GARRISON:  So your Honor, last night the Government sent over an email and said that they're producing over USAfx --

*THE COURT:*  They're producing what, I'm sorry?

*MR. GARRISON:*  That they were sending over USAfx. It's, like, basically like Dropbox or Box.  It's how they get the discovery over to us.  They said that they were sending over the clips of the post-arrest statement that they intended to play.

Well, when we attempted to open the files, we couldn't get them open.  So then we emailed them this morning and asked them to bring the clips on a flash drive.  But then subsequently, this morning after we got to court, our office was able to get the files open.

But the issue -- and the Government indicates that they want to play these clips this morning.  The issue that I have is that there's a lot of objectionable things in the clips that the agents say or that are 403 as to Mr. Rolon.  Some of the things -- I've been able to go through some of the transcript of the video which was produced to us this morning. And I've been able to go over that.

And I've talked to Mr. Fawcett a little bit, and there's some stuff we agree that should not come in and some that should.  And we did have the video, but at the same time, they never identified "Oh, we're going to play this clip from the video or that clip."

We have no idea what kind of -- if there was going to be objectionable content that they wanted to play.

So now, once again, we're scrambling. The Defense is prejudiced because of the Government's late disclosure and late decisions to do things. And so at a minimum, we're going to need time to go through this so we can address with the Court the things we think are objectionable that the jury shouldn't hear.

**THE COURT:** Thank you, Mr. Garrison.

From the Government?

**MR. FAWCETT:** First of all, the Defense has had this video from very early on in this case. I don't -- I don't think there's any hiding the ball that this is an important part of our case. We talked about it in our opening statement. And the idea that it's a surprise that we would try to introduce the defendant's post-arrest statements is --

**THE COURT:** Do you mind if I interrupt you for one second? Because I can say without hearing of the rest of what you have to say -- and I apologize -- I agree, the Defense has had it. I agree that I always encourage people and the Defense always asks for the Government to specify what portions they intend to use.

In theory, it's questionable whether the Government has an obligation to identify all portions that they intend to use. My question is, why can't we just -- is it going to harm you any in your presentation of your case if we do not handle that aspect of testimony or evidence this morning just to give

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 116 of 298
Case 3:24-cr-00684-LL Document 158 Filed 08/25/25 PageID.989 Page 9 of 207

9

the Defense an opportunity to --

MR. FAWCETT: Not at all, Your Honor. We don't have a problem with that. The reason that we moved our case agent up this morning was to try to accommodate. Because I know the material witness counsel wanted to be here for Mr. Yonathan Marroquin's testimony. So that's why we were trying to rearrange the order of things. So we're trying to balance that.

THE COURT: I appreciate that. So I'm going to allow the evidence to come in, but I'm going to allow Mr. Garrison and the Defense team to have the opportunity during the lunch break -- or whatever -- to review it. So that evidence will come in, at the earliest would be after the lunch break.

MR. FAWCETT: Okay.

THE COURT: Mr. Garrison?

MR. GARRISON: Yes. That's fine, Your Honor.

THE COURT: All right. Thank you.

Now with respect -- anything else from the lawyers with respect to that aspect?

MR. GARRISON: No, Your Honor.

THE COURT: All right. With respect to the material witness, I see that he's here. I don't know if you speak English.

MS. PHILIPS: No, he doesn't. I requested an interpreter.

**MR. FAWCETT:**  Our interpreter is in the room.

**THE COURT:**  Okay.  Thank you.

Hi, nice to see you.  Ms. Philips, you can come forward and make your appearance, please?

**MS. PHILIPS:**  On the record?

**THE COURT:**  Sure.

**MS. PHILIPS:**  Yeah, good morning.  Ruth Philips appearing on behalf of Mr. Yonathan Moises Ixan-Marroquin, the material witness who has been subpoenaed to testify in this matter.

**THE COURT:**  All right.  So I understand -- Rhea sent me the email that you forwarded to her.  I'm sympathetic that your husband has a medical procedure.  This came as a surprise, I think, to everyone, really, that your client would be here and prepared to testify.  He is under subpoena, and as such I don't know that anything has been brought before me that he has a right to counsel.  I'm not trying to impede anything that you may be trying to do to protect your client both during testimony and potentially in any relief that he's going to seek from immigration.  But his testimony is going forward this morning.

If you're not able to be here, I'm going to ask that you find counsel that can cover for you.  We have one juror who does not believe she can be here on Friday.  We only have one alternate.  We tried to start early this morning.  We have one

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 118 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.991    Page 11 of 207

11

juror who got stuck in traffic.  So we just don't have the luxury to go dark for the morning.

It's a terrible situation.  I'm typically very sympathic and accommodating.  I don't have much else I can provide to you at this point.  I understand the situation that you're in.  He was represented during the deposition.  I know you were there.  So if you're able to --

And flip side of that is I don't know if the Government -- other than the case agent and the material witness, I don't know if you have another witness that you want to call out of turn.  I let that be your decision.  You can work with Ms. Philips if you're able to, and we're able to call the material witness in the afternoon because you have something to fill the morning.  I'm happy to work with you all in flipping the order of things.  But if the Government doesn't have any other witnesses, he needs to testify this morning.

**MS. PHILIPS:**  May I respond?  Okay.  My request was not that this -- his testimony be postponed to another day.  It was merely that it be postponed until this afternoon.

**THE COURT:**  Correct.  I just don't have -- I'm sorry, but if the Government doesn't have other witnesses, we don't have the luxury of being dark in the morning.  That's my concern.

**MS. PHILIPS:**  I understand that.  I have taken a lot of the -- of the Government's time.  They've been very kind in

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 119 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.992    Page 12 of 207

12

working with me to accommodate me and my husband's medical needs. I didn't know until close of business yesterday that this was going to happen. I assume the Court would want my client only to be represented by counsel given the fact that he is being asked to admit to criminal conduct without any grant of immunity.

He's subject to perjury. He's got an asylum proceeding. And he -- in my opinion, if you were in my shoes, I think you would argue that he needs the protection of counsel. That is why I'm appointed. Whether my appointment is, sort of, constitutionally not required after he's released from detention, that's an academic question. But I can't imagine waiving my appearance for him, nor do I believe I can appropriately or anyone can appropriately advise him to waive his right to counsel.

He is represented by counsel for the purposes of this prosecution. And until I am relieved as counsel -- and I assume I'd have to be relieved for some cause -- I believe that he has a right to counsel in this proceeding. And as I say, there's a lot at stake for him. He has not been given immunity.

All I am asking is -- and I believe the Government has other witnesses. The reason I came here at nine o'clock in the morning was because the Government couldn't promise me they would fill the docket this morning. They said they would

attempt to accommodate me, and --

THE COURT:  I --

MS. PHILIPS:  -- I could not risk not showing up.  My client is here under subpoena.

THE COURT:  I understand.

MS. PHILIPS:  So I am prepared to go forward now with my fingers crossed that we can be done by 10:30 or 11:00 at the latest.  But if the Government is intending to call witnesses before, I cannot be here.

THE COURT:  So that is helpful for me to know.  Just so you know, Ms. Philips, I agree with you 100 percent.  My preference would not be for him to testify without having counsel here for reasons that you've stated.

So from the Government, if we're able to get the jury in here in the next ten minutes, if we start testimony of this material witness right at 9:30, do you believe that we can be done by 11:00 a.m. at the latest so Ms. Philips can go take care of the medical necessities of her husband?

MR. FAWCETT:  I certainly believe it's possible.  A lot of that would depend on the cross-examination.  So obviously, I can't speak to that.  But I certainly believe it's possible.

THE COURT:  Okay.  Ms. Philips --

Let me ask you this, Counsel:  Just generally speaking, how long do you think your direct examination will

take?

MR. FAWCETT:  Maybe 45 minutes.  That's -- that's a complete guess.

THE COURT:  Roughly.  And I appreciate that.

And Mr. Garrison or Mr. Bugarin, do you believe you can conduct your cross in 45 minutes?

MR. BUGARIN:  Yes, Your Honor.

THE COURT:  All right.  So that gives us an hour and a half.  So if we start at 9:30, that would have us right at 11:00.

Ms. Philips, would 11:00 -- if you needed to leave by 11:00, would that work for you?

MS. PHILIPS:  Yes, I can stay until 11:00.

THE COURT:  Okay.  So then I am going to wait for the jury to be ready.  I will have you confer with the Government, because I know that someone stepped out.  If they're able to call a different witness this morning and relieve you of this stress and then we can call your client either in the afternoon or they can call your client tomorrow morning, I will let you all work that out.  That is a trial strategy that I don't need to be a part of.

MS. PHILIPS:  Just to reiterate, the Government could not promise me that they would not need to call my client this morning pursuant to Your Honor's scheduling of this case.  So...

MR. FAWCETT: I don't mind -- I'm sorry, Your Honor. I don't mind talking even though it's a strategy thing. It's -- in light of the Court's ruling about the case agent, we would not have witnesses enough to fill the morning.

THE COURT: Okay.

MR. FAWCETT: We have a witness, but I believe it would be very brief. So I think we have a lot of dead time.

THE COURT: Very well. So let's just plan on having your client testify, and I will -- you know, Counsel, obviously conduct the direct you need. Conduct the cross-examination that you need. Be mindful of, you know, Ms. Philips's schedule. If we find ourselves needing -- that we're nowhere near ending and it's 11:00, we can decide whether he will be subject to recall in the afternoon and have you come back.

Ms. Philips, I will work with everyone, but we just got to get this testimony before the jury.

MS. PHILIPS: I have two brief matters on the subject of cross-examination. I can take it up now, or I can take it up in front of the jury. But I just wanted to raise them with the Court.

Number. 1, he is -- has an asylum petition pending. I believe his statements here, in whatever manner, they might be deemed dishonest or subject him to perjury or misleading or confusing. I want it to be clear that I intend to protect -- I don't believe that any questioning of him with regard to a

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 123 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.996    Page 16 of 207

16

pending asylum application is relevant or proper.  So I'm going to ask -- his testimony here has no bearing whatsoever on his asylum application, and I don't want him being led into trap that can haunt him --

(Court Reporter interruption.)

*MS. PHILIPS:*  I'll just withdraw that.

I don't believe it's proper to question him about a pending asylum application.  I don't believe that would bias -- make him a biased witness one way or the other.  He's under compulsion to testify honestly.  So I think it would be misleading to suggest to the jury that he's testifying here and hopes to get asylum in the future, because the two are mutually exclusive.

*THE COURT:*  Mr. Garrison?

*MR. GARRISON:*  They're not mutually exclusive.  The U.S. government has the power to grant him asylum.  The U.S. government is one that's prosecuting Mr. Rolon.

Furthermore, he doesn't have a Fifth Amendment right, because this isn't a criminal issue that she's addressing.  It's a civil issue.  We need to be able to cross-examine him on his ability to stay here, out in the community from August of last year until now.  And basically, the reason that he was able to do that was because he was brought here as a material witness.

So to curtail our cross-examination of what benefits

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 124 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.997    Page 17 of 207

17

he's received or he hopes to receive from the Government would definitely take away a major point on his credibility that we want to explore.

**THE COURT:**  I agree, Mr. Garrison.

Ms. Philips, your objection is noted for the record. That being said, the Government is free to redirect him on the fact that you all, as prosecutors on this case as part of this prosecution, if this is actually a true statement.

From what you've represented to me, it is -- that you all were not the ones that promised him asylum or signed any document at this juncture, to say, "Here's your asylum application or an S-visa."  You're welcome to, like, direct him on that or redirect him on that.

But I do think that it's proper cross-examination, Mr. Garrison.

**MS. PHILIPS:**  The -- the one last thing I wanted to --

**THE COURT:**  Of course.

**MS. PHILIPS:**  -- which I didn't really develop in the deposition -- and I wasn't here when you ruled on the deposition testimony.  He was cross-examined on the question of whether he was giving testimony in exchange for not being prosecuted.  And my objection to that question is a 403 objection.  He's not a cooperating witness.  He's never been charged with a crime.  There is no quid pro quo.  So to suggest to him that he -- there has been an exchange of his

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 125 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.998    Page 18 of 207

18

testimony -- it's been exchanged for a "no prosecution," that's not why he's not being --

THE COURT:  That's proper cross-examination, Ms. Philips.  I hear your objection.  I'm going to overrule it.  That's proper cross-examination.  The Government is going to direct him.  He's the Government's witness.  The Government can ask him whatever questions they wish to ask him about the fact that they didn't promise him anything.

But the fact that he wasn't prosecuted is something that the jury should be permitted to hear.  And the fact that he has a pending asylum application is something the jury should be able to hear.  The fact that none of those two things are happening in exchange for his testimony here is something the Government can elicit in direct, and Mr. Garrison or Mr. Bugarin can cross-examine on it.  But I do think it's proper cross-examination.

Anything else before we bring the jury in?

MR. GARRISON:  Just a housekeeping matter so that something doesn't happen in front the jury.  I anticipate that Ms. Philips will be objecting during her client's testimony.

THE COURT:  So I do want to pause there.  Ms. Philips, once your client takes the stand, you're not a party at this juncture and your objections need to be made now.  I'm not going to have you sitting in the back objecting during your client's testimony.  That's improper.

**MS. PHILIPS:** Okay. So long as he doesn't -- my client isn't questioned on anything that implicates attorney-client privilege or any communications --

**THE COURT:** Your client needs to then know to assert the attorney-client privilege.

And Counsel, if you're asking a question that I believe is attorney-client privilege, I may object from the bench, because that's is protected conversations that should not --

**MS. PHILIPS:** Well -- yeah.

**THE COURT:** -- those are protected conversations.

But you're welcome to be present. You're welcome to be here to offer your client support. But once he's on the stand, you're not going to be permitted on object on his behalf in any capacity. So if it's error, then it'll be taken up by the Ninth, or if it's attorney-client privilege and I will stop the lawyers. We have two sets of very component attorneys, both whom I know respect the value of attorney-client -- especially from the Defense because they have clients -- they respect the value of attorney-client privilege.

So don't go there, Counsel, because I don't think it's productive for the jury to have the judge objecting.

**MS. PHILIPS:** I guess my point is only that I would prefer he be asked what his understanding is but not asked about -- I mean, his understanding of the case is based on

communications with me.  He's never met with the Government.  He's not prepped with the Government.  So inasmuch as he's being asked about no prosecution in exchange --

THE COURT:  Counsel, my guess is that he's going to be asked about what happened when he was in the car, who told him to say what, who he made arrangements with, who gave him documents, who asked him to say what when he got to the border, who asked him to say what before he got to the border.

And then with respect to questions about what benefits he intends to receive, we've already discussed how that's going to unfold.  And I'm sure that the Government is competent in establishing that they, as prosecutors on this case, did not make him promises in exchange for his testimony in this case.

So Mr. Garrison?

MR. GARRISON:  That's it, Your Honor.  I don't have anything.

MS. PHILIPS:  Okay.  Thank you.

THE COURT:  Thank you, Counsel.

(Jury enters the courtroom at 9:23 a.m., court called to order)

THE COURT:  All right.  Good morning, everyone.  Welcome back.  By a show of hands, did anyone discuss this case with anyone, read anything about it, do any research, or in way begin deliberations prematurely?  Thank you.  Seeing no hands.

Counsel, you may be seated.

For Juror No. 1, appreciate your communication with my

courtroom deputy.  Thank you very much.  And I'm glad you made it here safely.

All right.  We may proceed.  The Government can call their next witness.

**MR. FAWCETT:**  Thank you, Your Honor.  The Government calls Yonathan Moises Ixan-Marroquin.  I believe we're just getting the interpreter here now.

**THE CLERK:**  The Government has provided one.

**(Interpreter duly sworn.)**

**(Witness duly sworn.)**

**THE CLERK:**  Thank you.  Please take the stand.

**THE COURT:**  For the interpreter, if you can please let the witness know that there is water, the cups, the pitcher.

**THE INTERPRETER:**  Okay.  Thank you.

**THE COURT:**  Of course.

**THE CLERK:**  Please state your first and last name for the record.

**THE WITNESS:**  Yonathan Ixan.

**THE CLERK:**  Thank you.

**YONATHAN MOISES IXAN-MARROQUIN,**
**called as a witness for the Government, having been duly sworn,**
**testified as follows:**

**DIRECT EXAMINATION**

**BY MR. FAWCETT:**

Q    Good morning.  Do you go by Mr. Ixan?

A    Yes.

Q    Mr. Ixan, how old are you, sir?

A    I am 20.

Q    Where were you born?

A    Guatemala.

Q    And where in Guatemala where you born?  What city?

A    Chimaltenango.

Q    Are you a citizen of Guatemala?

A    Yes.

Q    Are you a citizen of the United States?

A    No.

Q    Did you ever have -- on March 11th of 2024 or at any time before that, did you have legal status in the United States?

A    No.

Q    I'm going to ask you about the events on and before March 11th of 2024.  That was last year.

A    Okay.

Q    Were you apprehended at the United States border on March 11th, 2024?

A    Yes.

Q    Now, when did you make plans to come to the United States?

A    That same year.

Q    And with whom did you make those plans?

A    With Mel -- my brother-in-law talked to --

         THE INTERPRETER:  Your Honor, may the interpreter ask

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 130 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1003    Page 23 of 207

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT                                    23

for a clarification about a name?

        **THE COURT:**  Yes.

        **MR. BUGARIN:**  Objection, Your Honor.  Hearsay --

    **(Court reporter interruption.)**

        **MR. BUGARIN:**  -- confrontation.

        **MR. FAWCETT:**  Your Honor, we're getting the co-conspirator statements about their the arrangements -- smuggling arrangements --

        **THE COURT:**  Overruled.

        **THE WITNESS:**  My brother-in-law talked to Melquides.

**BY MR. FAWCETT:**

**Q**   The person you've named -- mentioned, "Melquides," do you know his last name?

**A**   **Palafox.**

**Q**   And what was the arrangement for you to come to the United States?

**A**   **Bring me from Guatemala, cross into Mexico, and from there, come over here.**

**Q**   And when you say "come over here," you mean to the United States?

**A**   **Exactly.**

**Q**   Were you going to pay money to be transported to the United States?

**A**   **Yes, it's correct.  It was paid.**

**Q**   How much money did you agree to pay?

**A**     **An approximate of 100,000 *quetzales*.**

**Q**     And "*quetzales*," is that a Guatemalan currency?

**A**     **Exactly.**

**Q**     Do you have knowledge about how much that would be in United States currency?

**A**     **The total of what was going to be paid, it was about 14 -- or $13,000.**

          **THE COURT:**  Counsel, before you ask the next question, if I can have the interpreter let the witness know to respond louder to you, because I can tell you're struggling a little bit, so that you can hear his responses.

          **THE WITNESS:**  Oh, okay.

          **THE COURT:**  Counsel, you may proceed.

          **MR. FAWCETT:**  Thank you, Your Honor.

**BY MR. FAWCETT:**

**Q**     Did you actually end up paying any money?

**A**     **Yes.**

**Q**     How much?

**A**     **100.**

**Q**     I'm sorry.  "100" what?

**A**     ***Quetzales.***

**Q**     Is that "100" *quetzales* or "100,000"?  I'm not sure I understand the currency.

**A**     **100,000 *quetzales.***

**Q**     And to whom did you pay this money?

SER-131

A    What was done was -- what I understand is that a deposit was made.

Q    Were you the one who personally made this deposit, or did someone make this on your behalf?

A    No.  My relatives.

Q    And who did they make this payment or deposit to?

A    To Melquides.

Q    Was it your understanding that as part of this arrangement, it was to cross into the United States illegally?

        MR. BUGARIN:  Your Honor, this line of questioning is hearsay.  And we would object on hearsay and confrontation and ask for a standing objection on this line of questioning.

        THE COURT:  It's a question about -- I'm going to overrule it.  The question is what he understood.  If he knows, he knows; if he doesn't, he doesn't.  But it's his understanding of what he was actually doing.

        MR. BUGARIN:  Your Honor, we'd ask for a standing objection on this line of questioning.

        THE COURT:  If you can repeat that?

        MR. BUGARIN:  We'd ask for a standing objection.

        THE COURT:  Very well.  It's noted.

        THE WITNESS:  Yes.

BY MR. FAWCETT:

Q    Did you ever meet Melquides in person?

A    Yes.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 133 of 298
Case 3:24-cr-00684-L    Document 158    Filed 08/25/25    PageID.1006    Page 26 of

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT                                    26
207

Q    Where were you when you first met him?

A    **At the border between Guatemala, Mexico.**

Q    Was anyone with you at the time?

A    **Yes.**

Q    Who was with you?

A    **My family.**

Q    Was there anyone else there?

A    **The other woman that was crossing together with us.**

Q    Do you remember her name?

A    **It was Zulemy.**

Q    Did you know Zulemy before you met at the border between Mexico and Guatemala?

A    **No.**

Q    Did you talk to Zulemy at any point during this journey?

A    **Yes.**

Q    Did you learn her citizenship?

A    **How is that?**

Q    Did you learn of what country she was from?

A    **Oh, yes.**

Q    Where was she from?

        *MR. BUGARIN:*  Your Honor, objection based on hearsay and confrontation.

        *THE COURT:*  Overruled.

*BY MR. FAWCETT:*

Q    What country was she from?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 134 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1007    Page 27 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT                    27

A    From Guatemala.

Q    Did you travel with Zulemy and Melquides?

A    Yes.

Q    How did you travel?

A    In a taxi.

Q    Any other means of transportation, or was it in a taxi the whole time?

A    It was -- it was in a car and later in an airplane.

Q    So you took a car.  Do you know where you took the car to initially?

A    It was to Tuxtla in Mexico.

Q    And where did you go from there?

A    We stayed one night in Tuxtla, and then we took the flight to Tijuana.

Q    Who paid for the airplane tickets?

A    Melquides.

Q    Who all was with you in the car ride and on the flight?

A    In the car that I traveled, there was only the driver, Zulemy, and me.

Q    Was Melquides with you at the time?

A    Oh, no.  Melquides and his wife were traveling in another car.

Q    You said you took to a flight to Tijuana?

A    Yes.

Q    At any point in this trip, did you have to show

identification to get on a flight?

A    Yes.

Q    Did you have -- did you show your own true identification
to get on the flight?

A    No.

Q    What did you show?

A    A license from Mexico.

Q    How did you get that license?

A    Melquides gave them to us.

Q    Did it have your name on it?

A    Yes.

Q    Did it have your picture on it?

A    Exactly.

Q    But you're not a citizen of Mexico?

A    No.   They made the arrangements.

Q    Okay.  I'm going to show you what's been previously marked
as Government's Exhibit 40, and has been previously admitted --
I'm sorry -- let me -- 42.  Excuse me.

        Can you see that in front of you?

A    Yes.

Q    What is the document that you're looking at?

A    It is a license.

Q    Is this the fake identification card that Melquides gave
you?

A    Yes.

**SER-135**

Q   What happened when you arrived in Tijuana?

A   **They dropped us off at a house.**

Q   Do you know where in Tijuana the house was?

A   **Around *Playas*.**

Q   Can you describe the house?

A   **It was -- it was a small house with one room, one bathroom, and the living room.**

Q   Was there anyone else who stayed in that house with you?

A   **The owner of the house.**

Q   Do you know what the owner of the house's name was?

A   **Right at this moment, I can't remember.**

Q   Was it just you and the owner, or was there anyone else there?

A   **The owner, Zulemy, and me.**

Q   Were you given food while you stayed at the house?

A   **Yes.**

Q   Were you given water?

A   **Yes.**

Q   Did you ever leave the house?

A   **Yes.**

Q   How long did you stay at the house in total?

A   **Approximately, two weeks.**

Q   What happened at the end of those two weeks?

A   **They came to pick us up.**

Q   Okay.  You said, "They came to pick us up."  Who is "they"?

SER-136

A    Melquides and the one who was going to cross us.

Q    Was -- what day was this that you got picked up?

A    The exact date, I can't remember.

Q    Was it the day that you were arrested or apprehended at the border?

A    Yes.

Q    What time of day were you picked up?

A    It was in the early morning hours.

Q    You mentioned that Melquides was there when you were picked up, and also the person --

A    Yes.

Q    Thank you.

     And also the person who was going to cross you?

A    Yes.

Q    Do you remember that person's name?

A    No.

Q    Do you -- did you get a good look at that person?

A    Yes.

Q    If you saw him again, would you be able to identify him?

A    Yes.

Q    I'd ask you to look around this room, this courtroom, and tell me, do you see the person who picked you up and who -- along with Melquides -- in this courtroom today?

A    Yes.

Q    I'd like you to point out where that person is sitting and

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 138 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1011   Page 31 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT          31

describe what that person is wearing, please.

A    Okay.  On the left side, and he's got a shirt on.

Q    Can you be a little more specific about what kind of shirt that person has on?

A    The color is similar to mine.

Q    Can you describe -- I just want to make sure that we're specific about what this is.  Can you describe that person's physical appearance, what the person's head or hair looks like?

A    Okay.  He is a white man.  He doesn't have hair, and he's got a beard.

        MR. FAWCETT:  Your Honor, at this point I would ask that the record reflect that this witness had identified the defendant, Miguel Rolon?

        MR. BUGARIN:  No objection, Your Honor.

        THE COURT:  All right.  He's been identified.  Thank you.

        THE WITNESS:  Okay.

BY MR. FAWCETT:

Q    Prior to picking you up, did this driver -- had you ever seen him before?

A    No.  The first time I saw him was when he arrived with Melquides.

Q    And when he arrived with Melquides, you mention they picked you up.  Was that in a vehicle of some kind?

A    Yes.  It was in a car.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 139 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1012   Page 32 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT                                    32

Q   Do you remember what kind of car?

A   It's a small car.  I don't remember exactly because it was nighttime.

Q   Who was driving?

A   Melquides.

Q   And the person who crossed you that you identified earlier, where was he sitted -- seated?

A   He was in the copilot seat.

Q   And where were you seated when you got into the car?

A   In the back.

Q   And where was Zulemy?

A   Beside me.

Q   Did Melquides or the person who crossed you talk to you while you were in the car?

A   Yes.  They were talking amongst themselves, and then later they talked to us.

Q   I'll ask about that more in a moment.

    Did you have any luggage with you when you got in the car?

A   Yes.

Q   Can you describe what that piece of luggage looked like?

A   It was a suitcase with my clothes.

Q   Do you recall whether Zulemy had any luggage with her?

A   Yes.

Q   Do you remember what that luggage looked like?

A   It was a bag, and it was pink, I think.  But I'm not too sure.

Q   Was your piece of luggage -- have a hard exterior or a soft exterior?

A   It was soft.

Q   So you mentioned that Melquides and the other person in the car that they spoke amongst themselves?

A   Yes, that's correct.

Q   Did you hear what they were talking about?

A   Not exactly.  They would only talk about, like, family between themselves.

Q   Were they speaking in English or in Spanish?

A   In Spanish.

Q   And then at some point, you said that they spoke to you; is that right?

A   Right.

Q   What did they say to you?

        MR. BUGARIN:  Objection.  Hearsay.

        THE COURT:  Overruled.

        MR. BUGARIN:  And objection as to being a vague question, Your Honor.

        MR. FAWCETT:  I can --

        THE COURT:  I'm sorry?

        MR. BUGARIN:  Vague.

        MR. FAWCETT:  I can rephrase and ask specifically.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 141 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1014   Page 34 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT

34

THE COURT: Thank you.

BY MR. FAWCETT:

Q   What, if anything, did Melquides say to you in the car?

A   **That the guy that was next to him, he was going to cross us.**

Q   And the guy that was next to him, that's the person who you identified earlier in the courtroom, the Defendant here today?

A   Yes.

Q   And was that person present, the defendant, was he present when Melquides told you this?

A   Yes.

Q   Did the defendant, the person you identified earlier, did he say anything to you in the car?

A   Yes.

Q   What did he say to you?

MR. BUGARIN: Objection. Hearsay.

THE COURT: Overruled.

THE WITNESS: That he was going to have the identifications. That if we were asked, we were coming from the dentist. And he gave the identifications.

BY MR. FAWCETT:

Q   When you say "identifications" that he gave you, what kind of identifications?

A   **It was an ID from here belonging to another person.**

Q   "From here," do you mean the United States of America?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 142 of 298
Case 3:24-cr-00684-L   Document 158   Filed 08/25/25   PageID.1015   Page 35 of 207

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT

35

A    Yes.

Q    I'd like to show you what's been previously marked and admitted as Government's Exhibit 40.  I'll blow this up for you so it's a little larger.

A    Okay.

Q    Do you recognize this document?

A    Yes.

Q    What is this document?

A    It is the document with which we were going to cross into here, into the United States.

Q    Can you read the name on the document?

A    Yes.  It's Joel Isaias Palafox -- no, I'm sorry -- Posadas.

Q    That's not you, right?

A    Right.

Q    What did the defendant tell you when he handed you this document?

        MR. BUGARIN:  Objection.  Hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  That while we were crossing that he was going to talk.

BY MR. FAWCETT:

Q    That who was going to talk?

A    Him.

Q    "Him" being the person, the defendant?

A    Yes.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 143 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1016   Page 36 of
207

IXAN-MARROQUIN | DIRECT | FAWCETT                    36

**Q**   Did he say anything else to you?

**A**   **Not that I remember right now.**

**Q**   Did he tell you to say anything to the officers at all when you crossed the border?

**A**   **No.**

**Q**   Did you -- in the house that you were in in Tijuana, did the defendant, the person who was going to cross you who you identified earlier, did he enter that house?

**A**   **Yes.**

**Q**   How long was he in that house before you guys -- before you all left in that car?

**A**   **Like one hour.**

**Q**   Okay.  Did you have any conversations with the defendant in that house in Tijuana?

**A**   **Very little.**

**Q**   Did you overhear any conversations between him and Zulemy in the house or in the car?

**A**   **Only that if they mentioned the --**

   *MR. BUGARIN:*  Your Honor, objection.  Hearsay as to the answer.

   *THE COURT:*  Overruled.

   *THE WITNESS:*  -- for us to raise our hand.

*BY MR. FAWCETT:*

**Q**   I'm sorry.  That was cut off there.  Can you repeat?  What did he say to Zulemy in the car?

A    That if they were to say the names on the IDs, for us to raise our hands.

Q    And the IDs that you're referring to, these are the passport cards that I just showed you?

A    Yes.  The one with the name Jose Isaias [sic].

Q    And that was the -- I'm going to bring it up for you again, Government's Exhibit 40.

Is this the one you're referring to to?

A    Yes.

Q    Did Zulemy get a passport card as well?

A    Yes.

Q    And who gave her that card?

A    Uh, uh -- Palafox.

Q    And where were you when Zulemy received that card?

THE COURT:  Before he responds, Counsel, at this juncture, unless you can establish that what you're asking about that this witness was present and saw it happen, it's improper questioning.  So I think you need to go there first.

MR. FAWCETT:  Understood.  I'm trying to establish that with the next question.

BY MR. FAWCETT:

Q    Did you watch -- you said Mr. Palafox give this card to Zulemy?

A    He showed them to us.

Q    Did -- were you both there, you and Zulemy?  Were you both

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 145 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1018   Page 38 of
207

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT                38

there when Zulemy was shown the passport card?

A    Oh, yes.  They were shown to us both together.

Q    And just for clarification, was that in the house in Tijuana, or was that in the car as you were traveling?

A    In Tijuana.

Q    And was that while the defendant was in that house?

A    Yes.

Q    So how long did you drive or ride in that car after you were picked up from the house before you got to the border?

A    When we left, I don't have the exact time because I fell asleep during the ride.

Q    Okay.  When did you wake up?

A    Like half an hour before arriving at the border.

Q    Did you have to wait in line at the border?

A    Yes.

Q    And did all four of you cross the border together?

A    No.

Q    Explain that.  What happened?

A    Melquides got off before crossing with our luggage.

Q    How long before you crossed the border did Melquides get out of the car?

A    Like five minutes.

Q    Where was the car when this happened?

A    In line.

Q    In line at the border?

A    Yes.

Q    Did Melquides say anything when he got out of the car?

A    **That we were going to meet in Los Angeles.**

Q    And you said he took luggage?

A    **Yes.**

Q    Whose luggage did he take?

A    **The one belonging to the woman that was traveling with me, and mine.**

Q    Earlier you stated that he was in the driver's seat, correct?

A    **Yes.**

Q    So what happened after he exited the driver's seat?

A    **They switched.  The one who started driving then was the gentleman.**

Q    Now, when you say "the gentleman," who are you referring to?

A    **The one who is on my left side wearing the shirt.**

Q    The defendant who is in the courtroom today?

A    **Yes.**

Q    You said he got into the driver's seat?

A    **Yes.**

Q    Did either you or Zulemy move?

A    **Zulemy.**

Q    And where did she go?

A    **To the copilot seat.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 147 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1020    Page 40 of
IXAN-MARROQUIN  |  DIRECT  |  FAWCETT
207

40

Q    Did the Defendant say anything to you after Melquides had left with the luggage but before you crossed the border?

A    **Yes.  For us to be calm, and he turned on the music.**

Q    And then at some point, you made it to the border, correct?

A    **Yes.**

Q    What happened when you arrived at the border?

A    **We were stopped, and we were asked for our identifications.**

Q    Did -- and who asked you for your identification?

A    **The police officer.**

Q    While this interaction was occurring between you and the police officer, did the defendant say anything to you?

A    **No.**

Q    Do you remember any of the questions that the police officer asked you?

A    **Yes.**

Q    What did he ask you?

A    **Where did I study -- whether I was studying.**

Q    And what did you answer?

A    **That "Yes, in the Arroyo."**

Q    Where did you get the -- were you, in fact, a student at somewhere called "the Arroyo"?

A    **No.**

Q    Why did you answer that way, then?

A    **They told us that they planned --**

*MR. BUGARIN:*  Objection as to hearsay, Your Honor.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 148 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1021   Page 41 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT                    41

THE COURT: I'm going to overrule it as to hearsay, but I am going to sustain an objection on the fact that it is vague, who "they" are and the circumstances under which this took place.

You can rephrase, Counsel.

MR. FAWCETT: Thank you, Your Honor.

BY MR. FAWCETT:

Q   I asked a moment ago about how you -- why you answered that way, "the Arroyo." Did someone tell to you to say that you were from the Arroyo?

A   Yes.

Q   Who specifically told you to say that you went to the Arroyo?

A   The gentleman.

Q   I'm going to ask you to clarify what you mean by "the gentleman."

A   The gentleman who is wearing a shirt.

Q   The person who was crossing the border with you in the car, right?

MR. BUGARIN: Leading, Your Honor.

THE COURT: Sustained.

BY MR. FAWCETT:

Q   The defendant who is sitting in the courtroom today, right?

MR. BUGARIN: Leading, Your Honor.

THE COURT: Sustained.

*BY MR. FAWCETT:*

Q   Was it the defendant who is sitting in the courtroom today who told you that -- to say that you went to the Arroyo?

A   **Yes.**

Q   Thank you for clarifying.

A   **Okay.**

Q   So after that initial interaction with the police officer that you already described, what happened next?

A   **They asked him questions.**

Q   Who did they -- who -- who asked questions of whom?

A   **The officer asked the guy.**

Q   I'm going to ask you to clarify, and I'm sorry.  But when you say "the guy," who do you mean?

A   **The one who was crossing us.**

Q   Okay.  Did you drive any more after you first stopped at the border?

A   **They made us go to another -- like, another port of entry.**

Q   And what happened when you got to that other place?

A   **They got us out.  They checked the car.**

Q   And when you say "they," who do you mean got you out?

A   **We were asked to get out.**

Q   By whom?

A   **The officer.**

Q   Okay.  Did the driver of the vehicle say anything to you from the time that you first stopped until the time you arrived

at that second place you described?

A    For us to be calm.

          MR. BUGARIN:  Objection, Your Honor.  Hearsay.

          THE COURT:  Overruled.

BY MR. FAWCETT:

Q    Did one of the officers ask you questions at that second place that you stopped?

A    Yes.

Q    Do you remember what questions he asked you?

A    The name -- our names.

Q    Did you -- what name did you give him?

A    The one that's on the card.

Q    I'm going to show you what's been marked as Government's Exhibit 40 and admitted.

     Is this the card you just described?

A    Yes.

Q    And this is the name that you gave that officer?

A    Yes.

Q    Did that officer take anything from you?

A    Our belongings.

Q    Did those belongings include that Mexican identification card that you described earlier?

A    Yes.

Q    What happened after the officer took that card from you?

A    We got taken to -- they put the handcuffs or the chains on

us.  I don't know what to call them.

Q    After that officer took that card, did you admit what your true name was to him?

A    He was able to get the Mexican ID.

Q    Let me rephrase.

     Did -- at some point did you admit to that officer that your name was not "Joel Isaias Posadas"?

A    Yes.

Q    Okay.  Did you have a phone with you?

A    Yes.

Q    Did the officer take the phone?

A    Yes.

Q    I'm going to show you -- just for you -- on that screen what's been previously marked as Government's Exhibit 5.

A    Okay.

Q    Do you see that?

A    Yes.

Q    What is being depicted in this photograph?

A    That is my old phone.

Q    Is this a photograph of the front and back of your phone?

A    Yes.

Q    Is this a true and accurate representation of what your phone looked like, the one you had on you on March 11th, 2024?

A    Yes.

     MR. FAWCETT:  Your Honor, at this time I'd move to

admit Government's 5 into evidence.

MR. BUGARIN:  No objection, Your Honor.

THE COURT:  All right.  It'll be admitted.  You may publish.

(Government Exhibit 5 received into evidence.)

BY MR. FAWCETT:

Q   Sir, I'm going show what's been marked as Government's Exhibit 6 for you to view.  Six, can you see that?

A   Yes.

Q   Who is that?

A   That's me.

Q   Is that a true and accurate photograph of that -- taken of you on March 11th, 2024?

A   Yes.

MR. FAWCETT:  Your Honor, at this time I'd move Government's Exhibit 6 into evidence.

MR. BUGARIN:  No objection.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 6 received into evidence.)

BY MR. FAWCETT:

Q   And was this -- do you know who took this photograph?

A   The officer.

Q   Okay.  So the cell phone that was taken from you that day, did you have any messages on that cell phone?

A   Yes.

Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1026   Page 46 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT                                    46


Q   Did you have photographs or videos on that phone?

A   Yes.

Q   Where there names on that phone with phone numbers or contacts listed on that phone?

A   Yes.

Q   I'd like to show you what's been previously marked as Government's Exhibit 6 -- I'm sorry -- 7.

     Do you recognize what's being depicted in Government's Exhibit 7?

A   Yes.

Q   Was this taken from your phone?

A   Yes.

Q   And what is being depicted on -- let me ask this:

     Is it a true and accurate representation of something that was on your phone at the time it was seized?

A   Yes.

     MR. FAWCETT:  At this time I'd move to admit Government's Exhibit 7, Your Honor.

     MR. BUGARIN:  No objection.

     THE COURT:  Admitted.  You may publish.

     (Government Exhibit 7 received into evidence.)

BY MR. FAWCETT:

Q   Is this a contact?

A   Yes.

Q   Who is this a contact number for?

A    Melquides.

Q    And is this the same Melquides who traveled with you through Mexico?

A    Yes.

Q    I'm going to show you what's been previously marked as Government's Exhibit 11 -- I'm sorry -- 8.  Excuse me.

THE COURT:  Eight?

BY MR. FAWCETT:

Q    Do you recognize what's being depicted in this photograph?

A    Yes.

Q    Is this a photograph of contents that were on your phone at the time it was taken from you at the border?

A    Yes.

MR. FAWCETT:  At this time, Your Honor, I'd move to admit Government's Exhibit 8 into evidence, and also Government's Exhibit 55, which we had previously marked for identification as a translation of this document.

MR. BUGARIN:  Your Honor, we would object as to hearsay and confrontation.

THE COURT:  I am going to overrule that.  I don't know if your objection was also made to 55.  But in the event you wish to make it now, I will -- that was only introduced for identification with the translator?

MR. BUGARIN:  We would object as to both, Your Honor.

THE COURT:  Very well.  So as to both, objection is

noted.  I'll overrule it.

MR. FAWCETT:  Thank you, Your Honor.

**(Government Exhibits 8 and 55 recieved into evidence.)**

*BY MR. FAWCETT:*

Q   And I'm going to show you a couple more things before we take a look at them more closely.  I'm going to show what's been marked as Government's Exhibit 9.

Do you recognize what's being depicted in this photograph?

A   Yes.

Q   And is this a true and accurate depiction of messages that were captured on your phone at the time your phone was taken from you?

A   Yes.

Q   I'm going to show you what's been previously marked as Government's Exhibit 10, as well.

And is -- is this a screenshot or a picture that's true and accurate depicting messages that were on your phone when it was taken from you on March 11th?

A   Yes.

MR. FAWCETT:  Your Honor, at this time I would move to admit Government's Exhibit 9 and Government's Exhibit 10 into evidence.

MR. BUGARIN:  Your Honor, we've raised the same objections previously as to hearsay and confrontation.

THE COURT:  Very well.  Noted, and they're overruled. Thank you.

(Government Exhibits 9 and 10 received into evidence.)

BY MR. FAWCETT:

Q    Finally, I'll show you what's been marked as Government's Exhibit 11.

Is this a true and accurate representation of a contact that was on your phone when it was taken from you on March 11th?

A    Yes.

MR. FAWCETT:  At this time, Your Honor, I'd move to admit Government's Exhibit 11 along with the previously marked for identification which was Government's 58.

THE COURT:  Which one was it?  50-what?

MR. FAWCETT:  11 and 58, which is the corresponding translation.

MR. BUGARIN:  No objection, Your Honor.

THE COURT:  Admitted.  Thank you.

(Government's Exhibits 11 and 58 received into evidence.)

MR. FAWCETT:  And Your Honor, I would also move to admit Government's Exhibit 56 and 57.  Those are the translations that were previously marked for identification as to Government's Exhibit 9 and Government's Exhibit 10.

THE COURT:  I will grant that.  Thank you.

(Government Exhibits 56 and 57 received into evidence.)

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 157 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1030   Page 50 of
207

IXAN-MARROQUIN | DIRECT | FAWCETT                50

*BY MR. FAWCETT:*

Q   Okay.  So I'll go ahead and publish -- move to publish Government's 11.  Who is this a contact number for?

A   **My sister's.**

Q   And is this your actual sister's contact screen?

A   **Yes.**

Q   Okay.  And then I'll go to Government's Exhibit 8.

    Who are these messages from your phone with?

A   **With my sister.**

Q   Your actual sister?

A   **Yes.**

    *MR. FAWCETT:*  I'm going to move to publish -- or ask to publish Government's Exhibit 55 --

    *THE COURT:*  For the Defense, your objection is noted. You may publish.

*BY MR. FAWCETT:*

Q   So this is a conversation between you and your sister, is that what you just testified to?

A   **Yes.**

Q   Okay.  Can you describe what you and your sister are conversing about in this -- on these messages?

A   **Yes.  About the anthem from Chiapas and Mexico.**

Q   And why were you discussing that?

A   **In case we got stopped in Mexico, to have information about Mexico.**

**SER-157**

Q   Was your sister involved in these arrangements for you to travel from Guatemala illegally into the United States?

A   **At that time she had the -- she, together with her husband, had the communications with Melquides.**

Q   A little more than halfway down this message, or down the screens, there's a message that says, "And I'm not mistaken, the coyote will be with you guys?"

A   **Yes, that's correct.**

Q   Who sent that message?

A   **My sister.**

Q   And what was your response?

A   **"That at the hotel."**

Q   So just for clarification on the left-hand side are the -- all of the messages at that are aligned with left messages from your sister?

A   **Yes.**

Q   And the messages on the right, are those the messages that are -- that you sent?

A   **Yes.**

Q   Okay.  I'm going to bring up Government's Exhibit 56.

        And who is this conversation with that's being shown in Government's 56?

A   **With my sister.**

Q   And are all of these messages -- that are actually written messages -- that are shown on this photo from your sister to

you?

A   Yes.

Q   Okay.  And I'm going to read from the English translation. It says on the -- here:

"Lower your head a little bit more.  Like this is fine but lower your head.  On Thursday, like in the early morning, you guys will be leaving the house with Tanchi [phonetic] because on Thursday around noon, they're going to hand you/him off in La Mesilla [phonetic]"

What -- do you understand what she was -- what she meant by this message?  Or what message she was conveying when she sent you this?

A   Yes.

Q   What was she telling you?

A   **That we were going to go towards La Mesilla.  And over there, I was going to be delivered.**

Q   Where is La Mesilla?

A   **The border between Mexico and Guatemala.**

Q   Who is Tanchi?

A   **She was referring to me.**

Q   Okay.  And you -- on the bottom of these, there's a photograph.  Is that a photograph that you sent?

A   Yes.

Q   Why did you send that photograph?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 160 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1033   Page 53 of 207

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT                    53

A    Because Melquides asked her for those photos for the Mexican ID.

Q    I'm going to show you what's been previously marked and admitted as Government's Exhibit 57.

Is this still that same conversation with your sister?

A    Yes.

Q    And are these messages that are aligned with the left, are these messages that your sister sent to you?

A    Yes.

Q    What are these -- what is the first image, the upper image that was sent to you?

A    The identification with which we were to cross.

Q    And what about the bottom picture?  What -- do you know what that is?

A    Yes.  It is the anthem, I think.  Yes.  The anthem for Chiapas.

Q    Okay.  Do you know why your sister sent you a picture of an identification card?

MR. BUGARIN:  Objection.  Speculation.

THE COURT:  Sustained.

BY MR. FAWCETT:

Q    Did your sister tell you why she was sending you a picture of an identification card?

MR. BUGARIN:  Objection.  Hearsay.

THE COURT:  Overruled.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 161 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1034   Page 54 of 207

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT          54

THE WITNESS:  So that we would -- so that we would learn the names.

BY MR. FAWCETT:

Q   Did this appear to be the same identification card that you later received a physical copy of in that house in Tijuana?

A   Yes.

Q   Okay.

THE COURT:  If I can interrupt you, Counsel, for one minute.  If I can have a very quick sidebar with lawyers.  If all want you can stand and stretch.

(The following proceedings were heard at the sidebar.)

THE COURT:  I was saying that I looked at Counsel for the Government.  I know it's part of his mannerism, as he's writing his head is moving.  I don't want it to appear that he's nodding in support of what the witness is saying.  So it's noted.

(End of sidebar; proceedings heard in presence of the jury.)

BY MR. FAWCETT:

Q   Sir, I'd like to show you a short video.

MR. FAWCETT:  May I ask the Court if there's headphones that he would be able to view this short clip with -- available?

THE CLERK:  No.

MR. FAWCETT:  Okay.

THE COURT:  We don't have --

MR. FAWCETT:  You don't have headphones?  It's only a few seconds.  If there's a way that we can show it to him outside the presence of the jury, unless --

THE COURT:  For identification?

MR. FAWCETT:  Just for the purposes -- I do plan to admit and publish, but I wanted to make sure he can identify and authenticate it first.

THE COURT:  Would you like to confer with Counsel to see if there can be a stipulation?  If not, a stipulation as to foundation.  If you have any other objections, I will obviously take note of those.

(Government Counsel and Defense Counsel confer.)

MR. BUGARIN:  Your Honor, we would stipulate as to foundation, but we would preserve objections as to hearsay and confrontation.

THE COURT:  Very well.  So with respect to foundation based on the stipulation, I will permit testimony.  And I will note your objection, and it's overruled.  You may raise it again at any point if you wish, Counsel.

BY MR. FAWCETT:

Q   I'm going to show you for you, sir, what's been previously marked as Government's Exhibit 65.

(Video played in open court.)

MR. FAWCETT:  Excuse us for one moment while we get the sound working.  My apologies.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 163 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1036   Page 56 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT          56

(Pause.)

*BY MR. FAWCETT:*

**Q**   I'm going to move on and ask a few other questions and come back to this, okay?

**A**   All right.

**Q**   Sir, when you were in the car on the way to the border, did you have your phone with you?

**A**   Yes.

**Q**   Did you take any video recordings with your phone?

**A**   Yes.

**Q**   What we just showed you was marked as Government's 65, was that a recording that you took with your phone?

**A**   Yes.

**Q**   Okay.  So that was without the sound.  Do you know whether there was sound in the recording that you took?

**A**   Yes.

**Q**   Okay.  During your travels, did you have any communication on your phone with the person you knew as Zulemy who was traveling with you?

**A**   Yes.

**Q**   There should be a binder there that's next to you with Government's exhibits.  Can you take a -- open that binder to Number 16?

Did you take a look at what's shown on Government's 16?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 164 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1037   Page 57 of 207

IXAN-MARROQUIN  |  DIRECT  |  FAWCETT

57

A     Yes.

Q     Do you recognize what's being depicted there?

A     Yes.

Q     Are those -- is that a true and accurate depiction of messages taken from your phone when it was taken from you on March 11th?

A     Yes.

Q     And I'm going to ask you to do the same for Government's Exhibit 17.  Can you take a look at that?

A     Okay.

Q     Is this also a true and accurate depiction of messages that were found on your phone on March 11th, 2024?

A     Yes.

Q     I'm going to ask you to turn to 18.

      Are these also messages that were on your phone on March 11th?

A     Yes.

Q     Is this a true and accurate photograph -- or picture of your phone with those messages on your phone that you had on you -- with you on March 11th?

A     Yes.

      MR. FAWCETT:  Your Honor, at this time I would move to admit into evidence Government's Exhibit 16, 17, and 18.

      THE COURT:  Defense?

      MR. BUGARIN:  No objection, Your Honor.

**SER-164**

*THE COURT:* All right. I do have a question with respect to the relevance of 17 and with respect to the relevance of the upper portion of 18.

*MR. FAWCETT:* May I establish with the witness, Your Honor?

*THE COURT:* Excuse me?

*MR. FAWCETT:* May I establish that relevance with the witness, Your Honor?

*THE COURT:* Certainly, before you publish.

*MR. FAWCETT:* Okay. Absolutely.

*BY MR. FAWCETT:*

Q   Sir, for Government's Exhibit 17, let's -- let's just start with 16 and then move on.

Government's Exhibit 16, who are these messages with?

A   Okay. It's with Zulemy.

Q   Is this the same Zulemy that you were traveling with through Mexico to the United States?

A   Yes.

Q   At the bottom of that page, there's a picture of -- or a photograph. Was that sent from Zulemy to you?

A   Yes.

Q   Do you know the context for this photograph as to why this was sent to you?

A   Yes.

Q   Why did Zulemy send this photograph to you?

A    Because Melquides had an accident.

Q    There are two more photographs on the next exhibit, Government's Exhibit 17 and -- Government's Exhibit 17 -- excuse me.

Can you look at those?

A    Yes.

Q    Were those also photographs that were sent at the same time from Zulemy?

A    Yes.

Q    Were these also in reference to that same accident that you just mentioned?

A    Yes.

Q    Is -- there's a person depicted at the bottom of Government's 17.  Do you recognize that person?

A    Yes, that's Melquides.

Q    Do you know why -- or did Zulemy tell you why she was sending you pictures of this accident and of Zulemy -- or excuse me -- of Melquides?

MR. BUGARIN:  Your Honor, I would object as speculation.

THE COURT:  If he knows.

And make sure the witness knows to only respond if he knows.

THE WITNESS:  Yes.

///

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 167 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1040   Page 60 of
IXAN-MARROQUIN  |  DIRECT  |  FAWCETT
207
Page 60 of

60

*BY MR. FAWCETT:*

**Q**   So why did she send those?

**A**   **Because he had an accident, Melquides.**

**Q**   On Government's Exhibit 18, I'll have you take a look at that.  After the photograph, at the bottom of that, there are some -- there's a name, a birthday, mother and father information.

What do you know -- did Zulemy tell you why she was sending that information to you?

**A**   **Yes.**

**Q**   Why was she sending that information to you?

**A**   **To learn the information for Palafox and for the wife.**

**Q**   Why did you need to know that information?

**A**   **Because, supposedly, they were our parents.**

**Q**   Now, just to be clear, they were not actually your parents, correct?

**A**   **Correct.**

**Q**   When you said "our parents," was Zulemy supposed to be posing as your sister?

**A**   **Yes.**

**MR. FAWCETT:**  All right.  Your Honor, at this time I would ask to publish 16, 17, and 18.

**THE COURT:**  16 through 18?  Or 16, 17, and 18?

**MR. FAWCETT:**  Sorry.  Before I do that, Your Honor, one more thing I would ask.  I would move to admit number --

Government's No. 59 into evidence, which is the corresponding translation to Exhibit 18 that was marked for identification yesterday with the interpreter.

THE COURT:  All right.  So are you moving to publish 16, 17, and 18 as well as the translations?

MR. FAWCETT:  Yes, Your Honor.

THE COURT:  Other than the previously noted hearsay objections, any objection?

MR. BUGARIN:  No, Your Honor.

THE COURT:  All right.  They can be admitted.  You may publish.  Thank you.

(Government's Exhibits 16 to 18 and 59 received into evidence.)

MR. FAWCETT:  Thank you, Your Honor.

BY MR. FAWCETT:

Q   So we talked about this a moment ago, but at the bottom of this screen is a photograph of a wrecked car or wrecked vehicle; is that correct?

MR. BUGARIN:  Objection.  Leading.

THE COURT:  One moment.  So sustained on leading.  But I am also looking.  I don't show there to be a translation of 16, 17, and 18.  I'm looking at my exhibit list.

MR. FAWCETT:  Your Honor, there is not for 16 or 17.

THE COURT:  There is for 18?

MR. FAWCETT:  For 18, there should be.

THE COURT:  That's noted.  That's admitted.  And the

leading objection is sustained.

*BY MR. FAWCETT:*

Q   What's the photograph at the bottom of this -- of your phone message shown on this picture?

A   **The car that crashed.**

Q   Is this -- who is this message from?

A   **Zulemy.**

Q   And Government's Exhibit 17, can you turn to that?

Who are these photographs from?

A   **Those are photos of Melquides and his accident.**

Q   Who sent you the photos?

A   **Zulemy.**

Q   Who is the person pictured in the bottom of the two photographs on Exhibit 17?

A   **Melquides.**

Q   How do you know that that's Melquides?

A   **Because I recognize him.**

Q   And then I'll move to Government's Exhibit 18, and then I'll pull up Government's Exhibit 59.

And what is the information that was sent to you depicted on the bottom of this screenshot -- or this photograph of your phone?

A   **Their information.**

Q   When you say "their information," whose information?

A   **Melquides's and his wife's.**

**Q**   All right.  At this time I'm going to go ahead and pull up a video for you.  This is the video that's been previously marked as Government's 65.  I believe we do have now audio for that.

            **THE COURT:**  Yes.  And Defense's objection is noted.

            **MR. BUGARIN:**  Thank you, Your Honor.

            **THE CLERK:**  I'm sorry.  This one is just for identification or it's admitted?

            **MR. FAWCETT:**  I'd move to admit.

            **THE CLERK:**  Okay.  Perfect.

       **(Government Exhibit 65 received into evidence.)**

       **(Video played in open court.)**

*BY MR. FAWCETT:*

**Q**   And I'll play that for you again.

            Are you able to hear what's being said in that video?

**A**   Yes.

            **MR. FAWCETT:**  Your Honor, at this time I would move to admit Government's Exhibit 66.  This has been previously identified -- or marked into evidence as a translation of this video by the interpreter yesterday.

            **THE COURT:**  That is correct.  It's been identified by the interpreter.  So any objection as to the content?

            **MR. BUGARIN:**  Your Honor, we would object as to --under confrontation and hearsay.

            **THE COURT:**  All right.  I'm going to overrule that.

(Government Exhibit 66 received into evidence.)

MR. FAWCETT: I'm going to go ahead and pull up, then I move to publish Government's 66.

THE COURT: Granted.

MR. FAWCETT: And then I'll go to the third page of this.

BY MR. FAWCETT:

Q Okay. So I'm going to read this on the second line here "So I have to fabricate a -- where I am innocent where it was not me."

Is that what was spoken in that video?

A Yes.

Q Who was saying those words in the video?

A Melquides.

Q And to whom was he speaking?

A To the one who was crossing us.

Q Why were you taking a video in the car?

A To show my sister where I was going through.

Q After you were stopped at the border, you were arrested -- or apprehended, taken into custody; is that right?

A Yes.

Q And you spoke with agents, officers, law enforcement officers of some kind?

MR. BUGARIN: Objection. Leading.

THE COURT: Sustained.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 172 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1045   Page 65 of 207

IXAN-MARROQUIN | DIRECT | FAWCETT                    65

*BY MR. FAWCETT:*

**Q**    Did you speak with law enforcement officers afterward?

**A    Could you repeat that question again?**

**Q**    Did you speak with law enforcement officers after you were taken into custody?

**A    Yes.**

**Q**    And you later were interviewed or asked questions by both the Government and Defense attorneys in this matter at a time after that?

**A    Yes.**

**Q**    After that interview, you were -- you didn't end up going back to Guatemala -- or did you end up going back to Guatemala, I should ask?

**A    No.  I did not return.**

**Q**    Did anyone make you any sort of promises that you would be allowed to stay in the United States if you testified in this case?

**A    No.**

**Q**    Did I or anyone from the United States make any sort of promises of any other type of benefit to you if you agreed to testify in this case?

**A    No.**

**Q**    And did anyone from the United States tell you what you -- make any sort of agreement with you that if you said any certain thing that you would get a benefit?

A    No.

Q    So how is it that you are not -- you were not removed to Guatemala after that interview you had?

A    Because of political asylum.

Q    Did you discuss this claim of political asylum with members of the prosecution in this case at all in any way?

A    No.

Q    And is there any -- has there been any promise regarding whether or not anything you do in this case would affect your political asylum claim?

A    No.

        MR. FAWCETT:  No further questions, Your Honor.

        THE COURT:  Thank you.

        Before we begin cross-examination, this might be a good time for our ten-minute morning break.  So if the jurors can go ahead and step outside, take your break.  As I said before, if there's still coffee left and you want to bring some inside, you can.

        And Counsel, if you can remain.

    (Jury exits the courtroom at 10:48 a.m.)

    (Proceedings heard outside the presence of the jury.)

        THE COURT:  All right.  Thank you, from the Government.

        Ms. Philips, eleven o'clock is your absolute deadline?  You can't stretch that so we can just get cross-examination

completed?

MS. PHILIPS: I'm in a really difficult situation.

THE COURT: I know.

MS. PHILIPS: Okay. Bordering on unfair. And I'm choosing my obligations to my client over my obligations to my family. And I think I could have foreseen that when I agreed to be here and I think everybody could have foreseen that, given his importance in the case and given the intricacy of his --

THE COURT: Ms. Philips.

(Simultaneous cross-talk.)

MS. PHILIPS: -- of evidence --

THE COURT: Ms. Philips. Ms. Philips, you've made your point. My simple question was whether you can stay any longer. If you cannot, I had previously said that if we had to recall this witness, we would.

I understand the difficult position you're in. I just did not want to begin cross-examination and have to end it midway, which is why I wanted to take the break now so that I can let the lawyers know that my intention would be to have your client be subject to recall so the cross-examination can take place this afternoon.

MS. PHILIPS: I would be so grateful to the Court if you could make that representation. Again, if I leave here, my understanding is my client will be recalled in the afternoon in

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 175 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1048    Page 68 of 207

68

my presence.  I just want to be clear on that.  I'm sorry.  I'm very tired.

THE COURT:  My understanding was that you could be back here this afternoon?

MS. PHILIPS:  Yes.  I can be back this afternoon.

THE COURT:  Okay.  So from the Defense, my thought process -- and I will explain procedurally without explaining his lawyer needed to leave -- just that this witness has reasons why he can't stick around for a couple of hours but that he is subject to recall.  We can -- so is the Defense okay with that?

MR. GARRISON:  Yes, Your Honor.

THE COURT:  All right.  That way we don't have that issue.

Does the Government have a couple of witnesses or a witness you can call to fill up the next hour before the lunch break?  If we need to break for lunch a little earlier, I'm happy to do that as well.

MR. FAWCETT:  We have one witness, and then we might ask to visit the issue of the other material witness as well.

THE COURT:  All right.  So what we will do, then, is we will have your client be subject to recall.  I am going to make sure that the interpreter knows I want him to stick around, you know, cannot leave this general vicinity.  We will have the Government call their other witness.  We will break

for lunch.  And if we break for lunch, say 11:45, we'll be back certainly by 12:45.  When can you be back?

**MS. PHILIPS:**  One o'clock -- one o'clock.

**THE COURT:**  Okay.  So we will make sure that we make that happen.

Any objection from the Defense?

**MR. GARRISON:**  No, Your Honor.

**THE COURT:**  All right.  Thank you.  So if the interpreter can please assist me.

So thank you very much, sir, for being here this morning.  The Defense now gets an opportunity to ask you some questions, and the Government will have an opportunity to ask you any additional questions.  In a perfect world, we would do that right now, but your lawyer wants to be sitting here while you testify.

Your lawyer has a personal matter that is impossible to change, so she will be unavailable until around one o'clock. Out of respect to your lawyer, we're not going to have you testify until she's back here.  But you absolutely need to stay either sitting in the hallway or right around this building. And I need you to be back here no later than 12:45.

**THE WITNESS:**  Okay.

**THE COURT:**  Thank you.  At that time you can wait in the hallway.  You don't have to come in yet.  My courtroom deputy, Rhea, will make sure to go outside to greet you and

confirm that you're here.

    *THE WITNESS:*  I understand.

    *THE COURT:*  Thank you.  You're not to discuss your testimony with anyone because you're still under oath.

    *THE WITNESS:*  Okay.

    *THE COURT:*  Thank you very much, sir.  You can be excused now.

    *MS. PHILIPS:*  Thank you.

    *THE COURT:*  Thank you.

    All right.  I'm going to take about five to eight minutes myself.  We'll have the jurors come back in and we'll make this happen.

    *MR. FAWCETT:*  Thank you, Your Honor.

    *MR. GARRISON:*  Your Honor, what time are we starting up?  11:00?

    *THE COURT:*  I'm sorry?

    *MR. GARRISON:*  What time are we --

    *THE COURT:*  11:00, 11:05, roughly.  Thank you.  If you need 11:05 because you need time, I'm happy to do 11:05.

    *MR. GARRISON:*  Thanks, Your Honor.

  **(A recess was taken from 10:54 a.m. to 11:02 a.m.)**

  **(Proceedings heard in the presence of the jury.)**

    *THE COURT:*  All right.  Welcome back, everyone.  I hope you had a nice short break.  By a show of hands, did anyone hear anything, have any conversations, or do any

research or anything of the sort regarding this case?  All right.  Seeing no hands.

I want to explain to the members of the jury we're going to be proceeding a little bit out of order.  And my reason for that, as I indicated at the beginning of this trial, is all of us value your time, and we want to make sure that we continue moving so that we can get the case to you for deliberations.

The witness who is on the stand would now -- in the normal course, also as I explained, would be subject to the cross-examination, redirect, and recross.  That witness is unavailable for personal matters for a couple of hours.  So he will return after the lunch break, and we will continue with questioning.

I didn't want to go what we call "dark" all morning and just waste your time, so I opted to proceed that way.  The Government does have another witness.  They're going to call that witness, and we'll continue.  And then that witness that was just on the stand will be back this afternoon.  So thank you for your understanding.

The Government may call their next witness.

**MR. FAWCETT:**  Thank you, Your Honor.  The Government calls Alexander Medina.

**THE CLERK:**  Good morning.

**THE WITNESS:**  Good morning.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 179 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1052   Page 72 of 207

MEDINA | DIRECT | FAWCETT

72

(Witness duly sworn.)

*THE CLERK:*  Thank you, please take the stand.  Please state your first and last name for the record.

*THE WITNESS:*  Alexander Medina.

*THE CLERK:*  Thank you.

<u>**ALEXANDER MEDINA**</u>,

**called as a witness for the Government, having been duly sworn, testified as follows:**

**DIRECT EXAMINATION**

*BY MR. FAWCETT:*

**Q**  Good morning, sir.

**A  Good morning, sir.**

**Q**  How are you currently employed?

**A  I'm an officer with U.S. Customs and Border Protection.**

**Q**  Officer Medina, what is your current assignment within Customs and Border Protection?

**A  I'm assigned to the Criminal Enforcement Unit at the San Ysidro Port of Entry.**

**Q**  What is the Criminal Enforcement Unit?

**A  It's a unit where we process warrants and we investigate alien smuggling cases at the San Diego area of responsibility.**

**Q**  So you mentioned that you're at the San Ysidro Port of Entry; is that correct?

**A  Correct.**

**Q**  But then you mentioned the San Diego area of

responsibility, what does that mean?

A   It means that we also are involved at the Otay Mesa Port of Entry, the Cross Border Express, and other ports of entry in that area of responsibility.

Q   Do you personally investigate alien smuggling cases?

A   Correct.

Q   And at what -- are you limited to just the San Ysidro Port of Entry, or do you investigate at other locations as well?

A   Other locations as well.

Q   What other locations have you investigated these events at?

A   The Otay Mesa Port of Entry, the Tecate Port of Entry, San Ysidro Ports of Entry.  Those for the most part.

Q   How long have you been a Customs and Border Protection officer?

A   Since March 2017.

Q   Did you have to go through any sort of training to become a Customs and Border Protection officer?

A   Yes, sir.

Q   Can you describe what type of training you did initially?

A   Yes, sir.  It was about a five -- five-and-a-half-month training at the Federal Law Enforcement Training Center in Glynco, Georgia.

Q   What --

A   Go ahead, sir.

Q   What type -- what types of subjects were you trained on?

A    We're trained on -- so customs, immigration, agriculture laws.  We're also learning defensive tactics, interviewing, learning immigration visas, anything related to the INA.

Q    And you said "INA."  What's that?

A    That's the immigration code for types of cases, and what we pretty much follow -- what we enforce.

Q    Now, you said you've been with Customs and Border Protection since 2017.  How long have you been with the Criminal Enforcement Unit in particular?

A    Since March of last year.

Q    And did you go through any particular type of training as a member of the Criminal Enforcement Unit?

A    Yes.

Q    Can you describe what type of training did that entail?

A    Yeah.  We do some training with types of investigations. We learn how to do interviews.  We're even sent on to different trainings.  We learn how to take evidence, like photographs, how to process warrants.  They do a training like that.

Q    Have you ever been involved in an alien smuggling investigation?

A    Yes, sir.

Q    As an officer?

A    Yes.

Q    Approximately how many alien smuggling investigations have you participated in, in some capacity, would you estimate?

A    Over 60, at least.

Q    During these investigations, have you ever had occasion to interview members of an alien smuggling organization?

A    Yes, sir.

Q    And can you just briefly describe what an alien smuggling organization is?

        *MR. BUGARIN:*  Object, Your Honor, as to the structure.
        *THE COURT:*  Sustained.

*BY MR. FAWCETT:*

Q    Have you ever had occasion to interview someone who has been involved in the crime of alien smuggling?

A    Yes.

Q    Have you interviewed suspects who were personally accused of alien smuggling?

A    Yes.

Q    Have you interviewed suspects or persons who were convicted of alien smuggling?

A    Yes.

Q    Have you interviewed persons who they themselves have been smuggled?

A    Yes.

Q    In these interviews have you ever learned any common slang terms used by those who were involved in alien smuggling along the southwest border?

A    Yes.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 183 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1056   Page 76 of 207

MEDINA | DIRECT | FAWCETT

76

Q    In your investigation have you had occasion to review phones that were used in alien smuggling events?

A    Yes.

Q    Have you, during your investigations, had occasion to review phones used particularly by those who smuggled aliens?

A    Yes.

Q    Have you reviewed phones used by those who were they themselves smuggled?

A    Yes.

Q    And have you reviewed messages either text messages or other types of messages on these phones?

A    Yes.

Q    Have you reviewed voice calls or other recorded messages on these phones?

A    Yes.

Q    Have you ever listened to jail calls by people who are charged with alien smuggling?

A    I have.

Q    In reviewing all of this information in the course of your investigations, have you become familiar with slang terms that are common -- in common use in the southwest region among alien smugglers?

A    Yes.

Q    Do you speak Spanish?

A    I do.

Q    Are a fluent Spanish speaker?

A    I am.

Q    And in your experience as a Customs and Border Protection officer, have you ever come across the word "*pollo*" in the context of alien smuggling?

A    I have.

Q    And is that one of the terms that you have become familiar with in your experience as an investigator?

A    That's correct.

MR. FAWCETT:  Your Honor, at this time the United States moves to qualify Officer Medina as an expert in the meaning of the word "*pollos*" in an alien smuggling context.

THE COURT:  From the Defense?

MR. BUGARIN:  Your Honor, we'd stand on our former objections as to this matter.

THE COURT:  Do you wish to explain?

MR. BUGARIN:  Not at this time, Your Honor.

THE COURT:  All right.  Thank you.

So he will be admitted -- tendered as an expert.

BY MR. FAWCETT:

Q    Literally translated to English, what does *pollos* mean?

A    "Chickens."

Q    In your experience, in the context of alien smuggling, how is the term "*pollos*" used to mean?

A    It's a term that is commonly used by alien smuggling

organizations when they're referring to undocumented --

MR. BUGARIN: Objection, Your Honor.

THE COURT: Sustained.

MR. BUGARIN: We move to strike.

THE COURT: I will strike that.

Instructing the jury that that response is not to be considered. It's stricken from the record.

Counsel, rephrase.

BY MR. FAWCETT:

Q   Let me ask this: In your experience in the context of alien smuggling -- and I'm only asking about individual alien smugglers -- what does the term "*pollos*" mean?

A   It means undocumented people attempting to cross the international border.

MR. FAWCETT: At this point, Your Honor, I would -- I would move to publish Exhibit No. 70, which was discussed yesterday, and I would ask for a sidebar just to clarify the discussion that we had.

THE COURT: Perfect. Let's do that, thank you.

(The following proceedings were heard at the sidebar.)

MR. FAWCETT: So it occurred to me I hadn't confirmed with everyone after our discussion yesterday, that exhibit that we discussed, I think the agreement was that we remove the second jail call from it.

THE COURT: Okay.

MR. FAWCETT:  There is only one jail call on the Exhibit 70, which is the one in English that uses the word "*pollo*."  I wanted to make it clear before I publish that to the jury.

MR. GARRISON:  That's fine.

THE COURT:  Any objection?

MR. GARRISON:  No objection, but I am moving for mistrial at this point.

Number 1, the expert knows nothing about alien smuggling organizations.  Two, the Government questioned him on direct about alien smuggling organizations, and they didn't obviously didn't tell him not to talk about alien smuggling organizations.  At this point, I mean, like even if you strike that testimony -- even if you give a curative, Your Honor, it's "How can we un-ring that bell at this point"?

THE COURT:  I understand.  I'm going to deny your motion for a mistrial at this juncture.  However, you need to make sure your witness stays on a pretty tight leash.

And you're welcome to renew your objection at the end of the trial, Mr. Garrison.

MR. GARRISON:  Thank you.

MR. FAWCETT:  Thank you, Your Honor.

(End of sidebar; proceedings heard in presence of the jury.)

THE COURT:  There's no objection to Exhibit 70.  So you may proceed, Counsel.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 187 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1060   Page 80 of
207

**MEDINA | DIRECT | FAWCETT**                                              80

**MR. FAWCETT:** Okay. I'm going to move to publish a small portion of this exhibit starting at timestamp 3 minutes and 45 seconds and going for 20 seconds to 4 minutes and 5 seconds.

**THE CLERK:** Your Honor, okay to publish?

**THE COURT:** I'm sorry?

**MR. FAWCETT:** May we publish, Your Honor?

**THE COURT:** Yes.

(Government Exhibit 70 received into evidence.)

(Audio played in open court.)

BY MR. FAWCETT:

**Q** Sir, were you able to hear the audio that was being played just a moment ago?

**A** Not completely to its entirety, but I heard some words.

**MR. FAWCETT:** I'm wondering if there's any way to increase the volume or just allow him to --

**THE CLERK:** I put the room volume. It's all the way at the top.

**MR. FAWCETT:** Let's just play it one more time and listen carefully, okay?

**THE WITNESS:** Sorry, ma'am.

**THE COURT:** I don't think anyone is hearing it entirely.

**MR. FAWCETT:** Understood.

**THE COURT:** One thing we did in our other trial is if

you -- if your device has a microphone -- or I mean a speaker -- if you put the microphone by the speaker, that might help.  I'm not sure.

**(Audio playing in open court.)**

*BY MR. FAWCETT:*

Q   What did you hear in that audio clip?

A   **He mentions that, "The *pollos* are snitching on me," I believe.  He does say the word "*pollos*."**

Q   Okay.  And this is the same term that you just testified about meaning "smuggled aliens"?

A   **Yes.**

*MR. FAWCETT:*  Okay.  No further questions, Your Honor.

*THE COURT:*  Thank you.

Cross-examination?

*MR. BUGARIN:*  Yes, Your Honor.

**CROSS-EXAMINATION**

*BY MR. BUGARIN:*

Q   Officer Medina, good afternoon.

A   **Good morning, sir.**

Q   Good morning.

A   **No worries.  I do it all the time.**

Q   Officer Medina, you mentioned that you have been with the U.S. Customs and Border Protection since 2017?

A   **That is correct, sir.**

Q   And you've been with the Criminal Enforcement Unit since

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 189 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1062   Page 82 of
**MEDINA** | **CROSS-EXAMINATION** | **BUGARIN**   Page 82 of

82

March of last year?

**A    That is correct, sir.**

Q    And as part of your duties, you're involved in the investigation and the prosecution of cases at the border?

**A    Involving alien smuggling, yes, sir.**

Q    And on direct, you mentioned -- or Mr. Fawcett mentioned that these terms that you're trained to have knowledge on, they're common terms used in the southwest border region; isn't that correct?

**A    That's correct, sir.**

Q    A term like "*pollos*" is a common slang term that's used in this region of the border?

**A    Yes, sir.**

Q    Border Patrol agents also use the term "*pollo*"?

**A    Yes, sir.**

Q    As well as CBP officers; is that right?

**A    Yes.**

Q    Okay.  And then as mentioned earlier, this is a phrase used by people living in the border on both sides of the border?

**A    Yes.  I'm assuming, yes.**

Q    Okay.  It's not just used exclusively by alien smuggling -- people accused of alien smuggling?

**A    Yes.  In theory, anybody can use that term, yes, sir.**

Q    Like a Border Patrol agent?

**A    They could use it.**

**Q** You've heard a Border Patrol agent use the word "*pollo*"?

**A** I wouldn't say that they refer to individuals as "*pollos*," but that's what we are trained to hear from alien smugglers.

**Q** Well, you just mentioned -- you know that Border Patrol agents use the word "*pollos*," right? You answered that a couple questions ago?

**A** Correct. But in what context? It all --

**Q** Just "yes" or "no."?

**A** Yes. I'm assuming, yes.

**Q** Okay.

*MR. BUGARIN:* One moment, Your Honor?

*THE COURT:* Of course.

**(Defense Counsel confers.)**

*MR. BUGARIN:* No further questions. Thank you, Officer Medina.

*THE WITNESS:* Yes, sir.

*THE COURT:* Thank you.

Any redirect?

*MR. FAWCETT:* Briefly, Your Honor.

*THE COURT:* Yes.

**REDIRECT EXAMINATION**

*BY MR. FAWCETT:*

**Q** Sir, in what context have you heard Border Patrol agents use the term "*pollos*"?

**A** It's usually when they're either doing investigations or

they're seeing, you know, either phone downloads or they're seeing where other individuals are using that terminology. That's usually when we come across it, either Border Patrol or Customs and Border Protection, but we won't reference people as them. That's how we hear the slang, and we have to be aware of how the slang is used for us to identify if this is an alien smuggling attempt.

Q    Would it be considered offensive for a Border Patrol or Customs and Border Protection officer to use that term just in their normal turn of phrase -- or normal speech, I should say?

A    To refer to people as them?

Q    Yes.

A    Correct.

MR. FAWCETT:  That's all I have, Your Honor.

THE COURT:  Any recross?

MR. BUGARIN:  No, Your Honor.

THE COURT:  All right.  Thank you.

Is this witness excused?

MR. FAWCETT:  Yes, Your Honor.

THE COURT:  From the Defense?

MR. BUGARIN:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.  You are excused at this time.

THE WITNESS:  Thank you, ma'am.

THE COURT:  All right.  Does the Government have any

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 192 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1065   Page 85 of

MEDINA | REDIRECT | FAWCETT
207

85

other witnesses at this time, or should we take an earlier lunch break and that way the other witness can return to continue testimony?

MR. FAWCETT: Yes, Your Honor. We don't have any others for this morning.

THE COURT: Very well.

From the Defense and from the Government, I appreciate your efforts in having us being as productive as we can be today. It's only 11:30, but we're going take our lunch break a little bit earlier.

Let's be back here at 12:45 and we should be ready to proceed. So your lunch can be a little longer today in light of us needing to make sure this witness returns and he is available. Thank you very much. Please leave your pads. Remember, do not to discuss this case with anyone. We'll see you back here at 12:45.

(Jury exits the courtroom at 11:23 a.m.)

(Proceedings heard outside the presence of the jury.)

THE COURT: All right. Mr. Garrison, your request for a mistrial at sidebar was noted, and it was denied. In the event that you wish -- I instructed the jury to disregard it, as you were here to hear. In the event you wish for me to provide any additional curative instruction, please provide me that information when we return from the lunch break, and I will do it. If you prefer for me to just include any

additional instruction at the end of the case, anything that you think is appropriate, I will be happy to provide. But as I indicated, I did instruct the jury as the response came out to disregard that statement.

The reason I asked the jurors to return at 12:45, even though we know Ms. Philips is not likely going to be back until 1:00, is just in the event that one of them -- in the event that somebody is running a few minutes late.

From the lawyers, I know particularly in light of the portions of the transcript that you received and had not had an opportunity to review, if you want to actually get here right at 12:45, you can do that. I'm not going to determine you to be late. If you're running a few minutes late, go ahead. I'm not going to bring the jury back until you're here, and I want to make sure that you have an opportunity to review that.

**MR. GARRISON:** Okay. Thank you, Your Honor.

**THE COURT:** All right. We'll see you back here in the afternoon.

**MR. FAWCETT:** If I may, Your Honor, just about those portions. I expect that Your Honor will be ruling on -- if there is any disagreement would be ruling on those. As far as publishing those, we could -- it would take a little bit of time to create a version that those are completely cut out of it. If it's something that goes back to the jury, we also could mark certain sections and not play those and then try to

have that remaining portion available at the end of trial. Just whatever, I guess, would be the most efficient way for Your Honor.

THE COURT:  So I would be ready to get back to the bench at 12:45 to address any portions that we have disagreement about.  I don't anticipate the jury is going to get the case today.  So I think that you will have, certainly, this evening to chop up and create whatever needs to be created to provide to the jury during deliberations.

As I've said before, as I said with the transcripts that were provided of the material witness's testimony, to the extent that you all can reach agreement, if there's something that the Defense is highly opposed to and doesn't really push any ball forward for the Government, you know, recognize that and make a concession.

For the Defense, you're in a different position being that have an obligation to represent your client.  So you'll need to make the proper objections.  That said, if the Government seeks to introduce something that is not harmful to your client and really doesn't impede on your representation of your client, be mindful as well.  And if we can't agree to those things, we'll have those 15 minutes to discuss it before we bring the jury back.

MR. GARRISON:  Okay.  Thank you, Your Honor.

MR. FAWCETT:  Thank you, Your Honor.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 195 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1068    Page 88 of 207
88

MEDINA | REDIRECT | FAWCETT

THE COURT: Of course. Thank you.

THE CLERK: The Court is now in recess.

(A recess was taken at 11:27 a.m. to 12:48 p.m.)

(Proceedings heard outside the presence of the jury.)

THE COURT: All right. We're going to go through this together.

Ms. Philips, thank you for being back here. I hope that you were able to take care of what you needed to take care of.

MS. PHILIPS: Yes. Thank you for giving me the time out.

THE COURT: Of course.

MS. PHILIPS: Appreciate it.

THE COURT: Of course.

THE CLERK: Your Honor, did you want to wait for the defendant?

THE COURT: Oh, yes. That's right. Sorry.

(Defendant present in custody.)

THE COURT: And while the defendant is walking to the table, do either Government or Defense wish to have the witness, while we go over this transcript, wait outside with his lawyer?

MR. GARRISON: Yes, please, Your Honor.

THE COURT: Of course. Thank you.

Ms. Philips, if you and your client can sit in the

hallway until we're ready.  We're going to go over just a couple of objections.  And I will call you right back, and we'll get started.

**MR. GARRISON:**  Your Honor, what I prepared is -- these are just the pages where either there's an agreement that that part won't come in, or the Defense has an objection to that.

**THE COURT:**  Okay.

**MR. GARRISON:**  And so the yellow represents what the Defense would be objecting to.  The blue highlight is what I believe we agree should not come in.  However, I have given a copy to the Government, too.  So they can correct me if I'm wrong or if I'm off a line or two.

**THE COURT:**  So the blue is what you agree?  Or you do not agree?

**MR. GARRISON:**  On the blue, we agree that it should not come into evidence.

**THE COURT:**  Okay.  And then the yellow, the Government wants to bring it in, but the Defense is objecting to it?

**MR. GARRISON:**  Yes, Your Honor.

**THE COURT:**  All right.  So page 18.

What is your objection there, Mr. Garrison?

**MR. GARRISON:**  My objection is that it's basically vouching, Your Honor.  If they -- like, if -- basically, they're on the video --

**MR. FAWCETT:**  I'm sorry.  I don't mean to interrupt.

We all agree --

(Court reporter interruption.)

MR. FAWCETT:  We'll agree on this point, as well, Your Honor.

THE COURT:  Okay.

MR. FAWCETT:  And we've already --

THE COURT:  Perfect.

MR. FAWCETT:  -- thought that out.

THE COURT:  So 18, that's going to --

MR. FAWCETT:  There are several -- I'm just going through the yellow marked sections, and there are several that we'll agree to cut out.

THE COURT:  Perfect.  All right.  So I'm going to go page by page.  Tell me if we have agreement, and that way we can get through it.

Page 18, the Government agrees to leave that out?

MR. FAWCETT:  Yes, Your Honor.

THE COURT:  Okay.  Page 19, the highlighted blue everyone agrees is coming out?

MR. FAWCETT:  Yes, Your Honor.

THE COURT:  Page 32, the highlighted yellow?

MR. FAWCETT:  We would not be in agreement that that would be cut, Your Honor.

THE COURT:  I'm sorry?

MR. FAWCETT:  We believe that that should remain in.

THE COURT: You think it should remain. Okay.

MR. FAWCETT: Yes.

THE COURT: Let me look at it.

Mr. Garrison?

MR. GARRISON: So the Defense issue with this, Your Honor, is that it's an unnoticed expert opinion. And I think that it also goes to structure as well.

THE COURT: From the Government? I mean, I do think that Officer Acevedo is certainly offering a statement that appears to have a good amount of certainty to it, you know, hence the objection that it goes to expert.

And also what is the relevance? I mean, I don't think that there's denying. Like, Mr. Rolon is -- prior to the highlighted portion, he's saying that he has American plates. So --

I mean, I'm happy to hear from the Government.

MR. FAWCETT: With that comment in mind, Your Honor, we'll submit on this one.

THE COURT: All right.

Okay. Page 34. The blue section everyone agrees comes out?

MR. FAWCETT: Yes, Your Honor.

THE COURT: Okay.

MR. FAWCETT: And we agree as to the yellow section as well.

**THE COURT:** Perfect. Thank you.

Page 35. The blue section everyone agrees?

**MR. FAWCETT:** Yes, Your Honor.

**THE COURT:** Thank you.

Page 37?

**MR. FAWCETT:** We'll -- we'll agree on this one, Your Honor.

**THE COURT:** Thank you. Yeah. It seems like Officer Corrales is almost giving legal advice there. So I appreciate that, Counsel.

Page 39. And it goes into 40.

**MR. FAWCETT:** We would submit that this ought to come in. They're confronting him with his story about whether he was helping people out, doing a favor for money. And he's denying portions of that, which is inconsistent, it seems, with other portions of his post-arrest statement. So I think that would be relevant to come in, Your Honor.

**THE COURT:** Mr. Garrison?

**MR. GARRISON:** Well, even if it's inconsistent, this is the officer opining on -- on the inconsistencies. In, like, Officer Acevedo's opening, Salvo, that's -- you know, that's clearly expert testimony, talking about the structure and the profile of people that are arrested for alien smuggling.

And then, you know, likewise, when we go to line 22, "In order for you to smuggle somebody, then you have to know

them."  That's what we're trying to get at.  I mean, that's just -- that -- one, it's expert testimony, just like the first thing; but two, it's also confusing to the jury because that's not true.

But if they hear, you know, a CBP officer saying it, then, you know, it has the weight of truth on it.  And then, on page 40, it's just more of the same.  It's more of the "This is the profile, this is the structure, this is the way that it works," type of interrogation.

And even if they were merely confront -- there's also an aspect to this whole exchange where they're commenting -- the Government is commenting on Mr. Rolon's veracity.  And we all know that if the -- if this was live testimony, the agent would not be allowed to get up there and say "Oh, I think the Defense is lying because of X, Y, and Z."  And it's the same thing.

**THE COURT:**  So this is what I find.  I do think that starting on page 40 where Officer Corrales begins with, on line 7, you know, "Were you doing somebody a favor" -- you know, speaking in Spanish -- "I mean, you haven't told us."  I think that statement is appropriate.  I happen to agree.

But I'm happy to hear from the Government.

With respect to everything prior to that, I do think it causes confusion.  I don't know that it pushes any ball forward.  I think it's the officer's opinion.  I know that

we've all been involved in cases where, in fact, the driver doesn't know the person that they're smuggling. I mean, they just show up somewhere and drive the person in. So I also don't know that that's an accurate statement.

**MR. FAWCETT:** We'll submit on our argument, Your Honor.

**THE COURT:** Thank you.

And so like I indicated, from page -- from line 7 on page 40, I think that's appropriate.

All right. Page 47.

**MR. GARRISON:** So for this one, once again, it's the agent basically saying that Mr. Rolon is lying to him. And then also the phrase "So, you know lying to a federal officer during a federal investigation it's an offense, right?" I mean, all that -- first of all, that's an inaccurate statement of the law; but second of all, it's -- you know, it basically what it's showing to the jury is, you know, Mr. Rolon committed more crimes than just what he's been charged with.

**THE COURT:** So I find that --

From the Government? My apologies.

**MR. FAWCETT:** This is -- the defendant is being confronted with what the officer is -- believes to be an inconsistent story. And right after this is where the story changes, and Mr. Rolon says, "All right. Yes," and then tells a second story.

So I think this is a pivotal moment, and it provides important context; the fact that he is confronted with an inconsistency and changes his story as a result.

THE COURT:  So I do think that the question from line 5 to 9 is appropriate, and I think that the response on line 12 is appropriate.  The statement on lines 10 and 11 I think can confuse the jury.  "So did you charge him?  So was he lying?  So was he not lying?"  And I don't -- what the Government is trying to establish, which is inconsistencies, is established by the prior section that I find to be appropriate.

Anything the Government wishes to add?

MR. FAWCETT:  Just to understand.  Just the lines 10 and 11 --

THE COURT:  Comes out.

MR. FAWCETT:  -- would be the ones that it covers?

THE COURT:  Yes.

MR. FAWCETT:  Okay.  Nothing further, Your Honor.

THE COURT:  And for the Defense, your objection is noted.

MR. GARRISON:  For page 50, you know, once again, this is just commenting on -- basically saying that Mr. Rolon is lying to them and commenting on, you know, his veracity, which I don't think is proper.

THE COURT:  I think that because you're going to get the rest of the statements, Mr. Garrison -- the rest of the

statement, Mr. Garrison, and I think that -- I find that if your client gave two different versions of what happened -- I believe the Government opened on that.

I think it's appropriate. So I'm going to have that remain.

**MR. GARRISON:** So this is the agent offering an opinion on Mr. Rolon's mental state, which would not be admissible at trial.

**THE COURT:** Do you believe that that is the entire section? Is the officer offering an opinion of his mental state? Because I do see that from lines 20 to 25. It continues to the next line -- page. But let me focus on page 53.

From the Government?

**MR. FAWCETT:** So as to the first portion, they are confronting with this, and he's making a denial. So it's relevant to the extent that this is a response from Mr. Rolon to this -- to this line of questioning. On the next page, it does get into the areas that we agreed, because it talks about his prior being bailed out and being in jail. But as to the content at the top of page 54 and on page 53, we do believe that is relevant and should come in.

**MR. GARRISON:** Also vouching. Because basically, this is Agent -- or this Officer Acevedo talking, and basically, putting the weight --

THE COURT: Mr. Garrison, I'm going to pause you for one moment, because I want to focus on page 53.

What is everyone's position with respect to lines 20 to 25? Because I think -- I think those statements do go to the officer's opining as to his state of mind, why he's acting in a certain -- why he's doing something, why he potentially agreed to do this.

I don't find lines 8 through 19 to be -- 17 through 19 may be close, but -- and 17 through 19 I think is fine, because it -- Officer Acevedo is responding to Mr. Rolon's response that he was doing this as a favor. So I'm inclined to allow lines 8 through 19.

But lines 20 through 25, from the Government, how do you justify that that is not either one of the two officers offering an opinion about Mr. Rolon's state of mind?

MR. FAWCETT: Well, I believe it bleeds into the next page where the next -- the question to follow up on that statement is, "And we're nobody to judge you, but we do all make mistakes, right?" And the response is, "Yeah." I think the fact that the defendant is acknowledging the -- like, the possibility of a mistake being made is relevant. So I see that as all kind of one question leading up to that.

THE COURT: So let me look at page 54. Give me one moment.

I don't find anything problematic with lines 1 through

5 of page 54.  We'll talk about the rest in a moment.  I think you already said that you agree that that shouldn't come in.  But I still want to go back to page 53, lines 20 to 25.

*MR. FAWCETT:*  We'll agree for that -- that 20 to -- lines 20 to 25, Your Honor --

*THE COURT:*  All right.  Thank you.

*MR. FAWCETT:*  -- that the beginning of the next page is coming in.

*THE COURT:*  Okay.  Then from line 6 to line 20, the Government agrees that that comes out?

*MR. FAWCETT:*  Yes, Your Honor.

*THE COURT:*  Okay.

*MR. GARRISON:*  Your Honor, on 53, if I could just -- lines 4 through 15, the agent says, "I honestly think that you -- you did know that they were undocumented."  Like, he's basically giving an expert opinion as to what Mr. Rolon knew.

*THE COURT:*  I don't find that to be an expert opinion.  And, more importantly, I find that your client's response is -- you know, he's affirmatively denying that.  So you know, I -- So I'll overrule that objection, Counsel.

Then page 55.  So line 1 --

*MR. FAWCETT:*  We would agree to --

*THE COURT:*  Okay.

*MR. FAWCETT:*  -- cut that as well.

*THE COURT:*  And then --

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 206 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1079   Page 99 of
207

MEDINA | REDIRECT | FAWCETT

99

MR. FAWCETT:  I guess it would start at the beginning -- or the end of the last page, line 25.

THE COURT:  My apologies?

MR. FAWCETT:  I think it -- I think we -- it would start at the -- actually, at the end of page 54 is the first part of that question.  But we agree that that should be omitted.

THE COURT:  Correct.  Okay.  Thank you.

Mr. Garrison, on page 55?

MR. GARRISON:  So once again, it's -- it's expert opinion.  Like -- and this, kind of, opining on what, you know, Mr. Rolon's mental state is.  And then also the agent's speculation as to who Mel is to Mr. Rolon.  So those are the reasons that we object.

THE COURT:  From the Government?

MR. FAWCETT:  So at least at the beginning of that, the officers ask -- or is noting that it's hard for them to understand.  And Mr. Rolon's response, "Yeah.  I know, I know." That -- that portion we argue should come in.  He's agreeing, basically, that it's a story that's hard to believe or hard to understand, at least.  The remainder of that, I -- we would agree to the cutting of line 16 in that section.

THE COURT:  Okay.  And I do find that lines 12 through 15 are appropriate.

Page 56?

Mr. Garrison?

**MR. GARRISON:**  On this one, I mean, it's -- when Mr. Rolon was arrested, he had no money on him.  And so there's multiple references to him hurting for money, which would be poverty evidence that's inadmissible.

**THE COURT:**  So let me pause you there.  Are there going to be any witnesses who testify that Mr. Rolon did not have any money on him?

**MR. FAWCETT:**  Not from us, Your Honor.

**THE COURT:**  From the Defense, that you know of?

**MR. GARRISON:**  We intended to elicit that on cross-examination from Agent Corrales.

**THE COURT:**  And what about -- so I think that lines 4 through 10 is appropriate where it says, "No one is -- nobody's perfect."  And then Officer Corrales continues with, "We all do make stupid mistakes when we need money and we're crunched up and we're like," you know, "it's as simple as that."

What is the Government's position with removing that?  And then the remainder I think is appropriate, "But like -- like, give me one story like this.  And then there's a story -- like, it doesn't make sense.  You know what I mean?"  I think that portion is appropriate.

From the Government?

**MR. FAWCETT:**  We would argue that it should all come in.  I don't think that his talking about, you know, "We all

make stupid mistakes. We all need money." That's a comment on the poverty. He's -- the officer is not specifically saying "We know that you have no money." It's a general statement.

**THE COURT:** I agree.

Mr. Garrison, your objection is noted. I will allow that.

What about the Government's position with respect to 17 through 20?

**MR. FAWCETT:** So at this point, Your Honor, Officer Corrales is saying that, you know, basically, "This is what's going to be seen, what the judge is going to see, that you're trying to play us. You know what I mean?" And then the response is, "Yeah."

So the defendant is acknowledging that he understands that -- how this is going to look. And I think that's an important admission, and we believe that's relevant -- highly relevant to his state of mind in that.

**THE COURT:** Mr. Garrison?

**MR. GARRISON:** Well, once again, I -- I just think that this is them basically calling him a liar. And they wouldn't be allowed to do that on -- from the stand when they testify, so they shouldn't be allowed to do it on a video that gets played. Because it's not -- I mean, the whole reason this is coming in is because it's admissions made by a party opponent to the Government. But it's not --

THE COURT: And because there was no *Miranda* violation.

MR. GARRISON: The Court --

THE COURT: Right?

MR. GARRISON: Yeah. The Court found there was no *Miranda* violation. But, I mean, it's not -- it's not open season for the officers to just talk about how everything happens in alien smuggling cases all the time and give this kind of, like, expert testimony and then comment on Mr. Rolon's story. If the stories are inconsistent, then they're inconsistent, and the jury will see that. They don't need the agents, who necessarily have the prestige of the Government behind them, wearing a badge, and basically saying "You're lying." I mean, that's -- that's black letter law that that shouldn't come into evidence.

MR. FAWCETT: Your Honor, our point here is -- it's important is that -- Mr. Rolon's answer, which is "Yeah." That he's -- he's admitting some agreement with this statement, and that's the important fact here. That means this should come in.

THE COURT: Mr. Garrison, how do you -- what do you respond to the fact that your -- I mean, is your position still that whether your client admits that -- by saying "Yeah," that he's playing with the officers or not? That nonetheless it's the officers' opinion that your client is being dishonest?

**SER-209**

**MR. GARRISON:** I think that, yes, it is his opinion. But also it's not -- it's not clear that this is an ascension to the statement that the officer is making that this is an agreement. He just says, "Yeah." I mean, in normal conversation, when somebody is saying -- talking, you could say "Yeah," it doesn't necessarily give a -- or indicate that there's an agreement. It's just a filler word to move the conversation along.

**MR. FAWCETT:** We believe the jury should be the judge -- or should be the ones to determine the significance of his answer there. I believe there's a pause at that point that indicates it's more than just a knee-jerk reaction. But I think that's something that the jury should be able to decide for themselves, Your Honor.

**THE COURT:** And, you know, Mr. Garrison, while I do recognize that -- the concern that you have, that this is the -- this is an officer's opinion which he would not be permitted to elicit if he was testifying to the facts that happened, but this is coming in as your client's post-arrest statement. Nonetheless, this is your client's -- this is the officer's opinion. From my review, your client is not admitting that he has lied to them. He maintains his story.

Officer Corrales has not yet testified, correct?

**MR. FAWCETT:** Correct.

**THE COURT:** So Officer Corrales can be, you know,

cross-examined on, you know, "When you make these statements, you know, it's your opinion." And you can cross him on it. But I don't believe that this is -- this portion is excludable. I will allow that to come in.

And then with page 57?

**MR. FAWCETT:** And I don't know what the Defense's position is. I believe, from our position, the only portion that's -- that ought to be excluded is the portion in lines 7 through 8 where Mr. Rolon talks about getting -- just got out of jail. The rest of the question and answer, if we can find a way to cut that small portion out, we believe should come in. But if we're not able to cut that portion out without taking out the rest of it, then we would agree to that.

**THE COURT:** Mr. Garrison?

**MR. GARRISON:** The same vouching issue that I had before --

**THE COURT:** All right.

**MR. GARRISON:** -- with the statements, "We've been working here a long time. Your story to us doesn't seem believable. We know there's a truth out there." And then Mr. Rolon disputes it and says, "But like I told you." So I mean, here, once again, it's basically them giving an opinion and saying "Oh, well, because I'm an agent, working here a long time, your story is not believable."

I have serious concerns that the -- that the jury is

going to take that as -- you know, basically that there's other available -- other information available to the Government that they don't have that makes them believe that the Government knows that Mr. Rolon's guilty.

**THE COURT:** So I'm more concerned about that than I am about this seeming to be vouching because, again, this is the agent's -- it's an interrogation tactic, and you'd be able to cross-examine, you know, the agent. It's a -- you know, we see it on post-arrest interviews all the time.

The concerning part to me is, you know, that last sentence when he says, "We know there's a truth out there, but -- but it's" -- it does lend itself to, you know, have the jury say, "What other truth? What did the Government know? Why didn't we hear about it?" And I find that it can cause confusion to the jury and misplace what the agent is really attempting to say in this -- in this portion.

From the Government, based on my comments?

**MR. FAWCETT:** Understood. We'll submit on our argument. We believe that the -- that's not a vouching, but it is interrogation. And the defendant's response to that interrogation includes a story that is inconsistent with testimony that the jury has heard from the material witness about when he picked them up, or at least could be interpreted that way. So that's why we believe it ought to come in. But we'll submit on our argument on that point.

**SER-212**

THE COURT: I will just have the Government remove "We know there's a truth out there, but -- but it's" -- I want that to come out.

And then lines 23 to 25?

MR. FAWCETT: Again, Your Honor, this --

THE COURT: I find that to be the officer's opinion. I don't find it to be vouching.

So Mr. Garrison, is your objection the same?

MR. GARRISON: Yes, Your Honor.

THE COURT: All right. So I will overrule it, and that can come in.

Any questions?

MR. GARRISON: No. Thank you, Your Honor.

THE COURT: From the Government?

MR. FAWCETT: No questions, Your Honor.

THE COURT: All right. Thank you.

Let's bring the witness -- the jury back in. The witness can come forward. Oh, he's also outside. Sorry.

(Jury enters the courtroom at 1:17 p.m.)

THE COURT: Welcome back, everyone. I hope you enjoyed your lunch. Thank you very much for your patience this morning. The lawyers and I were working through some matters so that we can continue with our trial as expeditiously as possible. So at this time, I would -- everyone may be seated.

I'd like to remind the witness that he's still under

oath.

       The Defense may begin its cross-examination.

**CROSS-EXAMINATION**

*BY MR. BUGARIN:*

Q   Good afternoon, Mr. Ixan.

**A   Good afternoon.**

Q   Is it "Ixon" or "Ishan"?

**A   "Ishan."**

Q   "Ishan."  Thank you.  Mr. Ixan, you answered some questions for the Government on direct?

**A   Yes.**

Q   We spoke about some of the events that occurred on March 11th of last year?

**A   I understand.**

Q   Is that a "yes"?

**A   Yes.**

Q   Okay.  You were arrested on that day, yes?

**A   Yes.**

Q   And you were interviewed by agents on that day?

**A   Yes.**

Q   So you were arrested because you entered the U.S. without any documents giving you permission to enter?

**A   Exactly.**

Q   Or work in the U.S.?  Any documents that would allow you to work in the U.S.?

**SER-214**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 215 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1088    Page 108 of 207

IXAN-MARROQUIN | CROSS-EXAMINATION | BUGARIN                    108

A    Yes.

Q    Or any documents that would allow you to reside in the U.S.?

A    Yes.

Q    You entered the U.S. illegally?

A    I understand.

Q    And you knew that it was against the law to do so?

A    No.

Q    You didn't know it was a crime to enter the U.S. illegally?

A    I -- I had not understood the -- the fact that crossing per se was a crime.

Q    So you were given -- you were given documents, U.S. passports?

A    Yes.

Q    You were given that by Mr. Melquides Palafox Posadas; isn't that right?

A    Correct.

        MR. BUGARIN:  One moment, please.

        THE COURT:  Of course.

BY MR. BUGARIN:

Q    I want to show you an exhibit that the Government showed you earlier.  I believe it was Exhibit No. 18.

        So this was a conversation between you and Ms. Zulemy; isn't that correct?

A    Yes.

**SER-215**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 216 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1089    Page 109 of 207

IXAN-MARROQUIN | CROSS-EXAMINATION | BUGARIN        109

Q    And on the bottom text, it describes information of a "Maria Uitz" and a "Melquides Posadas Palafox"?

A    Yes.

Q    So those individuals were supposed to act as your parents --

A    Yes.

Q    -- as you crossed through Mexico?

A    Yes.

Q    Okay.  So that's Mr. Melquides Posadas Palafox on that screen; isn't that correct?

A    Correct.

Q    Okay.  We're going to call him "Mr. Posadas" just for short.

A    Okay.

Q    Okay.  So you were given information from a passport card that you would use to cross into the U.S.; isn't that correct?

A    That is correct.

Q    And that passport card did not belong to you?

A    Correct.

Q    But you were told to act as if you were that person on that passport card?

A    Yes.

Q    That's because you did not yourself have any documents to enter the U.S.?

A    Correct.

**Q**   So you acted as the person on that passport card?

**A**   Yes.

**Q**   Because you knew it was illegal to come into the U.S. without the proper documents?

**A**   I understand.

**Q**   Is that a "yes"?

**A**   Yes.

**Q**   Okay.  Thank you.  So Mr. Ixan, you were held as a witness for the United States Government; isn't that correct?

**A**   Yes.

**Q**   And you were in custody for about over four months, isn't that right?

**A**   Correct.

**Q**   And you sat down on July of last year to answer questions from both the Government and Mr. Rolon's attorneys; isn't that right?

**A**   Correct.

**Q**   And it was your understanding that in exchange for your testimony, you would not be charged with a crime?

**A**   Yes.

**Q**   And as you sit here today, you haven't been charged with a crime?

**A**   I understand.

**Q**   Is that a "yes"?

**A**   Yes.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 218 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1091   Page 111 of 207

IXAN-MARROQUIN | CROSS-EXAMINATION | BUGARIN    111

**Q**   Okay.  If you can please just answer "yes" or "no" to my questions?

**A**   **Okay.**

**Q**   Okay.  So you haven't been charged with a crime?

**A**   **No.**

**Q**   And you don't want to be charged with a crime?

**A**   **No.**

**Q**   Okay.  So I want to back up a little bit to the beginning of your journey to the United States border.

**A**   **Okay.**

**Q**   So your sister arranged travel for you to come to the United States?

**A**   **Yes.**

**Q**   She arranged travel with Mr. Posadas?

**A**   **Yes.**

**Q**   Okay.  So on direct examination, you mentioned that you were to pay 100,000 *quetzales* -- *quetzales* to cross into the U.S.?

**A**   **Yes.**

**Q**   Okay.  But that number is actually 150,000 *quetzales*?

**A**   **Yes, that's correct.**

**Q**   Okay.  So it wasn't 100,000 quetzales?

**A**   **100,000 *quetzales* to cross -- to cross in Mexico, and then the rest would be paid once we were here.**

**Q**   Okay.  So you made a down payment -- or you had your sister

make a down payment?

**A      Yes.   They did ask for an advance payment.**

Q     Okay.  So you crossed into Guatemala -- from Guatemala to Mexico?

**A      Yes.**

Q     And you were given instructions by Mr. Posadas on the journey ahead?

**A      Yes.**

Q     And Mr. Posadas was accompanied by his wife?

**A      Yes.**

Q     That was a Ms. Maria Uitz; isn't that correct?

**A      Yes.**

Q     Okay.  So they traveled with you from southern Mexico to Tijuana?

**A      Yes.**

Q     Okay.  And in that time, Mr. Posadas gave you a false Mexican ID?

**A      Yes.**

Q     And you testified on direct that your sister provided a picture of you to Mr. Posadas to make that ID?

**A      Yes.**

Q     Because you're not a Mexican citizen?

**A      Correct.**

Q     And you received information about the Mexican national anthem?

A    Yes.

Q    And your purpose was to learn the national anthem of Mexico?

A    Yes.

Q    And that was in order to deceive any Mexican officials who might question you on the journey ahead?

A    Yes.

Q    Okay.  And you said you traveled from southern Mexico to Tijuana by an airplane?

A    Yes.

Q    And that airplane travel was arranged by Mr. Posadas?

A    Yes.

Q    And during that travel within Mexico, you posed as Mr. Posadas's child?

A    No.

Q    Okay.  You were given information on your phone by your sister about biographical information of Mr. Posadas and his wife?

A    Yes, that's correct.

Q    Thank you.  And that purpose was for you to act as Mr. Posadas's son?

A    Yes.

Q    Okay.  Going back to the ID that you got, the Mexican ID. That was given to you by Mr. Posadas?

A    Yes.

**SER-220**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 221 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1094   Page 114 of 207

IXAN-MARROQUIN | CROSS-EXAMINATION | BUGARIN    114

**Q**    And that ID had your real name on it?

**A**    **Yes.**

**Q**    Okay.  But it wasn't a real ID?

**A**    **Correct.**

**Q**    Okay.  Okay.  So moving along, you traveled from southern Mexico to Tijuana?

**A**    **Yes.**

**Q**    And those arrangements were made by Mr. Posadas?

**A**    **Yes.**

**Q**    You were told to wait at a house?

**A**    **Yes.**

**Q**    And that you would eventually be picked up and taken to the United States?

**A**    **Yes.**

**Q**    You were originally supposed to be taken to the United States much earlier than the date you actually went?

**A**    **Yes.**

**Q**    Okay.  But the driver, the original driver, wasn't able to make that trip?

**A**    **Yes, that's correct.**

**Q**    It was your understanding that that driver was sick?

**A**    **Yes.**

**Q**    It was a female driver?

**A**    **Yes.**

**Q**    Okay.  So instead, you waited for Mr. Posadas to give you

your next instructions?

A    Yes.

Q    Okay.  So you mentioned that you had never seen the passports until the day of the arrest?

A    Correct.

Q    But, in fact, you had seen a picture of that passport that you were supposed to use before the day you crossed?

A    That I had not seen it physically.

Q    Okay.  But you had seen a picture of that passport card?

A    Yes.

Q    And you were told to learn the name on that passport card?

A    Yes, that's correct.

Q    Can you tell us that name again?

A    I don't remember the name.

Q    Okay.  Would it help to see a picture of it?

A    Yes.

(Defense Counsel confers.)

        MR. BUGARIN:  Can I have one moment, please?

        THE COURT:  Of course.

(Defense Counsel and Government Counsel confer.)

BY MR. BUGARIN:

Q    Is this that passport card?

A    Yes.

Q    Okay.  And you were told to learn that name?

A    Yes.

SER-222

**Q**  Can you read that name to us?

**A**  **Joel Isaias Posadas.**

**Q**  Okay.  And it's your understanding that that was Mr. Posadas's son?

**A**  **Yes.**

**Q**  And Mr. Posadas told you that you were to act as his son on the trip?

**A**  **Yes.**

**Q**  Okay.  So I want to move forward to the day of your arrest.

**A**  **Okay.**

**Q**  So you were told to wait at a house until it was time to be taken to the U.S.?

**A**  **Yes.**

**Q**  And you stayed at that house until it was time to go?

**A**  **Yes.**

**Q**  And on the day of the arrest, Mr. Posadas showed up to the house?

**A**  **Yes.**

**Q**  So about 3:00 in the morning?

**A**  **It was in the early morning hours.  I'm unware of the time.**

**Q**  It was very early in the morning?

**A**  **Yes.**

**Q**  The sun wasn't out yet?

**A**  **No.**

**Q**  Okay.  And Mr. Posadas showed up with another man at the

house?

A     Yes.

Q     You had never met that other man before?

A     Correct.

Q     You had never made arrangements with that man?

A     No.

Q     You had never spoken to that man before that day?

A     No.

Q     Okay.  So now you left the house.  You're on the way to the border?

A     Yes.

Q     And Mr. Posadas had previously told you what name you would present at the border?

A     Yes.

Q     Okay.  That was the name on this passport card?

A     Yes.

Q     Okay.  And Mr. Posadas was in the car with you on the way to the U.S.?

A     Yes.

Q     And you were all in line waiting to get into the port of entry?

A     Yes.

Q     Okay.  Then you're waiting in line?

A     Yes.

Q     And then Mr. Posadas gets out of the car?

**SER-224**

A    Yes.

Q    And he takes your luggage?

A    Yes.

Q    He took your luggage and Zulemy's luggage?

A    Yes.

Q    Okay.  And then he -- it was your understanding that he was going to cross into the U.S.?

A    Yes.

Q    And he told you that he would give you your belongings when you got to your destination?

A    Correct.

Q    Okay.  So after your arrest, you were interviewed by an officer?

A    Yes.

Q    Okay.  And in that interview, you swore to tell the truth?

A    Yes.

Q    And you were asked about your nationality?

A    Yes.

Q    You first stated that you were a Mexican citizen?

A    Correct.

Q    Okay.  That's not true, though, is it?

A    Correct.

Q    Okay.  So you were a Guatemalan citizen; isn't that right?

A    That is correct.

Q    So you lied under oath?

**SER-225**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 226 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1099   Page 119 of 207

IXAN-MARROQUIN | CROSS-EXAMINATION | BUGARIN    119

A   Correct.

Q   This wasn't your first time trying to get into the United States?

A   Yes, it is the first time.

Q   You'd previously said that you had attempted to cross into the U.S.?

A   No.  That was the only time that I crossed.

Q   Okay.  We'll move on for right now.

A   Okay.

Q   Have you ever had permission to enter the United States prior to your arrest?

A   No.

Q   And your parents are -- they're from Guatemala?

A   Yes.

Q   Okay.  So you were -- you were released from custody back in August of last year?

A   Yes.

Q   And you were released into the United States?

A   Yes.

Q   And you've been allowed to stay in the United States?

A   Yes.

Q   You were granted permission to say in the United States?

A   Yes.

Q   And you were granted permission to stay in the United States by the United States Government?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 227 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1100   Page 120 of 207

IXAN-MARROQUIN | REDIRECT | FAWCETT          120

A    Yes.

Q    In fact, you have an immigration hearing in September?

A    Yes --

Q    To determine --

A    -- that's correct.

Q    To determine if you will stay in the United States?

A    Correct.

         MR. BUGARIN:  One moment.

         THE COURT:  Of course.

     (Defense Counsel confers.)

         MR. BUGARIN:  Thank you, Mr. Ixan.  I think we're done.

         THE COURT:  Any redirect?

         MR. FAWCETT:  Yes.  If I may, Your Honor.

                    REDIRECT EXAMINATION

BY MR. FAWCETT:

Q    Good afternoon.

A    Good afternoon.

Q    You were asked questions --

     You testified earlier that you were asked questions in an interview or in a deposition after you were taken into custody, is that correct?

         MR. BUGARIN:  Objection.  Leading.

         THE COURT:  Sustained.

///

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 228 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1101   Page 121 of 207

IXAN-MARROQUIN | REDIRECT | FAWCETT    Page 121 of    121

BY MR. FAWCETT:

Q   Were you asked questions at some point after you were taken into custody in a deposition or other type of interview?

A   How is that?

Q   Were you asked questions by prosecutors for the government and by defense attorneys?

A   I don't remember.

Q   Were you ever in a room where you were videotaped and asked questions?

A   Oh, yes.

Q   Okay.  And the defendant here, the person you identified earlier as the one who crossed you at the border, was that person in the room as well?

A   Yes.

Q   And attorneys for the defendant were there, is -- were --
        Were attorneys for the defendant there?

A   Yes.

Q   And were attorneys for the prosecution there as well?

A   Yes.

Q   And at that time, were you told that you would be removed from the United States after that hearing?

A   I don't remember.

Q   At that time, were you told that you would have to come back for trial?

A   Yes.

**Q**   You weren't removed -- were you removed after that?   After that hearing?

**A**   **No.**

**Q**   Was the reason that you weren't removed the asylum claim that you talked about earlier?

**A**   **Yes.**

**Q**   And was it your understanding that the prosecution in this case that was at that hearing had no bearing on that asylum claim?

**A**   **Correct.**

**Q**   Okay.   The Defense Counsel just asked you about a man arriving at that house you were staying at in Tijuana; do you remember that?

**A**   **Yes.**

**Q**   And you -- did you testify earlier that the -- that Melquides was one of the people who came to the house?

**A**   **Yes.**

**Q**   And did you testify earlier that the person who attempted to cross you -- or to bring you across the border was the other person who went to the house?

**A**   **Yes.**

**Q**   I'd like to show you what's been marked previously as Government's Exhibit 12.

        Can you see that in front of you?

**A**   **Yes.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 230 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1103    Page 123 of 207

IXAN-MARROQUIN | REDIRECT | FAWCETT                    123

**Q**   Have you seen this photograph before?

**A**   **Yes.**

**Q**   Were you present when this photograph was taken?

**A**   **Yes.**

**Q**   Did you take this photograph?

**A**   **I don't remember.**

**Q**   What is being shown in this -- or depicted in this photograph?

**A**   **That's the guy that was crossing us.**

**Q**   When you say "The guy that was crossing us," is that the defendant who you pointed out in this courtroom earlier today?

**A**   **Yes.**

**Q**   And at what location was this photo -- was this photograph taken?

**A**   **In the house in Tijuana.**

**Q**   Is that the same house that you testified earlier you stayed at for about two weeks?

**A**   **Yes.**

**Q**   And how -- at what time was this taken in relation to when you went to the border to try to cross?

**A**   **When he arrived, like, five or ten minutes later.**

**Q**   And how long after this photograph was taken did you leave that house to go to the border?

**A**   **Like 30 minutes.**

        ***MR. FAWCETT:***   Your Honor, at this time the

United States would move to admit Government's Exhibit 12.

**THE COURT:** From the Defense?

**MR. BUGARIN:** No objection.

**THE COURT:** All right. It can be admitted. You may publish.

**(Government Exhibit 12 received into evidence.)**

**(Government Counsel confers.)**

**BY MR. FAWCETT:**

**Q** Taking a look at Government's Exhibit 12, is that how the defendant, the person who attempted to cross the border with you, was dressed at the time that he was in the vehicle with you?

**A** Yes.

**Q** And does he appear the same way in this photo that he did that night when you saw him?

**A** Yes.

**Q** And I said "that night," but I think -- believe you had testified earlier that it was early morning; is that your testimony?

**A** Yes.

**MR. FAWCETT:** No further questions, Your Honor.

**THE COURT:** Thank you.

Any recross?

**MR. BUGARIN:** Yes, Your Honor.

**RECROSS-EXAMINATION**

*BY MR. BUGARIN:*

Q   Mr. Ixan?

A   **Tell me.**

Q   You don't want to go back to Guatemala?

A   **No.**

Q   You want to stay in the United States?

A   **Yes.**

Q   And your goal is to stay in the United States?

A   **Yes.**

Q   And you claimed asylum?

A   **Yes.**

Q   That means you have a fear to go back home?

A   **Yes.**

Q   You're afraid that you'll be hurt if you go back home?

A   **Yes.**

Q   You're afraid that you might be killed if you go back home?

A   **Yes.**

Q   So you don't want to go back?

A   **No.**

Q   And you would do anything not to go back home?

A   **In legal terms, yes.**

Q   The government decides -- the U.S. government will decide whether you get to stay in the United States or go home.

        *MR. FAWCETT:*   Objection, Your Honor --

        **(Court Reporter clarification.)**

**SER-232**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 233 of 298
Case 3:24-cr-00684-LL  Document 158  Filed 08/25/25  PageID.1106  Page 126 of

IXAN-MARROQUIN | RECROSS | BUGARIN

207

126

MR. FAWCETT: Calls for speculation, Your Honor.

THE COURT: All right. So Counsel, if you can ask -- rephrase the question in terms of whether he knows.

BY MR. BUGARIN:

Q   Do you know if the government will decide whether you get to stay in the United States or go home?

A   Yes.

Q   Okay. So the U.S. government will decide whether you get to go home or stay in the United States?

A   Correct.

MR. BUGARIN: No further questions.

THE COURT: Thank you.

Is this witness excused?

MR. FAWCETT: Yes, Your Honor.

THE COURT: From the Defense?

MR. BUGARIN: Yes, Your Honor.

THE COURT: Thank you very much, sir. You are excused.

The Government may call their next witness.

MR. FAWCETT: Your Honor, the United States calls Customs and Border Protection Officer Julio Corrales.

THE COURT: Thank you.

(Witness duly sworn.)

THE CLERK: Please take the stand.

Please state your first and last name for the record.

**SER-233**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 234 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1107    Page 127 of 207

CORRALES  |  DIRECT  |  FAWCETT                                           127

**THE WITNESS:**  Sure.  My first name's going to be Julio Corrales.  J-U-L-I-O; last name is Corrales, C-O-R-R-A-L-E-S.

**THE CLERK:**  Thank you.

                          <u>JULIO CORRALES</u>,

**called as a witness for the Government, having been duly sworn, testified as follows:**

                          DIRECT EXAMINATION

*BY MR. FAWCETT:*

Q   Good morning, sir.  How are you currently employed?

**A    I'm currently employed with U.S. Customs and Border Protection, CBP; under DHS, which is Department of Homeland Security.**

Q   Sir, how long have you been an employee with Customs and Border Protection?

**A    I've been employed for Customs and Border Protection approximately 12 years.**

Q   Did you go through any sort of particular training to become a Customs and Border Protection Officer?

**A    Yes.  I went to Glynco training with -- Federal Law Enforcement Training at Glynco for approximately 21 weeks.**

Q   So that's in Glynco.  Where's Glynco?

**A    Glynco, Georgia.**

Q   And describe what type of training you go through -- or you went through at Glynco, Georgia?

A    So within those 21 weeks I learned customs law, immigration law, interview skills, report writing law, seizures, as well as some defense tactics, agriculture, and as well as some, like, simple, like, moving, like with a vehicle, kind of like -- just driving, how to drive.

Q    What's your current assignment within Customs and Border Protection?

A    So I'm currently assigned as a task force officer on a task force.  Currently it involves San Diego Sheriff detectives; HSI, Human -- sorry -- HSI, which is Homeland Security Investigators, as well as DEA, Drug Enforcement Administration, agents; and CBP, Customs and Border Protection.  And we mostly focus on money laundering and bulk cash smuggling.

        THE COURT:  Before you ask the next question.

        You've got to slow it down.  You've been here for most of the trial.  You know you've got to slow it down.  Jessica's fingers are moving as fast as possible.

        THE WITNESS:  I apologize, Your Honor.  I just had coffee.  I'll slow down.  I'm sorry.

        THE COURT:  Thank you.

BY MR. FAWCETT:

Q    Thank you so much, Officer.

        Is that your current assignment with Customs and Border Protection -- or sorry.  You said that was your current assignment.

What was your assignment at -- in March of 2024?

A    So my assignment on March of 2024 was at Criminal Enforcement Unit for -- at the San Ysidro Port of Entry.

Q    And what is the Criminal Enforcement Unit?

A    The Criminal Enforcement Unit, it's an investigation, I guess, party within CBP that investigates any human smuggling, alien smuggling, any kind of federal crime that happens at the port of entry, and as well as assist with any warrants, searches, and -- search warrants and arrest warrants as well. We work locally with a lot of our local agencies, state agencies, and federal agencies.

Q    Thank you, sir.  How long were you with the Criminal Enforcement Unit?

A    Approximately five years.

Q    And what about before you became an officer with the Criminal Enforcement Unit?  What was your position at that point?

A    My position shortly before that, I was temporarily a supervisor for approximately 90 days.  Before that, I was at the Admissibility Enforcement Unit, which handles all the inadmissibility related to immigration, asylum hearings, anything to do with removals or deportations from within the port of entries.

Q    What's the physical location where you're assigned right now?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 237 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1110    Page 130 of 207

CORRALES  |  DIRECT  |  FAWCETT

130

A    Currently, right now, I am assigned here to the Federal Building, just across the street.  But I work -- my home station is San Ysidro Port of Entry.

Q    And are you familiar with the San Ysidro Port of Entry?

A    Yes.  I am very familiar with the San Ysidro Port of Entry.

Q    Have you worked at any other of the ports of entry in this area?

A    Yes.  I work at all the San Diego field office.  So I work at Otay Port of Entry, Tecate Port of Entry, CBX, and Brown Field Airport as well.

Q    And is the San Ysidro Port of Entry -- is -- you're familiar with where that's located?

A    Yes, I am, sir.

Q    Is that located within the Southern District of California?

A    That is located within the Southern District of California.

Q    Are you the person -- the agent who was assigned as the case agent to this particular case, the United States v. Miguel Rolon?

A    That is correct.  I was assigned to this case, yes.

Q    Did you respond to the port of entry on March 11th, 2024?

A    Yes, I did.

Q    Did you interact with the defendant, Miguel Rolon, on that day?

A    Yes, I did.

Q    Did you conduct an interview with Miguel Rolon?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 238 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1111    Page 131 of 207

CORRALES  |  DIRECT  |  FAWCETT                     131

A    Yes.  That's accurate.

Q    And did you see him in person?

A    I did see him in person, yes.

Q    Do you see the person who you identified, at least on that day, as Miguel Rolon?  Do you see that person in the courtroom today?

A    Yes, I do.

Q    Could you please look around the courtroom and point out that person by where they're sitting and what they're wearing, what their appearance is?

A    Okay.  He's sitting to your right, my left, wearing a blue shirt, kind of leaning towards the desk, with his arms crossed.

     MR. FAWCETT:  Your Honor, I would ask that the court record reflect that this witness identified the defendant, Miguel Rolon.

     THE COURT:  It does.  Thank you.

BY MR. FAWCETT:

Q    Did you interact with any of the passengers of the vehicle that Mr. Rolon was driving on March 11th, 2024?

A    Yes, I did.

Q    And can you describe the nature of that interaction?

A    I conducted an interview, a follow-up interview, with them as well.

Q    And you would -- would you recognize them if you saw them?

A    Yes, I will.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 239 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1112    Page 132 of 132

CORRALES   |   DIRECT   |   FAWCETT
207

**Q**   Were you in the courtroom during the last witness's testimony just a moment ago?

**A**   **That is correct.  I've been here in the courtroom, yes.**

**Q**   Did you recognize the person who was testifying?

**A**   **That's correct.  I did recognize him.**

**Q**   And who was that?

**A**   **That was Yonathan Marroquin.**

**Q**   And is that one of the persons who was in the vehicle -- or who you interacted with on March 11th, 2024?

**A**   **That is correct, yes.**

**Q**   I'd like to show you what's been previously marked as Government's Exhibit 44.

Do you recognize this photo?

**A**   **Yes, I do.**

**Q**   Did you take this photo?

**A**   **I did not take this photo.**

**Q**   Where -- do you know where this photo was taken?

**A**   **I was present when that photo was taken.**

**Q**   And where was that?

**A**   **That was at the San Ysidro Port of Entry, in the Secondary Inspection area, in our security office.**

**Q**   And is -- who is depicted in this photograph?

**A**   **So that's Yonathan Marroquin.**

**Q**   And is this picture a true and accurate representation of the -- what this photograph depicts as of March 11th, 2024,

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 240 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1113   Page 133 of 207

CORRALES | DIRECT | FAWCETT                                    133

when it was taken?

A   That's correct, yes.

MR. FAWCETT:  Your Honor, I move to admit Government's 44.

MR. BUGARIN:  No objection, Your Honor.

THE COURT:  Perfect.  It's admitted.

(Government's Exhibit 44 received into evidence.)

THE COURT:  You may publish.

BY MR. FAWCETT:

Q   I'm going to show you what's been previously marked as Government's Exhibit 45.

Likewise, same question, were you present when this photograph was taken?

A   Yes, I was present.

Q   Where was this taken?

A   Same location.  At the San Ysidro Port of Entry, in our secondary area, at security office.

Q   And is this a true and accurate depiction of -- of what this -- well, let me ask this first, sorry.

What is this photograph portraying or depicting?

A   This is a picture of the -- one of the passengers that were in the vehicle with our defendant, Mr. Rolon.  She was, I believe, the front passenger.  And her name is Zulemy Yohana -- sorry -- Zulemy Yohana Raquec-Mucia.  Sorry.  Her name is a little bit --

**Q**   Is this a true and accurate depiction of how this person appeared when you were present when this picture was taken on March 11th, 2024?

**A**   Yes, it is, sir.  Yes.

        **MR. FAWCETT:**  Your Honor, I move to admit Government's 45 into evidence.

        **MR. BUGARIN:**  No objection, Your Honor.

        **THE COURT:**  All right.  It'll be admitted.

   **(Government Exhibit 45 received into evidence.)**

**BY MR. FAWCETT:**

**Q**   Okay.  Sir, I'm going to show you what's been previously marked as Government's Exhibit 45 -- I'm sorry, 46.  I misspoke.

        Are you familiar with this photograph?

**A**   That's correct.

**Q**   Were you present at the time this photograph was taken?

**A**   I was present, yes.

**Q**   Did you take the photograph yourself?

**A**   I did take this photograph myself.

**Q**   I'm sorry.  I'm not sure if I heard.  Is that an "I did" or "I did not"?

**A**   I did take this picture myself, yes.  It was me.

**Q**   And what is being depicted in this photograph?

**A**   This photograph is a depiction of defendant in the interview room with his belongings that were with him on his

person at the time of his arrest.

Q   And is this photograph a true and accurate depiction of the scene as it appeared when you took the photograph on March 11th, 2024?

A   That's correct, yes.

MR. FAWCETT:  Your Honor, I move to admit Government's 46.

MR. BUGARIN:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.  You may publish.

(Government Exhibit 46 received into evidence.)

BY MR. FAWCETT:

Q   So there's only -- there's only one person pictured in this photograph.  Who is that?

A   That's Mr. Rolon, our defendant.

Q   And what he is wearing?

A   He's wearing what's -- like a gray -- like a white, cream-ish color sweater, jacket.

Q   And there are a few items before him on a table.  Can you describe what -- what those items are doing there?

A   Correct.  Those are items that were taken picture of -- of his property as -- at the time he was -- when he was arrested, that was on his person.  We laid it out and took a picture of it.

Q   Okay.  I'm going to show you, sir, what's been previously

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 243 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1116    Page 136 of 207

CORRALES | DIRECT | FAWCETT                                    136

marked as Government's Exhibit 47.

Do you recognize this photo?

**A    I do recognize this photo, yes.**

Q    Did you take this photo?

**A    I did take this photo, yes.**

Q    What is being depicted in this photograph?

**A    This is a depiction of Defendant's cell phone, the back side of his cell phone with the case.**

Q    And how do you know that this is the defendant's phone that you took the picture of?

**A    I took the picture myself.  And it's very unique, and I remember it, especially because the way the case looks.  It has like a little indent, almost -- just -- the way it looks, I just -- I remember it.**

*MR. FAWCETT:*  Your Honor -- before I do that --

*BY MR. FAWCETT:*

Q    Sir, is this photograph a true and accurate depiction of the phone as you took it when you took the photograph?

**A    That's correct, yes.**

*MR. FAWCETT:*  Your Honor, I move to admit 47.

*MR. BUGARIN:*  No objection, Your Honor.

*THE COURT:*  Thank you.

It's admitted.  You may publish.

**(Government Exhibit 47 received into evidence.)**

*///*

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 244 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1117    Page 137 of 137

CORRALES  |  DIRECT  |  FAWCETT                137

*BY MR. FAWCETT:*

Q   Did you -- at the time that you interviewed the defendant, did you have access to this phone?

A   **Yes, I did.**

Q   And -- I apologize.  When I say "have access," was the phone physically present?

A   **The phone was physically present when he was there.**

Q   Did you present the phone to the defendant, Mr. Rolon?

A   **That's correct, I did.  Yes.**

Q   And what was the purpose of that?

A   **The purpose is to identify that this phone did belong to our defendant.  I wanted to make sure that I got the facts right, so that's why I asked that question.**

Q   And did Mr. Rolon respond when you confronted him with this phone?

A   **Yes, he did.**

Q   What did he say?

A   **He stated that, in fact, was his phone.**

Q   Sir, as a Customs and Border Protection officer, are you familiar with something called TECS records; and that's T-E-C-S records?

A   **Correct, I am familiar with it.**

Q   Generally speaking, what are TECS records?

A   **So normally it's a law enforcement computer system.  Law enforcement uses it, mostly CBP.  It gathers information**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 245 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1118   Page 138 of 207

CORRALES  |  DIRECT  |  FAWCETT                    138

nationwide of any outbound/incoming entries into the United States, out of the United States, as well as captures information related to people, person, and vehicles, and sometime business.  So -- and it also works as a communication between CBP, local, nation -- nationwide law enforcement, and federal agencies.

Q   What type of information is recorded in TECS records?

A   Multiple of information [sic].  The ones mostly is inbound and outbound.  I guess -- so what I mean by "inbound" is when you travel outside of the -- into the United States, and "outbound" is when you exit outside of the United States, where you travel abroad.  It captures that information.  So crossing history; that makes it a little bit easier.

Q   So you mentioned that it covers crossing history.  I'd like to ask a little more specifically.

What is -- what is crossing -- let me ask this way:

When you mentioned "outbound" from the United States to Mexico --

A   Correct.

Q   -- how are those outbound crossings recorded in the TECS system?

A   So in TECS system, if a person travels from within United States to Mexico, if you were inspected by an officer, it will have your name, date of birth, document used.  If you travel in a vehicle, it's going to have your license plate

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 246 of 298
Case 3:24-cr-00684-LL Document 158 Filed 08/25/25 PageID.1119 Page 139 of 207

CORRALES | DIRECT | FAWCETT                    139

number and, if any, other information that an agent gathers or an officer gathers or a system gathers. But mostly for vehicles, it's usually a plate. It also captures the time and date. I'm sorry.

Q   And what you're describing, is that for outbound crossings or inbound crossings?

A   It's either. It could capture it. Inbound and outbound as well.

Q   Generally speaking, is there -- when someone's going out from -- from the United States into Mexico, do they go through the same process that they go through when they come inbound?

A   No. The process is a little bit more lenient. It's a little bit easier. It doesn't capture as much data as coming inbound.

Q   Is there always an interaction with a live human being at the border when someone's driving into Mexico?

A   No. There's -- no.

Q   So for those situations where someone doesn't encounter someone -- like a live officer, how does that information get gathered into the TECS system?

A   So that information gets gathered by a license plate reader. When the vehicle leaves from the United States, in this case into Mexico, it captures it by a license plate reader.

Q   For inbound crossings, how is the information gathered and

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 247 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1120   Page 140 of 207

CORRALES | DIRECT | FAWCETT

140

put into the TECS system, when someone is coming into the United States?

**A So if you're coming into the United States, there's a license plate reader. So it reads your license plate. Not only that; it also reads the passengers that are in the vehicle. And that's inputted by an officer. When you give him the documents, he'll put that information. Or a lot of times there's an RFID, I guess, machine that will capture the RFID. It captures all the document information and time and date of your crossing.**

**Q** So you said someone can go out from the United States into Mexico without interacting with an officer.

Can someone come into the United States from Mexico the same way, without interacting with an officer?

**A No, not legally.**

**Q** And so is -- is the information in the TECS system reflective of what the officer puts in as well as those automated systems you discussed?

**A That's correct.**

**Q** And for these records, is this just specific to San Diego area? Or is this a nationwide thing?

**A No. So it is -- as I mentioned previously, it's a nationwide computer system, law enforcement system, that is captured nationwide.**

**Q** Are you familiar with -- or let me ask this:

SER-247

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 248 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1121    Page 141 of 207

CORRALES | DIRECT | FAWCETT                    141

Are these crossing records kept by the Department of Homeland Security in the normal course of the operations of that department?

A    That's correct, yes.

Q    And are you familiar with the format that these records generally take?

A    Yes.

Q    And are you familiar with the system of retrieving these records in a viewable format?

A    Correct.  Yes, I am.

Q    When someone -- you mentioned this was nationwide.

So if someone were to cross into the United States from Mexico at any port of entry legally, would that crossing, if it were entered correctly, be in that TECS system?

A    That is correct, yes.

Q    I'm going to show you what's been previously marked as Government's Exhibit 48.

Have you seen this document before?

A    Yes, I have.

Q    What is -- generally speaking, what is this document?

A    It's a TECS record of a vehicle.

Q    Is there a license plate associated with that vehicle?

A    Correct.  There's a license plate associated to this vehicle.

Q    Are you familiar with that particular license plate number?

**A    Correct.  I am familiar with that license plate number.**

**Q**    How are you familiar with it?

**A    I remember it.  And this was the vehicle Defendant crossed into the United States with.**

**Q**    So are these the TECS or vehicle crossing records for the vehicle that the defendant took into the United States?

**A    That's correct, yes.**

      *MR. FAWCETT:*  At this time, Your Honor, I would move to admit Government's Exhibit 48 into evidence.

      *MR. BUGARIN:*  No objection, Your Honor.

      *THE COURT:*  Thank you.

      It will be admitted.  You may publish.

   **(Government Exhibit 48 received into evidence.)**

      *MR. FAWCETT:*  Thank you, Your Honor.

*BY MR. FAWCETT:*

**Q**    So on this document, there's a table in the middle with some columns of information.  I'd like to ask some questions about that.

      On the left-hand side is the "license number," what is that column representing?

**A    So that column there on the left-hand side represents the license plate number the license plate reader captured at that time.**

**Q**    The next column over is "license state."

      What is that indicating, that and "license country"?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 250 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1123    Page 143 of 143

CORRALES | DIRECT | FAWCETT    143

A    That's going to be the license state, obviously, where the license plate's from, and then the country where the license plate is from as well.

Q    And the next is "date," what is that signifying for us?

A    That is the date that is captured -- that record was captured.

Q    And then the "time"?

A    The time is the time that that -- the -- sorry -- that -- that -- that license plate was captured.  However, it is in Eastern time.  So -- because it's a nationwide program, so that way it's consistent across the nation.

Q    So is it true that for all TECS records, the time that's listed is going to be in Eastern time?

A    That's correct, yes.

Q    And to your knowledge, what's the time difference between Pacific Time here in California and Eastern Time?

A    It's three hours' difference.

Q    So for that first entry, it lists the time at 8:26.

Are you able to tell from this entry what time that was here in California?

A    Here in California, or in San Ysidro where this happened, it was 5:26.

Q    And do you -- can you tell from this record whether that's in the morning or in the evening?

A    That's going to be a.m., because it's in military time.  So

**SER-250**

8 -- 5:26 a.m.

Q   Okay.  The next column over is -- you see an "I/O."  Do you see that?

A   I do see that, sir, yes.

Q   What does that mean?

A   So "I" stands for an inbound coming from a foreign country into the United States.  Outbound, it's going outside to a foreign country.

Q   So that first line, there's an "I."  Does that signify that it's a -- it was an inbound crossing?

A   That's correct, yes.

Q   And then that second line is an "O."  Does that signify that that was recording an outbound crossing?

A   That is correct.

Q   What about the "site" column that's right to the right of "I/O"?

A   So the site, it's a unique number depending on where that license plate reader was at or the location of where that record was recorded at.

Q   So that top line, the site says "L255," what does that mean?

A   L255, I know it -- based on my time and experience, I know it's San Ysidro Primary -- like Primary booths coming in.

Q   Okay.  What about the next line down, "L25H"?

A   L25H, same thing.  Based on my time and experience --

(Court Reporter clarification.)

**THE WITNESS:** So yes. Based on my time and experience, I know L25H is for the outbound lanes.

*BY MR. FAWCETT:*

Q   And then the -- there's a column to the right of it that says "lane," what does that mean?

A   **So "lane" signifies the terminal it was recorded on. 27 alpha, it's Lane 27 at the San Ysidro Port of Entry vehicle entry lanes.**

Q   And what about "W5"? What's that mean?

A   **W5 is generic to all outbound license plate readers.**

Q   I'm going to skip a few columns over. There's a column that says "number of passengers."

        Do you see that?

A   **Yes, I do.**

Q   How -- well, first of all, what is that signifying in this record?

A   **That's the number of passengers within a package, if it's a vehicle, that were on that -- in that package, or vehicle.**

Q   Okay. So you used the term "package," what do you mean by "package"?

A   **How we determine "package" is -- because it's a vehicle. It could be any kind of vessel for us, so we don't say "vehicle." So it's a package that consists of a vehicle and the passengers within that vehicle.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 253 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1126    Page 146 of 207

CORRALES | DIRECT | FAWCETT

146

Q    Now, does number of passengers include the driver in that total?  Or is it -- or is it exclusive of the driver?

A    No.  It's the total number of passengers, including the driver as well.

Q    And for the first line there, how many passengers were recorded in that vehicle?

A    According to this record, there was three passengers.

Q    And the next one down says "unknown."

Can you explain that?

A    Correct.  It's unknown.  So our license plate reader wasn't able to determine how many passengers were in the vehicle because there was no inspection going outbound.

Q    So is that typical of an outbound crossing to have it listed as "unknown," the number of passengers?

A    Correct.  That's very typical.

Q    For this first line here on this -- on Government's Exhibit 48, it shows a crossing of March 11th, 2024, at 8:26 Eastern Time or 5:26 Pacific Time; is that right?

A    That's correct.

Q    Are you familiar with the event with that date and time?

A    Yes, I am.

Q    What does this crossing record correspond to?

A    This crossing record corresponds to the arrest or the attempt of -- the arrest of Defendant Rolon.

Q    What time is going to be recorded here?  Is it going to be

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 254 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1127    Page 147 of 207

CORRALES    |    DIRECT    |    FAWCETT                    147

a time of arrest or a different time?

**A    No.   So this is a different time.   This is the time he actually -- the license plate reader on Primary captured that -- that plate number.**

Q    So --

**A    So the time of his application for admission.**

Q    So would this be the time that the -- the vehicle that's being recorded actually reached the Primary booths?

**A    That's correct.**

Q    Okay.   I'm going to show you what's been previously marked as Government's Exhibit 49.   Go ahead and take a look at that for a moment.

         Do you recognize this document?

**A    Yes, I do.**

Q    What is this document?

**A    This document is a TECS record of Defendant Rolon.**

Q    And when you say "TECS record," is this a crossing record?

**A    That's correct.**

Q    So how does a crossing record for a vehicle, as we saw in Exhibit 48, differ from a crossing record of a person?

**A    So for a person it captures additional items, additional data.   For example, one of those data, it's date of birth and type of document and if it crossed in vehicle, or pedestrian as well.**

Q    And are you the person who retrieved this particular

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 255 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1128    Page 148 of 207

CORRALES   |   DIRECT   |   FAWCETT                                    148

crossing record for Mr. Rolon?

A    Correct.  Yes.

Q    How do you know that this record corresponds to Mr. Rolon?

A    It's stated by first, last name, and date of birth.

Q    And is this a true and accurate representation or copy of the TECS crossing record that you retrieved from the Department of Homeland Security database for Mr. Rolon?

A    That's correct.

MR. FAWCETT:  Your Honor, I would move at this time to admit Government's 49.

MR. BUGARIN:  No objection, Your Honor.

THE COURT:  Thank you.

It's admitted.  You may publish.

(Government Exhibit 49 received into evidence.)

BY MR. FAWCETT:

Q    So I'm going to focus on the table here at the bottom half of this.  So this looks a little -- a little different though similar to the last one.  So I'm going to walk through some of those differences.

The first two columns here are "first name" and "last name."  Where does that information come from?

A    That information comes from -- officers either input it in manually or by a document presented.

Q    Okay.  And "DOB," which has been whited out here, but what is that information that's generally provided there?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 256 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1129   Page 149 of 207

CORRALES | DIRECT | FAWCETT                    149

**A**   That's a date of birth of the subject's first and last name, whoever's the owner of that.

**Q**   And did you compare the date of the birth on the original copy of this TECS crossing record with the defendant's date of birth?

**A**   Yes, I did.

**Q**   Did it match?

**A**   Yes, it's -- it was a match.

**Q**   There's an encounter date and time that's listed.  What does that mean?

**A**   So that was the time of the encounter, when the subject or the person on this case is -- was encountered and the record was created.

**Q**   And is the same thing true of this as it was of the other record regarding times being recorded in Eastern Time?

**A**   That's correct, yes.

**Q**   So two -- two more columns over to the right, there's an "I/O," what does that mean?

**A**   Same as previous.  So "I" means inbound.  They're coming from a foreign country into the United States.  "O" stands for outbound, which is they're departing the United States, going to a foreign country.

**Q**   And then "site," is that the same explanation as the previous document?

**A**   That's correct.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 257 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1130    Page 150 of 207

CORRALES | DIRECT | FAWCETT                                    150

Q   One of these is a little bit different than the others.  It says "L25C," do you know what that means?

A   Yeah.  So the meaning of L25C, that's meaning that the person crossed walking, not in a vehicle.  It came -- it crossed into the United States walking, pedestrian.

Q   So are both vehicle crossings and pedestrian crossings recorded on this same document?

A   That's correct.  It records all -- all crossing history into the United States.

Q   The column that says "inspector," what does that mean?

A   That's the inspector that entered that record or encountered that person.

Q   And there's a column that says "type," what does that mean?

A   That's the type of entry way.  So if you can see their vehicle, that's the vehicle.  He came in in a vehicle type. Pedestrian, he came walking; pedestrian, so...  There is one other one that says "vehicle DCL."  "DCL" stands for dedicated commuter lane.  Those are our SENTRI members or our trusted travelers.  That's what that means.  They came through a lane, that it was a dedicated commuter lane.

Q   So does this document capture all of the recordings -- or all of the crossings of the defendant that were recorded in the Department of Homeland Security database?

A   That's correct, yes.

Q   And referring to Government -- Government's Exhibit 48, the

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 258 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1131   Page 151 of 207

CORRALES | DIRECT | FAWCETT                                           151

last one we looked at.

Does that record all of the crossings of that particular vehicle that are present in the Department of Homeland Security's database?

A    **That's correct.**

Q    Did you -- for the first line, for the encounter titled "3/11/2024 at 8:26" -- or 5:26 Pacific Time -- did you compare that encounter date and time with the vehicle crossing records in Government's 48?

A    **Yes, I did.**

Q    And how does that compare?

A    **It's a match.  The only difference is, of course, one is for a person and the other one is for a vehicle.**

Q    Okay.  I'm going to show you what's been previously marked as Government's Exhibit 50.  And then I'm going to -- there are several pages here.

So I'm going to slowly scroll through those.  And then once you have an opportunity to look at all of them, please let us know.

A    **Okay.**

Q    We have a few more to --

A    **Okay.  Yeah.  So all 12 of them?  Okay.**

Q    Yeah.  Okay.  I'm going to go back to the first page here.

Have you had a chance to look at each of those 12 pages?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 259 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1132   Page 152 of 207

CORRALES   |   DIRECT   |   FAWCETT                                      152

A    Yes, I did.

Q    Have you seen this document before today?

A    Have I seen it?  Yes, I have.

Q    And what is this document?

A    This is a TECS record of a person as well.

Q    And what's the name of the person of -- who this is a record of?

A    Mr. Melquides Posadas.

Q    Did you retrieve this record as part of your investigation in the current case from the Department of Homeland Security database?

A    Yes, I did.  I pulled this record.

Q    And during the course of your investigation, did you become familiar with a person with the name "Melquides Posadas"?

A    Yes, I did.

Q    And did you ever encounter or see this person named Melquides Posadas?

A    Yes, I did.

Q    And did you learn the date of birth of that person?

A    Correct.

Q    And did you compare the date of the birth -- date of birth of the person you know as "Melquides Posadas" with the date of birth listed on this record?

A    That's correct, I did.  Yes.

Q    And how did they compare?

SER-259

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 260 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1133    Page 153 of 153

CORRALES    |    DIRECT    |    FAWCETT
207

A    They're the same date of birth.

Q    Is this record for Melquides Posadas a true and accurate copy of the version of the record that you pulled from the Department of Homeland Security databases, minus redactions for date of birth?

A    That's correct, yes.

        MR. FAWCETT:  Your Honor, at this time I move to admit Government's Exhibit 50.

        MR. BUGARIN:  No objection, Your Honor.

        THE COURT:  Thank you.

        It's admitted.  You may publish.

    (Government Exhibit 50 received into evidence.)

BY MR. FAWCETT:

Q    All right.  I'm going to show you, sir, the second page of this record.

        So we just talked about what all of this information means -- not for each of these columns -- so I'm not going to go through that again.  But I'm going to ask you to take a look at the second line -- or the second entry on this page; can you see that?

A    Yes, I could.

Q    What's the name given for that entry?

A    So the name that was provided was Melquides Palafox Posadas.

Q    And does that record indicate a crossing of some type?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 261 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1134   Page 154 of 207

CORRALES | DIRECT | FAWCETT                                          154

A    Yeah.  It does indicate a pedestrian crossing.

Q    And is that inbound or outbound?

A    That's going to be an inbound.

Q    Just to maybe clarify a point.  There are several -- for this and the last one we looked at, there are several inbound crossings listed in a row without an outbound crossing being listed; do you recall that?

A    That's correct, yes.

Q    Logistic -- or logically, it doesn't really make sense that someone could come in without having gone out --

A    Correct.

Q    -- before the next entry.

       Do you understand what I'm saying?

A    I do understand, sir.  Yes.

Q    So why are there just a bunch of inbound crossings without an outbound crossing?

A    So the reason there's only inbounds and no outbounds, a lot of times -- as I explained previously, when you come in from a foreign country into the United States, we capture all that information.  However, when you leave, we -- there's not an inspector or -- a CBP inspector or an officer getting that information.  So you're not -- there's -- you're not getting inspected as you leave the United States.  That's why there's no outbound information.

Q    So is it unusual to have a -- in a record like this to have

just a series of inbound crossings?

**A    No.  It's actually very common.**

Q    Okay.  So for that second line down, there's -- what's the date of that crossing?

**A    Can you repeat your question?  Sorry.**

Q    Sure.  For the second entry on this -- on this page, what is the date of the encounter?

**A    The date on the second entry is going to be March 11, 2024.**

Q    What's the time listed?

**A    The time listed there is 10:44 Eastern Time.  So that'd be about -- approximately about 7:44 our time.**

Q    And what type of crossing was this?

**A    That was an inbound crossing.**

Q    And was this in a vehicle or on -- a pedestrian?

**A    This was a pedestrian entry.**

Q    What -- for a pedestrian crossing, what -- how was that time indicated?  I know you said for a vehicle, it's when they get to the Primary.  But what about a pedestrian?

**A    For a pedestrian it's the same nationwide.  It's just on Eastern Time, yeah, to keep it uniform.**

Q    So let me be clear.  How -- at what point is that time recorded?

**A    At the time of inspection.  When he -- that document is slide or inputted into the system, that's when that record is created.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 263 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1136   Page 156 of 207

CORRALES | DIRECT | FAWCETT                    156

**Q**   So we've talked about and seen the vehicle inspection process a little bit.

        But how does the pedestrian inspection process work at the San Ysidro Port of Entry?

**A**   Okay.  So at the San Ysidro Port of Entry as you come in, you're walking.  So there's no license plate reader; there's no data that -- or RFID that captures your information.  You simply come up to the inspection booth.  You provide your document or your immigration document you might have.  You give that to the officer.  The officer takes that document, slides it either in the system or inputs it manually, or you give them the information you have.  Once that record is created, that's the time that's captured.  That's the time stamp as an encountered time.

**Q**   And during the inspection process for a pedestrian inspection, does this include -- what is -- what all is involved in this inspection?

**A**   It's a variety of things.  It could be a customs inspection, immigration inspection, agriculture inspection, or anything to do with child pornography.  There's many, many violations that we look for, not just customs and immigration.

**Q**   Do you -- is there -- are there any searches of belongings that's done at this point?

**A**   It could be, yes.

**Q**   Does luggage ever get searched at the point of a pedestrian

inspection?

A    Yes, luggage do [sic] get searched on pedestrian -- on Primary inspection.

Q    Is that a common occurrence?

A    It's quite common, yes, I could say.

Q    I'm going to show you what's been previously marked as Government's Exhibit 51.

Are you familiar with this photograph?

A    Yes, I am familiar with this photograph.

Q    What is this photograph depicting?

A    This is depicting on the outbound inspection from March 11, 2024.

Q    Now, you mentioned earlier that outbound inspections are done by an automated license plate reader; is that correct?

A    That is correct, yes.

Q    So for this particular photograph, did a human being take this photograph?  Or was this taken by an automated system?

A    This is taken by an automated system.

Q    Are you familiar with the system that takes and stores these photographs?

A    Correct.  Yes, I am.

Q    Are you familiar with the procedure in Department of Homeland Security for requesting those photographs?

A    Yes, I am.

Q    And does the system that record -- that takes those

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 265 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1138    Page 158 of 207

CORRALES | DIRECT | FAWCETT                                    158

photograph record the date and time that those photographs are taken?

A    That's correct, yes.

Q    And is this -- did you request this particular photograph or a record of this particular crossing in the course of your investigation in this case?

A    Yes, I did.  I asked for a request of this.

Q    Is the photo that's being depicted before you on that screen a true and accurate representation of the image that you received from Department of Homeland Security showing an outbound crossing related to this case?

A    Yes.

Q    And what was the date and time of that crossing?

A    The date and time of this crossing was March 11, 2024, at approximately 12:37 a.m.

Q    Is that Pacific Time?

A    Correct.

Q    Okay.

        MR. FAWCETT:  Your Honor, at this time we'll move to admit Government's Exhibit 51 into evidence.

        MR. BUGARIN:  No objection, Your Honor.

        THE COURT:  Okay.  It's admitted.  You may publish.

    (Government Exhibit 51 received into evidence.)

BY MR. FAWCETT:

Q    Are you able to see at least part of the license plate in

this photograph?

A    Yes, I have.

Q    And did you compare the license plate from this photograph with those of the crossing records that we looked at earlier in Government's 48?

A    Yes, I have.

Q    And do the license plate numbers match?

A    They do match, yes.

Q    Now, in this one, it's -- there's maybe -- it's a little unclear on the bottom, but can you read to the best of your knowledge or the best of your ability that license plate number?

A    Yeah, so the license plate was 8, "T" as in tango, "N" as in November, "E" as in echo, 791.

Q    Now, it kind of looks like to me like an "F" as the fourth digit in that license plate.

     Do you see what I'm saying?

A    I understand.  I see it.

Q    Did you look into that?

A    I did take that into account.  However, I verified both by visually looking at the vehicle and the time of the inspection. And our license reader read it as an "echo," and I confirmed it visually as well.

Q    So is this an issue with this particular image that cut off part of that?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 267 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1140   Page 160 of 207

CORRALES | DIRECT | FAWCETT        160

A    That's correct.  Depending maybe on the speed of the vehicle.  A lot of times, if you take a fast picture, it kind of glares.  It gives you a little ghost vision.  So that's probably what happened on this case.

Q    What was the license plate number in the system that records this photograph?

A    So the system recorded this license plate as "8, Tango, November, Echo, 791.

Q    Okay.  I'd like to bring Government's Exhibit 48 back up.

So the first line of this table here shows an entry of 3/11/24 at 8:26 Eastern Time.

A    Correct.

Q    The second one shows 3/11/24 at 3:37 -- is that also Eastern Time?

A    That's correct.

Q    Would that be 12:37 Pacific Time?

A    Can you repeat?  12:37, I thought you said "27."

Q    I might have.  My apologies.

A    Correct.  So the time is 12:37.  Sorry, I didn't hear you.

Q    Did you compare this entry, this outbound crossing with the photograph in Government's Exhibit 51?

A    Yes, I did.

Q    And is that photograph -- was that photograph taken at the time of this outbound crossing?

A    Correct.  It's a package.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 268 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1141    Page 161 of 207

CORRALES | DIRECT | FAWCETT

161

**Q**   I'm going to show you what's been previously marked as Government's Exhibit 52.

Have you seen this photograph before?

**A   Yes, I have.**

**Q**   Are you familiar with this -- the area where this photograph was taken?

**A   Yes, I am familiar.**

**Q**   Is this photograph a still image from a surveillance video?

**A   That is correct.**

**Q**   How are you familiar with what this photograph is depicting?

**A   I am familiar because I work at the San Ysidro Port of Entry.  I've done it for 12 years.  I daily see this most -- my whole career.  That is pedestrian, and I'm familiar with the layout.**

**Q**   And describe what this photograph is depicting?

**A   So this photograph is depicting a CBP officer inspecting a pedestrian -- in this case, a subject -- inspecting both luggage; a black bag and a red bag.**

**Q**   Now, are you familiar with the system that records video of -- in this location?

**A   Yes, I am.**

**Q**   Describe this particular location where this angle or this camera is pointed out?

**A   This angle is Pedestrian Primary.  So that's our inspection**

booths.  That's where you will present your document to our CBP officers.

Q   Are these surveillance recordings made as part of the normal operations of the Department of Homeland Security?

A   That's correct, yes.

Q   And did you retrieve the surveillance video that's being depicted in this photograph?

A   I requested this video, yes.

Q   And is this image an accurate depiction of one frame of that surveillance video?

A   That is correct.

Q   And on what date was surveillance video captured?

A   This date was March 11, 2024.

Q   And what time was that captured?

A   I believe it was captured at 7:44 a.m., our time.

Q   And what -- where would you have gotten that information of the date and time of the capture?

A   Date and capture [sic] was timestamped according to the video, and also crossing history.  So that's an approximate time.

Q   And is this image an accurate representation of what that surveillance video footage that you recovered depicted when you retrieved it?

A   That's correct, yes.

        MR. FAWCETT:  Your Honor, I move to Government's

Exhibit 52 into evidence.

MR. BUGARIN:  No objection.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 52 received into evidence.)

BY MR. FAWCETT:

Q   Do you recognize the person whose face you can see most clearly in this photo?

A   Yes, I do recognize him.

Q   Who is that person?

A   That's Mr. Melquides Posadas Palafox [sic].

Q   How do you recognize him?

A   I recognize him because I interviewed him myself, and I physically saw him.

Q   Okay.  And what does he appear to be holding in this hand or touching with his hand?

A   He's touching a red hard-shell bag.

Q   And do you see any other luggage in that image?

A   Yeah.  There's another luggage right in front of the CBP officer.  It's a black duffle bag or gym bag with a unique white stripe on the top with gray on the bottom.

Q   Going back to Government's Exhibit 40 -- I'm sorry. Government's Exhibit 50 -- going to the second page of that.

     Did you compare the date and time that that photograph was taken with Melquides Palafox Posadas's crossing history?

A   Yes, I did.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 271 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1144    Page 164 of 207

CORRALES | DIRECT | FAWCETT                              164

**Q**   Is there any correlation between any of those crossings and that -- that event or that photograph that we showed in the previous exhibit?

**A   Correct.  So the date and time corresponds, so they're similar -- not similar -- but pretty much accurate of that crossing.**

            *MR. FAWCETT:*  If I may have a moment, Your Honor?

      **(Government Counsel confers.)**

*BY MR. FAWCETT:*

**Q**   Sir, I'm going to show you what's been previously marked as "Government's Exhibit 69," and that's -- that's going to be in that binder -- the Government's Exhibit binder that's next to you.

        Okay.  What is that?

**A   That's a post-arrest interview clip.**

**Q**   So is that a disk that's in there with you?

**A   Correct.  That's a disk, yes.**

**Q**   Okay.  Now, did you conduct an interview with the defendant in this case, Miguel Rolon?

**A   Yes, I did.**

**Q**   What day did you interview him?

**A   I interviewed him on March 11th, 2024, the day of the event.**

**Q**   And when you interviewed him, before you -- at the beginning of the interview, did you ask some basic background

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 272 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1145   Page 165 of 207

CORRALES  |  DIRECT  |  FAWCETT                    165

questions?

**A    Correct.  I got some biographical information from him.**

Q    And did you advise him of his *Miranda* rights?

**A    That's correct.  I did give him his *Miranda* rights.**

Q    And did he agree to talk with you after that?

**A    That's correct.  He did agree.**

Q    The video that you -- or the disk that I just showed you there, you said that's clips from that interview; is that correct?

**A    That's correct, yes.**

Q    Have you reviewed the full interview of what happened that day?

**A    I did review.**

Q    Did you review that portion that's in Government's Exhibit 69?

**A    That is -- yeah, that's correct.  Yes, I did.**

Q    And is that a true and accurate representation of the -- well, I'm sorry.  I'm going to back up a moment.

Was that recorded interview recorded [sic]?

**A    Can you repeat your question one more time?  Sorry.**

Q    Was the interview with Mr. Rolon recorded?

**A    Correct.  It was video recorded and audio recorded as well.**

Q    Okay.  And are you familiar with the system that records those interviews?

**A    Yes, I'm very familiar.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 273 of 298
Case 3:24-cr-00684-LL    Document 158    Filed 08/25/25    PageID.1146    Page 166 of 207

CORRALES | DIRECT | FAWCETT

166

**Q**   Do you have to toggle something to activate that recording?

**A**   **You do.  You have to go and activate it for it to be recorded.**

**Q**   So is the -- the contents of that Government's 69, is that a portion of that interview?

**A**   **Correct.  It is a portion of the interview.**

**Q**   All right.  And there are -- I'm going to --

*MR. FAWCETT:*  At this time, Your Honor, I would move to admit Government's Exhibit 69, subject to the redactions that have been agreed upon earlier.

*THE COURT:*  Any objection?

*MR. BUGARIN:*  No objections, Your Honor.

*THE COURT:*  All right.  You may admit it.

**(Government Exhibit 69 received into evidence.)**

*MR. FAWCETT:*  All right.

*BY MR. FAWCETT:*

**Q**   All right.  So about how long was that whole interview?

**A**   **The whole interview was, approximately, about 53 minutes.**

**Q**   Okay.  And so we're cutting down a portion of that, so it's going to be less than that?

**A**   **Correct.**

*THE COURT:*  And before -- my apologies.  It has not been published, right?

*MR. FAWCETT:*  It has not.

*THE COURT:*  I would like to speak to Counsel sidebar

before we publish.  You may proceed with your questioning.

MR. FAWCETT:  Your Honor, I think that was it before I move to publish.

THE COURT:  All right.  Sidebar, thank you.  Stand up and stretch.

**(The following proceedings were heard at the sidebar.)**

THE COURT:  I just want to make sure that all the redactions are in there.

MR. FAWCETT:  If we -- it's a good time for a break, it may be a good time to look.  They -- I gave them the notes to go off of.  I haven't, obviously, had a chance to review it, because it just came in a few minutes ago.

THE COURT:  I think it's a good time for a break.

MR. GARRISON:  That's good.

THE COURT:  Thank you.

**(End of sidebar; proceedings heard in presence of the jury.)**

THE COURT:  I was just trying to get a status of where we were.  Because I don't want to start playing a video and then interrupt it for an afternoon break.  So this is a great time for our afternoon break.  It's 2:43.  Let's be back here at 2:55 and we will continue with testimony.

Sir, you're still under oath.

We'll see you all back here in 10, 11, 12 minutes roughly.  Thank you.

**(A recess was taken from 2:43 p.m. to 2:56 p.m.)**

(Proceedings heard outside the presence of the jury.)

THE COURT:  All right.  We're back on the record.
Everyone was able to review the transcript and video?

MR. FAWCETT:  Your Honor, we're going over it right now.

THE COURT:  I'm sorry?

MR. FAWCETT:  We're going over it right now.

THE COURT:  Okay.  You need another couple of minutes?

MR. GARRISON:  Sure, Your Honor.

THE COURT:  All right.  Perfect.  Thank you.  And I don't want to leave them waiting, so be as efficient as you can.  But I want to make sure it's accurate.

MR. FAWCETT:  Yes, Your Honor.  We're doing our best.

THE COURT:  Perfect.  Thank you.

(A recess was taken from 2:56 p.m. to 3:09 p.m.)

(Proceedings heard in the presence of the jury.)

THE COURT:  You may be seated, Counsel.

All right.  Welcome back, everyone.  By a show of hands, did anyone discuss anything about this case with each other, with anyone else, do any research, or anything regarding this case?  Thank you.  Seeing no hands.

And my apologies, we went a little over.  We wanted to make sure that the video would be ready to play instead of having you come in and wasting your time.

Counsel, you may proceed.

**SER-275**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 276 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1149    Page 169 of 207

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN        169

MR. FAWCETT:  Thank you, Your Honor.

BY MR. FAWCETT:

Q    Just to backtrack a question here.

Government's Exhibit 69, was that the portion of the post-arrest statement or the -- the interview that you conducted with Mr. Rolon?

A    That's correct.

MR. FAWCETT:  Your Honor, I would move to publish at this time.

MR. BUGARIN:  No objections, Your Honor.

THE COURT:  All right.  Thank you.  You may publish it.

(Video played in open court.)

MR. FAWCETT:  No further questions, Your Honor.

THE COURT:  Thank you.

Cross-examination?

MR. BUGARIN:  Can we set up?

THE COURT:  Whatever you need.

CROSS-EXAMINATION

BY MR. BUGARIN:

Q    Good afternoon, Officer Corrales.

A    Good afternoon, sir.

Q    Officer Corrales, you testified that you had been in Customs and Border Protection for about 15 years, 16 years or so right?

A    That is incorrect.

Q    Since 2008 -- my apologies -- is that right?

A    I've been for CBP, Customs and Border Protection for, approximately, 12 years.

Q    Okay.  Officer Corrales, through your investigation, you became familiar with the car used in this case; is that right?

A    That is correct.

Q    That was a 2004 Honda Civic?

A    Correct.  That was a 2004 Honda Civic.

Q    It had a California license plate?

A    That is correct.

Q    One moment.  I'm sorry about this.

A    No problem.

        MR. BUGARIN:  Ms. Smith, are we able to pull up Government's Exhibit 48?

BY MR. BUGARIN:

Q    This is the crossing history for that car; isn't that correct?

A    That is correct, yes.

        MR. BUGARIN:  I move to publish it, Your Honor.  I think it's already been introduced into evidence.

        THE COURT:  I'm sorry?

        MR. BUGARIN:  It's published, Your Honor.  I apologize.

        THE COURT:  Yes, you may.  It's been admitted.  So

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 278 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1151   Page 171 of 207

CORRALES   |   CROSS-EXAMINATION   |   BUGARIN          171

feel free.  Anything that's admitted, you publish.  You have permission.

      *MR. BUGARIN:*  Thank you, Your Honor.

      *THE COURT:*  You're welcome.

*BY MR. BUGARIN:*

Q    And that license plate as you mentioned was 8T --

    **(Court Reporter clarification.)**

*BY MR. BUGARIN:*

Q    8TNE791.

A    **That's correct.**

Q    Okay.  And as part of your investigation, you reviewed the registration of this vehicle?

A    **That's correct.**

Q    And as part of a typical investigation, you reviewed documents in a car that's been seized?

A    **That's correct.**

Q    Including the car's registration?

A    **If it's available, yes.**

Q    Okay.  If it's available, then you review the car's registration?  If the car registration is in the car, you review it?

A    **Correct.  We have also systems that could run it by license plate.**

Q    Okay.  So you have multiple ways that you can review the car's registration?

A    That's correct, yes.

Q    Okay.  In the course of your investigation, I'm sorry -- strike that --

A    What was that?

Q    Strike that from the record.  I apologize.  Withdraw that question.

And you may run that person's name from that registration in a database to get information about that person?

A    I'm sorry.  Can you repeat that question?

Q    So we're talking about a car registration, right, that's seized from this -- from any case at the border that you're investigating?

A    The registration document itself?

Q    Yes.  So that registration, it has the owner of the car on that registration; isn't that right?

A    That's correct.  It does have the name listed.

Q    Okay.  So then you would run that -- the owner of the car's registration -- their name.  You would run their name into a database to get information about that person?

A    That is inaccurate.

Q    Do you follow up on -- with the owner of a car from those registrations?

A    If it's relevant to our case, we will follow up with that.

Q    Okay.  So I want to -- you've reviewed the registration in

this car?  In this -- I'm sorry -- you reviewed the registration in this case for this car that was used?

**A    Can you repeat the question?**

Q    Did you review -- you reviewed the registration for this car, the 2004 Honda Civic?  You reviewed that registration; isn't that correct?

**A    Correct.  I did, yes.**

Q    Okay.  I'm showing you what's been marked for identification as Defense's -- not for publishing -- as "Defense Exhibit E4."  Do you recognize this?

**A    Yes, I do.**

Q    Is this the registration that was used that -- for that car in this case?

**A    Correct.  That is the registration that was on that vehicle, yes.**

Q    And that copy was found in that car that day?

**A    That is correct, yes.**

Q    So is this a true and accurate representation of the registration that was found that day?

**A    Yes.  It is, sir.  Yes.**

**MR. BUGARIN:**  Your Honor, at this time I'd move to admit and publish to the jury.

**MR. FAWCETT:**  No objection, Your Honor.

**THE COURT:**  All right.  It is admitted.  You may publish.

(Defense Exhibit E4 received into evidence.)

BY MR. BUGARIN:

Q   So this registration, it's a California registration; isn't that right?

A   That is correct.

Q   Okay.  And that registration shows the registered owners of that vehicle?

A   That is correct, yes.

Q   And it's not registered to Mr. Rolon?

A   It's not, no.

Q   One of the registered owners is "Yenifer Posadas Robledo"?

A   Correct.

Q   And she shares the name "Posadas" with Mr. Posadas in this case?

A   They have the same last name, yes.

Q   And you didn't speak to her regarding this case?

A   Correct.  I have no way of talking to her.  She wasn't present.

Q   You didn't call her?

A   I don't have a phone number for her.

Q   You didn't interview her?

A   Correct.  She wasn't available.

Q   Okay.

(Defense Counsel confers.)

///

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 282 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1155    Page 175 of 207

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN    175

*BY MR. BUGARIN:*

Q   So Officer Corrales, it's true that you would be able to get her information by running her name in a database?

A   **By "information," what are you referring to?**

Q   In term of addresses, maybe a rap sheet; something like that?

A   **Correct.  Yes.**

Q   Okay.  But you didn't do that in this case?

A   **I ran it and it didn't seem relevant to the case.  So I didn't pursue it.  I didn't want to go down a rabbit hole.**

Q   Did you write a report about it?

A   **No, I did not.  Not relevant to the case.**

**(Defense Counsel confers.)**

*BY MR. BUGARIN:*

Q   Okay.  So you said, "It wasn't relevant to the case"?

A   **Correct.  Based on investigation and crossing history, it was not determined to be relevant to this case.**

Q   That's based on your belief?

A   **That's based on my investigation, correct.**

*MR. BUGARIN:*  All right.  We can take this down, Ms. Smith.

*BY MR. BUGARIN:*

Q   All right.  Officer Corrales, you know that Mr. Posadas was detained in 2006 for alien smuggling?

A   **That is correct, yes.**

**Q**   And you're familiar with the report in discovery for this case outlining that event?

**A**   Correct.  I presented this, yeah.

**Q**   And you recall, as I mentioned, that Mr. Posadas was involved in that incident?

**A**   I believe he was one of the passengers in that incident, yes.

**Q**   Okay.  Another person involved was Mr. Posadas's wife?

**A**   That's correct, yes.

**Q**   Officer Corrales, I want to show you what's been premarked as "Defense Exhibit E5."

        **THE COURT:**  This is for the witness only?

        **MR. BUGARIN:**  For the witness only.

        **THE COURT:**  Okay.

**BY MR. BUGARIN:**

**Q**   Officer Corrales, have you seen this before?

**A**   Yes, I have.

**Q**   And that's the 2006 event we just spoke about?

**A**   That is correct.  Yes, sir.

**Q**   Okay.  And, this is a true and accurate representation of the report of this event?

**A**   I didn't create this report, but based -- this is a report that I reviewed, yes.

        **MR. BUGARIN:**  Okay.  At this time, Your Honor, I'd move to publish it to the jury.

**MR. FAWCETT:** Objection, Your Honor. This report is hearsay.

**MR. BUGARIN:** Your Honor, this is a party opponent statement.

**MR. FAWCETT:** Your Honor, this is a -- we don't know anything about the creation of this report beyond the fact that Mr. Corrales did not do it. It was just a report he received. They have not established -- the authenticity nor an exception to hearsay.

**THE COURT:** Thank you, Counsel.

Mr. Corrales, is this a report that's kept in the normal course of business where reports are kept for investigations conducted by U.S. Department of Homeland Security?

**THE WITNESS:** Correct. This is a report of investigation, ma'am, yes.

**THE COURT:** All right. And you obtained this report by searching the databases for U.S. Department of Homeland Security?

**THE WITNESS:** That is correct, I --

**THE COURT:** All right. I'm going to admit it over the Government objection. It comes in.

    **(Defense Exhibit E5 received into evidence.)**

**MR. BUGARIN:** Can we publish to the jury?

**THE COURT:** Yes, you may.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 285 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1158    Page 178 of 178

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN    178
207

MR. BUGARIN:  Thank you, Your Honor.

BY MR. BUGARIN:

Q   Okay.  So I want to zoom in on this -- on this middle part after where it says "alien smuggling case," on the first three lines where it says "alien smuggler."

Okay.  Mr. Corrales, you've reviewed this before?

A   I've seen it, correct.  Yes.

Q   Okay.  And this first name it says "Maria,"

"Maria Uitz Ek"? [phonetic]

A   That is correct.  Yes.

Q   That's Mr. Posadas's wife; isn't that right?

A   That is correct, yes.

Q   Okay.

MR. BUGARIN:  Can we zoom out?  I want to zoom into that next portion.  Oh, sorry.  Where it says the alien smuggler heading, the next couple of lines.

BY MR. BUGARIN:

Q   Okay.  Officer Corrales.  Right here, it names Mr. Posadas as one of the co-smugglers in this 2006 event; isn't that right?

A   According to this record, yes.

MR. BUGARIN:  Okay.  Zoom out.  I believe there's a second page on this exhibit.  Okay.  Can we zoom into that second paragraph at the very bottom?  Like, towards the bottom of the page.  Second to the last paragraph.

*BY MR. BUGARIN:*

Q   Okay.  Officer Corrales, right here in this report from 2006, it says that, "Maria" -- so Mr. Posadas's wife -- "admitted that she provided her birth certificate to be used for alien smuggling," isn't that right?

A   **That -- according to the statement, yes.  That's accurate.**

Q   That's what this statement says?

A   **That is correct.  Yes, sir.**

Q   Prepared by Homeland Security?

A   **Prepared by an officer by Homeland Security, yes.**

Q   Yes.  Thank you for the clarification.  Okay.

    *MR. BUGARIN:*  Can we zoom out?

*BY MR. BUGARIN:*

Q   So from this report it says that Mr. Posadas and his wife used their daughter's birth certificate to try to bring someone into the United States?

A   **Correct.**

Q   And that was back in 2006?

A   **That is correct.  Yes, sir.**

Q   And Mr. Posadas was considered a co-smuggler in that incident?

A   **According to this record, I'm not sure how they determined that, but yes.**

Q   All right.  Mr. Corrales, you discovered as part of your investigation that one of the material witnesses,

Zulemy Raquec-Mucia, had been in contact with Mr. Posadas?

A   That is correct, yes.

Q   Okay.  And this was well before they attempted to cross into the U.S.?

A   Correct.

Q   Okay.  And you reviewed the material witnesses' cell phones as part your investigation.

A   Correct.  I did a review of the whole entire case, yes.

Q   So you know Ms. Raquec-Mucia was in contact with Mr. Posadas as early of.

(Court Reporter clarification.)

BY MR. BUGARIN:

Q   February 2, 2024.

A   I don't remember the exact date.  But, yes, I know they were in contact early in the year.

Q   Okay.  In fact, the material witnesses met with Mr. Posadas in Guatemala?

A   That is correct, yes.

Q   Okay.  This is well -- this is before they crossed -- they made their trip north?

A   Correct.  That was prearranged.

Q   Okay.  And the material witnesses crossed into Guatemalas -- sorry -- crossed from Guatemala to Mexico with Mr. Posadas?

A   I'm not sure if -- if they crossed or Mr. Posadas picked

them up.  I'm not sure about that.  But I know that they eventually joined in Mexico.

Q   Okay.  But you just mentioned that he did meet with the material witnesses in Guatemala?

A   As I stated -- no, that's inaccurate.  I said they -- I know they were joined in Mexico, yes.

Q   I believe in your last answer you said that they had met with Mr. Posadas in Guatemala?

A   That is inaccurate.

Q   Okay.  So on this trip north with the material witnesses and Mr. Posadas, they were accompanied by his wife?

A   That's correct, yes.

Q   Okay.  That's the same woman who was in that 2006 smuggling event?

A   Correct.  Yes.

Q   Okay.  And you know that Ms. Raquec was instructed to deposit money into a bank account?

    MR. FAWCETT:  Your Honor, at this point I would object to this line of questioning.  This is all hearsay.  This is not something -- this is not offered as personal knowledge of, but got through other witnesses.

    THE COURT:  I'm going to sustain it, Counsel.

BY MR. BUGARIN:

Q   Okay.  So you know Mr. Posadas gave the material witnesses false IDs?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 289 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1162    Page 182 of

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN    Page 182 of

207

182

A    Correct.

Q    They were Mexican IDs?

A    Yes.

Q    And you saw those IDs as part of your investigation?

A    That's correct.  Yes, I did.

Q    And you know as part of your investigation that the material witnesses provided photos for the fabrication of these fake IDs?

A    Correct.  They provided photos.

Q    As instructed by Mr. Posadas?

A    That's -- there was no instructions, but I know there was messages as to the photos.  They were -- never said "Send me a picture," I didn't recall seeing that.

Q    Ultimately, the photos ended up in Mr. Posadas's possession?

A    That is correct, yes.

Q    Okay.  And Mr. Posadas and his wife traveled with the material witnesses in Mexico to Tijuana?

A    Correct.

Q    Okay.  And the material witnesses waited in Tijuana for over two weeks before they attempted to cross on March 11th?

A    According to their statements, yes.

Q    So Mr. Corrales -- like you said -- you reviewed the material witnesses' phones in this case?

A    Correct.  I reviewed all of the phones.

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 290 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1163    Page 183 of

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN    183
207

**Q**   Including Mr. Rolon's?

**A   All of the phones, sir, yes.**

**Q**   Okay.  So there are no text messages between Ms. Raquec-Mucia and Mr. Rolon?

**A   Excuse me?**

**Q**   There are no text messages between Ms. Raquec-Mucia and Mr. Rolon?

**A   Based on my time and experience, that usually never happens.**

**Q**   Okay.  That's not my question.

**A   Okay.  Can you repeat your question, please?**

**Q**   There are no text messages between Mr. Rolon and Ms. Raquec-Mucia; "yes" or "no"?

**A   That's correct.  That's no text messages.**

**Q**   There are no text messages between Mr. Ixan and Mr. Rolon?

**A   Mr. Marroquin and Mr. Rolon, there's no text messages.**

**Q**   Okay.  You didn't see any calls between them?

**A   No.**

**Q**   Officer Corrales -- oh, well.  Excuse me --  Officer Corrales, through your investigation, you learned about Mr. Posadas?

**A   That is correct, yes.**

**Q**   And you knew about his identity on the night of the arrest?

**A   I discovered his identity, yeah, during my investigation that night.  Yes.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 291 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1164   Page 184 of 207

CORRALES   |   CROSS-EXAMINATION   |   BUGARIN        184

**Q**   Okay.  And Mr. Posadas as we saw from the Government's Exhibit, he entered the United States from Mexico on that night -- or that early morning?  I apologize.

**A**   **That morning, yes, before I were to discover his identity.**

**Q**   It was through the Pedestrian lanes?

**A**   **That is correct, yes.**

**Q**   And he crossed with both material witnesses' bags into the United States?

**A**   **That's correct, yes.**

**Q**   And as we saw, it was captured on camera?

**A**   **That is correct, yes.**

**Q**   And Mr. Posadas was not arrested that morning?

**A**   **As stated previously, I wasn't aware of his identification or knowledge.**

**Q**   Officer Corrales, I just need a "yes" or a "no."

**A**   **Sorry.  Are you -- I didn't ask for if it was a "yes" or "no."  What was your question, again?**

**Q**   Mr. Posadas was not arrested on that morning?

**A**   **No, he was not.**

**Q**   Okay.  In fact, he was admitted into the United States?

**A**   **That's correct.  Yes, he was.**

**Q**   And you know that Mr. Posadas was in that Honda Civic that morning?

**A**   **I found out after he crossed into the United States.**

**Q**   That's a "yes"?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 292 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1165   Page 185 of 185

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN        185

**A    Correct.**

**Q**    Okay.  And this was before he had presented himself at the Pedestrian lane?

**A    I didn't have knowledge of that.**

**Q**    That's not what I asked you.

This was before he presented himself at the Pedestrian lane; is that a "yes" or a "no"?

**A    I don't recall what time I discovered that he was in the vehicle.**

**Q**    I asked you if he was in the car --

***MR. FAWCETT:***  Objection, Your Honor.  The defendant is already -- I'm sorry, the defendant -- the witness has already said that he does not know the answer to that.

***MR. BUGARIN:***  Your Honor, he didn't really answer my question.

***THE COURT:***  One moment.

I don't think the witness has actually said that he doesn't know.  I think the witness is providing explanatory responses as opposed to responding to a, direct question.

So Counsel, if you could just rephrase your question and we'll try to get a response and move on.

**(Defense Counsel confers.)**

*BY MR. BUGARIN:*

**Q**    So Mr. Posadas was in the car that morning?

**A    Correct.  He was in the car that morning.**

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 293 of 298
Case 3:24-cr-00684-L1    Document 158    Filed 08/25/25    PageID.1166    Page 186 of 207

CORRALES    |    CROSS-EXAMINATION    |    BUGARIN    186

Q    At some point he got out of that car?

A    **That's correct.**

Q    He showed up to Pedestrian lane?

A    **Excuse me?**

Q    He showed up to the Pedestrian lane?

A    **Correct.  Yes, he did.**

Q    This was after he had been in that car?

A    **Correct.  Yes.**

Q    Okay.  From your investigation, you discovered an image depicting him driving that car that morning?

A    **That's correct.**

Q    And that picture was taken by one of the material witnesses?

A    **That is correct.**

Q    I want to show you what's been marked for identification as "Defense Exhibit E7" -- just for the witness.

        Officer Corrales, you're familiar with this picture, right?

A    **Yes, sir.**

Q    Okay.  And is this a true and accurate representation -- I'm sorry -- what is this picture?

A    **This picture, it was of -- inside of a vehicle of Mr. Melquides Posadas.**

Q    Okay.  You recognize this person in that car as -- in that picture as Mr. Posadas, right?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 294 of 298
Case 3:24-cr-00684-LL   Document 158   Filed 08/25/25   PageID.1167   Page 187 of 207

CORRALES   |   CROSS-EXAMINATION   |   BUGARIN        187

A    That's correct, yes.

Q    Okay.  And is it a true and accurate representation of the image taken from one of the material witnesses' phones?

A    That's correct, yes.

        MR. BUGARIN:  At this time, Your Honor, I'd move to admit.

        MR. FAWCETT:  No objection, Your Honor.

        THE COURT:  Admitted.  You may publish.

    (Defense Exhibit E7 received into evidence.)

BY MR. BUGARIN:

Q    Okay.  Officer Corrales, so this is Mel Posadas driving the car on that morning?

A    That is correct, sir, yes.

Q    Okay.  That's the Honda Civic, right?  2004, I believe?

A    The inside of the vehicle appears to be the vehicle that Defendant was driving that morning.

Q    So that's a "yes"?

A    That's correct, a "yes."

Q    Okay.  And this vehicle belonged to a Yenifer Posadas?

A    According to the register -- it was registered to her.  I'm not sure who it belonged to.

Q    It was registered to a Yenifer Posadas.

A    That is correct, yes.

Q    Thank you.  And as you just testified to, he eventually left that car?

A    That is correct, yes.

Q    Okay.  And he crossed into the United States?

A    Correct.  Yes, he did.

Q    Okay.  Officer Corrales, you looked into the biographical information for both defendants in this case?

A    Correct.  Yes.

Q    Including their ages?

A    Correct.

Q    Their addresses?

A    Correct.

Q    And through your investigation, you discovered Mr. Posadas's residence?

A    Correct.

Q    And Mr. Posadas resides in San Bernardino, California?

A    That's correct.

Q    Okay.  Officer Corrales, you reviewed the Primary inspection port video as part of your investigation?

A    For who?

Q    The primary video of the 2004 Honda Civic?

A    Correct.  I did review it from March 11th.  Is that what --

Q    That's correct.

A    Yes, I did.  Yes.

Q    Okay.  And you remember that in Primary inspection Mr. Rolon said that he was heading home?

A    That's correct, sir.

Q    To San Bernardino?

A    Correct.

Q    Okay.  And then you remember Officer Presas asked the passengers in the back seat where they went to school -- or the passenger in the back seat where he went to school?

A    Correct.

Q    And the response was "Arroyo"?

A    I'm not sure if they were able to respond.  I think the defendant responded for him.

Q    You remember Mr. Rolon saying "Arroyo," right?

A    Correct.

Q    Okay.  And through your investigation you discovered that Arroyo is a high school in San Bernardino?

A    Correct.

Q    Okay.  And that's the same city where Mr. Posadas resides; isn't that right?

A    I'm not sure where he resides.  I know where the last address -- known address --

Q    His last known address was in San Bernardino?

A    That's correct.

Q    Okay.

        MR. BUGARIN:  If I can just have one moment?

        THE COURT:  Of course.

    (Defense Counsel confers.)

///

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 297 of 298
Case 3:24-cr-00684-L1 Document 158 Filed 08/25/25 PageID.1170 Page 190 of 207

CORRALES | CROSS-EXAMINATION | BUGARIN 190

*BY MR. BUGARIN:*

**Q** Officer Corrales, you testified on direct that you reviewed Mr. Rolon's crossing history?

**A That's correct.**

**Q** Okay. And you pulled his history, personally? You pulled the TECS for Mr. Rolon, personally? You generated that report?

**A Correct.**

**Q** Okay. I just want to pull up Government's Exhibit 49. Okay. I believe this was introduced into evidence as well. All right. Officer Corrales, so you remember this report?

**A I do, yes.**

**Q** That's Mr. Rolon's crossing history; isn't that right?

**A That's correct.**

**Q** Okay. So towards the right hand of this report it says the type of crossing, right, whether it's vehicle or pedestrian?

**A Where it says "type?"**

**Q** Yes.

**A That's correct.**

**Q** And there are five total recorded crossings for Mr. Rolon on this report; isn't that right?

**A That's correct.**

**Q** Okay. And of those five, there are four vehicle crossings?

**A That is correct.**

**Q** Okay. So on the second to last column, there's a thing that says "customs" and "not referred," do you see that?

Case: 25-4322, 05/04/2026, DktEntry: 23.2, Page 298 of 298
Case 3:24-cr-00684-L1   Document 158   Filed 08/25/25   PageID.1171   Page 191 of 207

CORRALES   |   CROSS-EXAMINATION   |   BUGARIN                191

A    Second to the last column?

Q    Second -- towards the right-hand side.

A    I see "customs" and then on bottom of that, "not referred."

Q    So this -- going vertically?

A    Okay.  Yes, sir.  I apologize.  Yes, I do see that.

Q    No, it's fine.  Okay.

So there's a few that say "custom," a few that say "not referred," right?

A    That is correct.

Q    All right.  So of the four vehicle crossings that Mr. Rolon has, three of them say "customs" on it; isn't that right?

A    That is correct.

Q    Okay.  And so when it says "customs," that means someone was referred to Secondary Inspection; isn't that right?

A    Correct.

Q    Okay.  So first we have Primary inspection?

A    Correct.

Q    Then there's Secondary Inspection?

A    That's correct.

Q    Secondary Inspection is if -- there's a greater degree of scrutiny at Secondary Inspection?

A    That's accurate.

Q    Okay.  So of those four vehicle crossings, Mr. Rolon was referred to Secondary Inspection three times?

A    Within the last two years, yes.  He was referred three